

1   **William K. Hanagami, SBN 119832**
    **THE HANAGAMI LAW FIRM**
2   **A PROFESSIONAL CORPORATION**
    **21700 OXNARD STREET, SUITE 1150**
3   **WOODLAND HILLS, CA 91367-7572**
    **(818) 716-8570 / (818) 716-8569** *FAX*
4   **BillHanagami@esquire.la**

5   **Abram J. Zinberg, SBN 143399**
    **THE ZINBERG LAW FIRM**
6   **A PROFESSIONAL CORPORATION**
    **412 OLIVE AVENUE, SUITE 528**
7   **HUNTINGTON BEACH, CA 92648-5142**
    **(714) 374-9802 / (714) 969-0910** *FAX*
8   **AbramZinberg@gmail.com**

9   Attorneys for Plaintiff and <u>Qui</u> <u>Tam</u> Relator,
    Anita Silingo

10

              UNITED STATES DISTRICT COURT

11

              CENTRAL DISTRICT OF CALIFORNIA

12

13   UNITED STATES OF AMERICA, *ex rel.*     CASE NO. CV13- 1348

    ANITA SILINGO,

14

            Plaintiffs,

15

    vs.

16

    MOBILE MEDICAL EXAMINATION

17   SERVICES, INC., a California corporation;
    MEDXM, a business entity, form unknown;

18   WELLPOINT, INC., an Indiana corporation;
    ANTHEM BLUE CROSS AND BLUE

19   SHIELD, business entity, form unknown;
    HEALTH NET, INC., a Delaware corporation;

20   HEALTH NET OF CALIFORNIA, INC., a
    California corporation;  HEALTH NET LIFE

21   INSURANCE COMPANY, a California
    corporation; VISITING NURSE SERVICE OF

22   NEW YORK, a New York corporation;
    VISITING NURSE SERVICE CHOICE,

23   business organization, form unknown;
    MOLINA HEALTHCARE, INC., a Delaware

24   corporation; MOLINA HEALTHCARE OF
    CALIFORNIA, a California corporation;

25   MOLINA HEALTHCARE SERVICES, a
    California corporation; MOLINA HEALTH-

26   CARE OF CALIFORNIA PARTNER PLAN,
    INC., a California corporation; ALAMEDA

27   ALLIANCE FOR HEALTH, a business
    organization, form unknown,

28

            Defendants.

COMPLAINT FOR VIOLATIONS
OF THE FEDERAL FALSE
CLAIMS ACT, AND CALIFORNIA
LABOR CODE SECTIONS 201, ET
SEQ.:  REQUEST FOR JURY
TRIAL

**[UNDER SEAL** PER 31 U.S.C. §
3730(b)(2)]

COMES NOW, Plaintiff and Qui Tam Relator Anita Silingo, individually and on behalf of the United States of America, and alleges as follows:

JURISDICTION AND VENUE

1.     Plaintiff and Qui Tam Relator Anita Silingo (Relator) files this action on behalf and in the name of the United States Government (Government) seeking damages and civil penalties against the defendants for violations of 31 U.S.C. § 3729(a).  Relator also files this action on her own behalf seeking damages and other remedies against certain defendants for violations of 31 U.S.C. §3730(h) and *California Labor Code* §§ 201, et seq.

2.     This Court's jurisdiction over the claims for violations of 31 U.S.C. §§ 3729(a) and 3730(h) is based upon 31 U.S.C. § 3732(a).  The Court's jurisdiction over the claims for violations of *California Labor Code* §§ 201, et seq. is based upon 28 U.S.C. § 1367(a).

3.     Venue is vested in this Court under 31 U.S.C. § 3732(a) because at least one of the defendants transacts business in the Central District of California and many acts constituting violations of 31 U.S.C. § 3729(a) occurred in the Central District of California. Venue is also vested in this Court under 28 U.S.C. § 1391(b) because at least one of the defendants transacts business in the Central District of California and many acts constituting violations of 31 U.S.C. § 3730(h) occurred in the Central District of California.

THE PARTIES

4.     Relator is a citizen of the United States and a resident of the State of California. Relator brings this action of behalf of the Government under 31 U.S.C. § 3730(b), and on her own behalf under 31 U.S.C. § 3730(h).

5.     At all times relevant, the Government funded the Medicare program which provides payment of healthcare services for, among others, those 65 years or older.  The Government provided a Medicare option known as Medicare Advantage, previously known as Medicare+Choice, in which eligible Medicare beneficiaries can enroll with a managed care organization or health maintenance organization (collectively, "HMO") contracted with the Government for a capitated rate paid by the Government that would provide at least those services provided to standard Medicare beneficiaries.

-2-

6.     At all times relevant, defendant Mobile Medical Examination Services, Inc. is and was a corporation formed under the laws of the State of California, and transacted business in, among other places, the Central District of California.  At all times relevant, defendant MEDXM is a business entity, form unknown,  and transacted business in, among other places, the Central District of California.  All defendants referenced in this paragraph are collectively referred to in this Complaint as "MedXM."

7.     At all times relevant, MedXM contracted with various Medicare Advantage HMOs and health plans, including but not limited to the other defendants in this action, to perform physical medical examinations of such HMOs' Medicare Advantage patients at their residence for purposes of documenting HCC risk scores.  In turn, MedXM retained physicians, nurse practitioners and physician assistants as independent contractors to perform such physical medical examinations.

8.     At all times relevant, defendant Wellpoint, Inc. is and was a corporation formed under the laws of the State of Indiana, and transacted business in, among other places, the Central District of California.  At all times relevant, defendant Anthem Blue Cross and Blue Shield is and was a business entity, form unknown,  and transacted business in, among other places, the Central District of California.   All defendants referenced in this paragraph are collectively referred to in this Complaint as "Wellpoint."

9.     At all times relevant, defendant Health Net, Inc. is and was a corporation formed under the laws of the State of Delaware, and transacted business in, among other places, the Central District of California.  At all times relevant, defendants Health Net of California, Inc. and Health Net Life Insurance Company are and were corporations formed under the laws of the State of California, and transacted business in, among other places, the Central District of California.  All defendants referenced in this paragraph are collectively referred to in this Complaint as "Health Net."

10.     At all times relevant, defendant Visiting Nurse Service of New York is and was a corporation formed under the laws of the State of New York.  At all times relevant Visiting Nurse Service Choice is and was a business organization, form unknown.   All defendants

-3-

referenced in this paragraph are collectively referred to in this Complaint as "VNS."

11.     At all times relevant, Molina Healthcare, Inc. is and was a corporation formed under the laws of the State of Delaware, and transacted business in, among other places, the Central District of California. At all times relevant Molina Healthcare of California, Molina Healthcare Services, and Molina Healthcare of California Partner Plan, Inc. are and were California corporations, and transacted business in, among other places, the Central District of California. All defendants referenced in this paragraph are collectively referred to in this Complaint as "Molina."

12.     At all times relevant, defendant Alameda Alliance for Health (Alameda) is and was a business organization, form unknown.

13.     At all times relevant, Wellpoint, Health Net, VNS, Molina, and Alameda are and were managed care organizations that contracted with the Government as Medicare Advantage HMOs. The defendants referenced in this paragraph are collectively referred in this Complaint as "defendant Health Plans."

14.     Relator was employed with MedXM between August 2011 and June 2013, initially as an independent contractor, and then as an employee during and after January 2012. Relator held the position of Director of Provider Relations throughout her employment with MedXM. Relator was also MedXM's Compliance Officer from about late spring/early summer of 2012 until April 2013.

Risk Adjustment

15.     At all times relevant, Section 1853(a)(3) of the Social Security Act [42 U.S.C. § 1395w-23(a)(3)] required the Government's Centers for Medicare and Medicaid Services (CMS) to risk adjust payments to Medicare Advantage organizations, such as the defendant Health Plans. In general, the risk adjustment methodology relied on enrollee diagnoses, as specified by the International Classification of Disease, Ninth Revision Clinical Modification guidelines (ICD-9), to prospectively adjust capitation payments for a given enrollee based on the health status of the enrollee. Diagnosis codes (ICD-9 codes) submitted by Medicare Advantage HMOs, such as the defendant Health Plans, to CMS were used to develop

-4-

Hierarchical Condition Category (HCC)[1] risk scores that are used by the Government to adjust the capitated payment rates paid by the Government to that particular Medicare Advantage HMO. The risk scores compensated an HMO with a population of patients with more severe illnesses than normal through higher capitation rates. Likewise, an HMO with a population of patients with less severe illnesses than normal would see a downward adjustment of its capitation rates because it was servicing a healthier than normal population of patients. By risk adjusting Medicare Advantage HMO payments, CMS attempts to make appropriate and accurate payments for enrollees with differences in expected healthcare costs. Risk adjustment data records the health status and demographic characteristics of an enrollee. This process was phased in beginning in or about 2005 and was completed by or about the end of the 2008 risk adjustment data submissions.

MedXM's FRAUDULENT MISCONDUCT

Unlocked Electronic Medical Records/Improper Electronic Signatures/Improper Alterations

16.     At all times relevant, the Government's Centers for Medicare and Medicaid Services (CMS) required electronic medical records be locked, such as in pdf file format, so that the contents therein could not be modified once prepared.  However, MedXM's independent contractor physicians, nurse practitioners and physician assistants that performed medical examinations on MedXM's behalf utilized a computer template that created electronic medical records into unlocked Microsoft Word documents. The template only permitted the author's name to be typewritten, and did not permit the author to place CMS-required electronic signature. MedXM's independent contractor physicians, nurse practitioners and physician assistants transmitted such unlocked medical records to MedXM, which were then reviewed by MedXM coders.

17.     CMS requires that electronic medical records bear the author's signature in certain authorized formats. Although encrypted digital signatures are permitted, simply typing the name of the author on the document is not permitted. (*See,* Medicare Program Integrity

---

[1]Not all diagnoses result in a HCC risk score.  Only certain diagnosis codes or combinations thereof result in HCC risk scores.  A HCC risk score will vary upon the diagnosis codes of combinations thereof according to a matrix determined by the Government.

Manual, Ch. 3.3.2.4. (D)-(E).)  All medical examination reports and other medical records prepared by MedXM's independent contractor physicians, nurse practitioners and physician assistants were prepared on Word documents and only bore the typed names of its authors, and did not bear a CMS-required electronic signature.

18.     With about 60% of the unlocked medical records submitted to MedXM, the MedMX coders advised the originating MedXM independent contractor physician, nurse practitioner or physician assistant to modify the unlocked medical record in order to increase the severity of the patients' diagnosis, in an effort to increase the patients' HCC risk scores, and thus payments by Medicare to the defendant Health Plans.  The originating MedXM independent contractor physicians, nurse practitioners and physician assistants then modified the unlocked medical records per the MedXM coders' instructions and recommendations, and resubmitted the modified unlocked electronic medical records to MedXM.  MedXM then converted the unlocked electronic medical records (those that were modified and those that were not) into pdf electronic medical records, and then transmitted such files to the appropriate Medicare Advantage health plan, including but not limited to, the defendant Health Plans.

19.     American Health Information Management Association (AHIMA) guidelines requires that when a medical record is amended, that the historical integrity of the original or prior record be maintained so that the clarifying addition amendment can easily be distinguished from the information on the original medical record.  AHIMA and CMS guidelines also prohibit MedXM from recommending or suggesting a new diagnosis not previously raised or presented by the reviewed medical records to its independent contractor physicians, nurse practitioners and physician assistants.

20.     After MedXM's coders decided that the unlocked medical reports contained information supporting the diagnosis codes resulting in the highest HCC risk scores for the examined patients, MedXM's coders then inserted diagnosis codes onto the medical reports so that it appeared as though such codes were already on the reports when they were purportedly "signed" by the author.  (As discussed above, the author's typed name does not comply with CMS electronic signature requirements.)  These reports, as modified by the

-6-

1    coders were sent converted into pdf file format, and submitted to the appropriate Medicare

2    Advantage HMO, including the defendant Health Plans.

3        21.    While employed with MedXM, Relator became aware that MedXM coders were

4    instructing MedXM's independent contractor physicians, nurse practitioners and physician

5    assistants (that prepared and sent medical examination reports and other medical records in

6    unlocked Word documents to MedXM) replace entire chart notes and other entries with new

7    chart note and entries recommended by MedXM's coders, and/or recommending or suggesting

8    a new diagnosis not previously raised or presented by the reviewed medical records to

9    MedXM's independent contractor physicians, nurse practitioners and physician assistants. The

10   authors of such medical examination reports and other medical records made the

11   recommended changes to their medical examination reports and other medical records (which

12   were kept as unlocked Word documents) and then resubmitted them to MedXM. The

13   resubmitted documents had no indication of the original chart note or entry in violation of

14   AHIMA guidelines. Approximately 60% of the medical examination reports and other

15   medical records that MedXM submitted to its health plan clients, including the defendant

16   health Plans, were medical records that were altered as described in this paragraph.

17   Examinations Not Performed In Person

18       22.    During or about December 2012, Molina noticed that MedXM medical

19   examination reports for about 750 Molina patients had identical results for age, weight, height

20   and blood-pressure and notified MedXM. All of the patients involved had assessments

21   performed by the MedXM's Dr. Awasi. MedXM determined that Dr. Awasi did not actually

22   exam all of these patients as some were seen by his nurse who was not credentialed with

23   MedXM. Further, Dr. Awasi routinely purportedly completed more than 22-25 assessments

24   per day for Molina traveling over a wide geographic area making it implausible that he

25   actually performed the work that he claimed.

26       23.    Upon finding out about Dr. Awasi's duplicate records relating to the patient

27   assessments, MedXM's CEO instructed his staff to call all of Dr. Awasi's patients and

28   interview them under the pretense of performing quality improvement. Through these

interviews, MedXM learned that Dr. Awasi was not performing all of the visits as he claimed, but that his assistant, a nurse, was performing a significant number of them in violation of CMS guidelines. MedXM then had the patients reveal over the telephone their age, height, weight and normal blood-pressure, as well as any other relevant medical information that was related to HCC diagnosis and plotted it on a spread sheet. This information was forwarded to Dr. Awasi so he could redo the assessments. Dr Awasi took the information from the spreadsheets and created new medical assessments based on the information provided. These new assessments were then provided to Molina.

24.    MedXM's CEO advised Molina was that a printer malfunction caused the data to duplicate. Molina accepted the explanation and the resubmitted assessments without further question and submitted them to CMS.

25.    The assessments were fraudulent because they were not based upon actual examinations by Dr. Awasi, but rather based upon information provided by the patients to MedXM over the telephone.

26.    Relator recommended the immediate termination of Dr. Awasi, disclosure to Molina of the problem, retrieval of the assessments and a Corrective Action Plan that included the hiring of a Quality Assurance Director to prevent a repeat of the problem. However, Relators' recommendations were not taken, and Dr. Awasi was not terminated for another four months. MedXM's CEO advised Relator that Dr. Awasi's services were needed because of his high volume and willingness to travel.

27.    During March 2013, a similar problem arose with Dr. Robinson's medical examination reports of Molina patients. 80 out of 87 assessments had the identical information for the patients' physical examination reports. MedXM had Dr. Robinson revise her assessments so that they did not have identical information. In a similar fashion as the Dr. Awasi incident, MedXM improperly gathered additional medical information via telephone interviews with the patients and then Dr. Robinson modified her original assessments. These modified assessments were then submitted to Molina, and then on to CMS. Relator recommended that Dr. Robinson be terminated and the retrieval of the assessments. However,

-8-

1   Relator's recommendations were not taken, and Dr. Robinson was not immediately terminated

2   because of her willingness to travel great distances to perform medical assessments.

3        28.    Vadim Troshkin, a MedXM physician assistant or nurse practitioner in the San

4   Diego area, improperly obtained medical information from numerous patients by telephone,

5   instead of obtaining such information from in person visits, and fraudulently completed

6   medical examination reports as if such information was obtained during in visit examinations.

7   Relator complained to MedXM's CEO that Troshkin should be immediately terminated, and

8   that Troshkin's medical examination reports submitted to Medicare Advantage HMOs be

9   withdrawn.  Plaintiff is informed and believes that MedXM refused to promptly comply with

10   these recommendations.

11   HIPAA Non-Compliance

12        29.    HIPAA required MedXM to maintain patients' medical information with the

13   utmost care and security measures.  MedXM provided its independent contractor physicians,

14   nurse practitioners and physician assistants with laptop computers to create and maintain

15   medical records of examined patients, transmit medical records to MedXM, and communicate

16   electronically with MedXM.  Each laptop computer was password protected.  However, up

17   until April 2013, MedXM physically placed each laptop computer's password on the computer

18   so that anyone sitting in front of the laptop computer would know that computer's password.

19        30.    On or about December 14, 2012, the MedXM laptop computer provided to Joe

20   Harrison, one of MedXM's nurse practitioners, was stolen.  That laptop computer contained

21   medical records of all of the medical examinations performed by Mr. Harrison on Health Net

22   patients.  Relator complained to MedXM's Chief Executive Officer that MedXM's practice

23   of physically placing passwords on its laptop computers violated HIPAA, and that the Health

24   Net should be immediately notified of this breach of security of patient confidentiality.

25   Plaintiff is informed and believes that MedXM did not notify Health Net of this breach of

26   security of patient confidentiality.

27        31.    Before 2012, about one half of MedXM's independent contractor physicians,

28   nurse practitioners and physician assistants utilized personal email addresses to send and

1   receive emails and electronic medical records to and from MedXM. This violated HIPAA

2   because this represented an improper method of transmitting and storing patients' medical

3   information.

4          32.    Before April 2013, MedXM utilized an unsecured email server (without

5   encryption abilities) to send and receive emails and electronic medical records to and from

6   MedXM's independent contractor physicians, nurse practitioners and physician assistants.

7   This violated HIPAA because this represented an improper method of transmitting and storing

8   patients' medical information.

9   <u>Other Frauds</u>

10          33.    One of MedXM's independent contractor physicians, Dr. Hanna Rhee, was

11   licensed to practice medicine in California, but not in Oregon nor Virginia. However, MedXM

12   assigned Dr. Rhee to conduct medical examinations of Health Net patients in Oregon and

13   Wellpoint patients in Virginia, in spite of knowing through background investigations that Dr.

14   Rhee was not licensed to practice medicine in those states. Dr. Rhee conducted examinations

15   of such patients in Oregon during or about Fall 2011 and in Virginia during or about Spring

16   2012, and prepared medical evaluations thereon which were submitted to MedXM, and then

17   forwarded to Health Net and Wellpoint. Such evaluation reports did not comply with CMS

18   regulations because Dr. Rhee was not licensed to practice medicine in those states. MedXM's

19   CEO advised Relator that MedXM sent Dr. Rhee to such states because she was willing to

20   travel.

21   <u>Damages Caused by MedXM's Misconduct</u>

22          34.    MedXM periodically represented to its Medicare Advantage HMO clients,

23   including the defendant Health Plans, that it complied with all applicable laws, rules and

24   regulations. Such representations were false and intended to induce the Medicare Advantage

25   HMO clients to pay MedXM monies to perform, and for performing, the services rendered.

26          35.    Correspondingly, MedXM's Medicare Advantage HMO clients, including the

27   defendant Health Plans, submitted the faulty medical records submitted by MedXM and relied

28   upon same in determining the HCC risk scores for the examined patients, resulting in the

-10-

1  Government paying excessive payments to MedXM's Medicare Advantage HMO clients,

2  including the defendant Health Plans, as a result of HCC risk scores that were inflated by the

3  faulty MedXM medical records.

4  <u>DEFENDANT HEALTH PLANS' FRAUDULENT MISCONDUCT</u>

5  36.   At all times relevant, 42 C.F.R § 422.503 required the defendant Health Plans

6  to have in place an effective compliance program that met CMS' requirements to prevent,

7  detect, and correct non-compliance with CMS' program requirements, as well as prevent,

8  detect, and correct fraud waste and abuse.  This comprehensive legislation is the centerpiece

9  of CMS' enforcement and regulation of Medicare Advantage HMOs with respect to the

10 detection of fraud waste and abuse and creates an affirmative duty on the HMO, its senior

11 management and its governing body to be knowledgeable about compliance requirements and

12 to ensure that the compliance plan is properly implemented, and accomplishing its objectives.

13 37.   The minimum basic requirements include but are not limited to: written

14 comprehensive policies and procedures that are well publicized throughout the organization;

15 ongoing programs of risk assessment, self evaluations and audits designed to validate the

16 compliance program and discover fraud waste and abuse; through and timely investigations

17 of all compliance issues related to payment: regular (at least annually) compliance education

18 of senior management, governing body, and first tier, downstream and related entities (FDR);

19 regular reports to the HMO's governing body regarding compliance efforts; effective lines of

20 communication for reporting of compliance issues from HMO employees as well as from

21 FDRs; non-intimidation policies protecting employees from reporting and/or resolving

22 compliance issues.

23 38.   This duty does not stop at the HMO's doors but extends to all of the HMO's first

24 tier, downstream and related entities they contract with for the provision of health care services

25 provided to Medicare Advantage beneficiaries (a first tier entity is defined as having a direct

26 contract with a HMO for the provision of covered benefits under the HMO's Medicare

27 Advantage contract).  MedXM is a first tier contracting entity, i.e., FDR, of the all of the

28 defendant Health Plans.  The HMOs are required to ensure that their FDRs are also in

-11-

compliance with all of the regulations and laws affecting the HMOs and their requirements under their Medicare Advantage contracts.

39.     In order to comply with duties imposed by 42 C.F.R §§ 422.503 and 422.504, the defendant Health Plans were required to:

      i.     Conduct compliance education and training at MedXM;

      ii.     Validate MedXM's assertions that it had a state of the art computer infrastructure and electronic medical record system;

      iii.     Ensure that MedXM had a HIPAA-complaint computer infrastructure designed to safeguard confidential patient information in accordance with federal law and appropriate policy and procedures related thereto;

      iv.     Ensure that MedXM maintained an electronic medical record system produced a valid electronic signature per CMS signature requirements and that MedXM had appropriate policies and procedures for maintaining the accuracy and integrity of the medical records it created and the data it reported in accordance with federal law and CMS rules, regulations guidelines and standards;

      v.     Ensure that MedXM had a Compliance Officer, a compliance program and appropriate policies and procedures for the effective implementation of the same in accordance with federal law and CMS regulations and guidelines; and

      vi.     Regularly and actively monitor MedXM's activities and data submissions for incidents of fraud and respond accordingly.

40.     The defendant Health Plans nor any of the other health plans contracted with MedXM to provide HCC Risk Score assessments (except for Wellpoint which will be discussed in more detail below) made an attempt of any kind to satisfy the duties set forth hereinabove.  Instead they all turned a blind eye to the truth in exchange for receiving HCC risk assessment data that increased their risk scores and thereby increased their capitation revenue form CMS.  Had the defendant Health Plans made even a modest attempt to validate

-12-

any of MedXM's claims regarding their computer systems and infrastructure or comply with their statutory obligations, the true facts would have become immediately apparent.

41.   The true facts are that:

    i.    MedXM did not have any type of approved electronic medical record software system;

    ii.    MedXM did not have appropriate policies or procedures for documenting physician chart notes or amendments and changes thereto and did not do so in a manner that complied with acceptable charting standards or CMS guidelines;

    iii.    MedXM did not have appropriate policies and procedures for having physicians authenticate the medical records and data they submitted to defendant Health Plans and MedXM physicians did not validly authenticate the medical records or data that was submitted to defendant Health Plans;

    iv.    MedXM did not have an effective compliance program nor policies and procedures to properly train their management and staff regarding fraud waste and abuse and that MedXM routinely submitted fraudulent and inaccurate data to defendant Health Plans; and

    v.    MedXM did not have appropriate policies and procedures or employee training for HIPAA compliance as required by federal law and CMS guidelines and regulations and did not properly report HIPAA data breaches when such breaches occurred.

42.   Wellpoint was the only defendant Health Plan that attempted to perform a pre-contractual audit as was apparently their standard practice. By the time Wellpoint began the process in 2011, MedXM was already performing assessments on their behalf. Wellpoint's initial audit revealed that:

    i.    MedXM did not perform HIPAA employee training as part of employee orientation;

-13-

ii.     MedXM did not provide employee training for fraud waste and abuse as part of employee orientation; and

iii.    MedXM did not have a Compliance Officer, compliance plan or any policy and procedures related thereto.

43.    Instead of suspending further work and voiding any HCC risk score assessments previously submitted by MedXM, Wellpoint increased the volume of HCC risk score assessments performed by MedXM. Wellpoint did issue a corrective action plan (CAP) requiring MedXM to adopt a compliance plan, document employee orientation training for HIPAA and fraud, waste and abuse. Wellpoint's CAP addressed only the issues in the most superficial manner and failed to identify any of MedXM's other egregious violations. Even at this low-level threshold, MedXM was unable to successfully address the CAP and failed Wellpoint's follow up pre-contractual audit which occurred in the second quarter of 2012.

44.    Wellpoint returned in the fourth quarter of 2012 for its final pre-contractual/CAP follow-up audit. By then, MedXM had manufactured the required compliance plan polices and placed forged and/or inaccurate certificates in the staff's personnel files indicating the they had received the minimally required HIPAA training as part of their employee orientation as well as training for fraud waste and abuse. The training that did occur was a sham; not all employees actually received the training as claimed, the training was not done in a serious manner and was otherwise inadequate and the employees were given the answer key along with the examination that followed the training. MedXM still had not designated a compliance officer. During this final pre-contractual audit/CAP follow-up visit, Wellpoint removed its CAP. Throughout 2012 MedXM's volume of Risk Score assessments on behalf of Wellpoint continually increased.

45.    Shortly thereafter, Relator was invited to a celebratory lunch hosted by the MedXM CEO and attended by key Wellpoint managed care network and compliance executives. The Wellpoint executives revealed that they had instructed their auditor to remove the CAP because of the increased HCC risk scores resulting from MedXM's data submissions. Wellpoint informed MedXM that it would have to designate someone as an actual compliance

-14-

1   officer in time for the annual audit to take place during or about March or April 2012.  This

2   resulted in Relator being named to the post of compliance officer.  MedXM's CEO advised

3   Relator that she would just hold the position in title only as a figure-head with no significant

4   additional responsibilities because of her ongoing duties as Director of Provider Relations.

5   Wellpoint quickly became MedXM's single largest health plan contract.

6

7                                    FIRST CLAIM FOR RELIEF

8                      (Violation of 31 U.S.C. § 3729(a) against all defendants)

9          46.    Relator realleges and incorporates by reference all previous paragraphs of this

10   complaint as though fully set forth at length.

11          47.    At all times mentioned, defendants routinely and repeatedly violated 31 U.S.C.

12   § 3729(a)(1) by:

13                 i.     Knowingly presenting and/or causing to present to agents, contractors or

14                        employees of the Government false and fraudulent claims for payment

15                        and approval;

16                 ii.    Knowingly making, using, and/or causing to make or use false records

17                        and statements to get false and excessive claims paid or approved by

18                        Medicare; and

19                 iii.   Conspiring among themselves to violate 31 U.S.C. § 3729(a)(1)(A) and

20                        (B).

21          48.    Relator is informed and believes, and upon such information and belief alleges,

22   that as a result of defendants' fraudulent misconduct, the Government was damaged in excess

23   of $1,000,000,000.

24          49.    As a result of defendants' conduct, defendants are liable to the Government for

25   three times the amount of damages sustained by the Government as a result of the false and

26   fraudulent claims alleged above.

27

28

50.     As a result of defendants' conduct, 31 U.S.C. § 3729(a) provides that defendants are liable to the Government for civil penalties between $5,000 and $10,000 for each such false and fraudulent claim for payment.

51.     Relator is also entitled to recover her attorneys fees, costs and expenses from defendants pursuant to 31 U.S.C. § 3730(d).

## SECOND CLAIM FOR RELIEF

(Violation of 31 U.S.C. § 3730(h) against MedXM)

52.     Relator realleges and incorporates by reference all previous paragraphs of this complaint as though fully set forth at length.

53.     During her employment with MedXM, Relator complained to MedXM's Chief Executive Officer that:

  i. MedXM's medical chart amendments made its medical records fraudulent;

  ii. MedXM's use of unlocked Word medical records, amendments and corrections thereto, constituted frauds upon the Medicare Advantage HMOs and CMS;

  iii. The unsecured laptop notebooks and use of emails constituted HIPAA violations and frauds upon the Medicare Advantage HMOs and CMS;

  iv. The various CMS and/or HIPAA violations mentioned above; and

  v. MedXm was retaliating against her for complaining of MedXM's fraudulent misconduct by, among other things, advising her that MedXM had employed someone to replace Relator as the Director of Provider Relations.

54.     As a result of Relator complaining of such misconduct, MedXM retaliated against Relator in violation of 31 U.S.C. § 3730(h)(1) by discriminating against Relator in the terms and conditions of her employment and/or subjecting her to a hostile work environment that included, but was not limited to:

-16-

   i.  Refusing to correct or take appropriate action to correct the fraudulent misconduct Relator complained of;

   ii.  Advising Relator that MedXM had employed someone to replace her as the Director of Provider Relations;

   iii.  Hiring Relator's replacement before terminating Relator;

   iv.  Terminating Relator's employment on or about June 23, 2013; and

   v.  Withholding pay and penalties due her under *California Labor Code* §§ 201(a) and 203.

55. As a result of such retaliation and discrimination, Relator has suffered, and will continue to suffer, emotional distress, worry, anxiety and humiliation in an amount according to proof at trial.

56. In retaliating against Relator, MedXM acted with fraud, oppression and malice, warranting an award of punitive damages against MedXM in an amount to be determined at trial.

57. Relator is also entitled to recover her attorneys fees, costs and expenses pursuant to 31 U.S.C. § 3730(h)(2).

## THIRD CLAIM FOR RELIEF

(Violation of *California Labor Code* §§ 201, et seq. against MedXM)

58. Relator realleges and incorporates by reference all previous paragraphs of this complaint as though fully set forth at length.

59. MedXM wilfully failed to timely pay Relator compensation due her as required by *California Labor Code* § 201(a) in an amount according to proof.

60. In addition to her unpaid compensation, Relator is entitled to recover penalties from MedXM pursuant to *California Labor Code* § 203 in an amount according to proof.

61. Relator is entitled to prejudgment interest on the amount due pursuant to *California Labor Code* § 218.6.

62.     Relator is entitled to reasonable attorney's fees and costs incurred pursuant to *California Labor Code* § 218.5.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff and <u>Qui Tam</u> Relator prays for relief as follows:

FOR THE FIRST CLAIM FOR RELIEF

1.     Treble the Government's damages according to proof;

2.     Civil penalties according to proof;

3.     A relator's award of up to 30% of the amounts recovered by or on behalf of the Government;

FOR THE SECOND CLAIM FOR RELIEF

4.     General damages in amount according to proof;

5.     Reinstatement with the same seniority status that Relator would have had but for the discrimination and retaliation;

6.     Two times the amount of back pay;

7.     Interest on the back pay;

8.     Punitive damages according to proof;

FOR THE THIRD CLAIM FOR RELIEF

9.     Compensatory damages in amount according to proof;

10.     Penalties pursuant to *California Labor Code* § 203 in an amount according to proof;

11.     Prejudgment interest on the amount due pursuant to *California Labor Code* § 218.6;

12.     Reasonable attorney's fees and costs incurred pursuant to *California Labor Code* § 218.5;

/ / /

/ / /

-18-

FOR ALL CLAIMS FOR RELIEF

13. Attorneys fees, expenses, and costs; and

14. Such other and further relief as the Court deems just and proper.


THE ZINBERG LAW FIRM
A Professional Corporation

THE HANAGAMI LAW FIRM
A Professional Corporation

Dated: August 30, 2013          By: _____
                                William K. Hanagami
                                Attorneys for Plaintiff and Qui Tam Relator,
                                Anita Silingo


REQUEST FOR JURY TRIAL

Plaintiff and Qui Tam Relator hereby requests a trial by jury.


THE ZINBERG LAW FIRM
A Professional Corporation

THE HANAGAMI LAW FIRM
A Professional Corporation

Dated: August 30, 2013          By: _____
                                William K. Hanagami
                                Attorneys for Plaintiff and Qui Tam Relator,
                                Anita Silingo

Complaint P01.wpd

-19-

COMPLAINT

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Fernando M. Olguin _____ and the assigned Magistrate Judge is _____ Stephen J. Hillman _____ .

The case number on all documents filed with the Court should read as follows:

### SACV13-1348-FMO(SHx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____ August 30, 2013 _____                    By  C. Sawyer _____
Date                                                    Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| | | |
|---|---|---|
| [x] Western Division<br>312 N. Spring Street, G-8<br>Los Angeles, CA 90012 | [ ] Southern Division<br>411 West Fourth St., Ste 1053<br>Santa Ana, CA 92701 | [ ] Eastern Division<br>3470 Twelfth Street, Room 134<br>Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---

CV-18 (08/13)                    NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

**CIVIL COVER SHEET**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

United States of America, Anita Silingo

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Mobile Medical Examination Services, Inc.; MedXM; Wellpoint, Inc; Anthem Blue Cross and Blue Shield; Helath Net, inc.; Health Net of Calfiornia, Inc.; Health Net Life insurance Company; Visiting Nurse Service of New York,; Visiting Nurse Service Choice; Molina Healthcare, inc.; (continued on Attachment 1)

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Williarn K. Hanagami, THE HANAGAMI LAW FIRM, A.P.C., 21700 Oxnard St, Ste 1150, Woodland Hills, CA 91367-7572 (818) 716-8570
Abram J. Zinberg, THE ZINBERG LAW FIRM, A.P.C., 412 Olive Ave, Ste 528, Huntington Beach, CA 92648-5142 (714) 374-9802

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes  ☒ No     ☒ **MONEY DEMANDED IN COMPLAINT:** $ 1,000,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☒ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number:

**AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.**

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ NO ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☒ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, Los Angeles County | Alameda County, Indiana, New York |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, Los Angeles County | Alameda County, Indiana, New York |

***Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note:** In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _[signature]_   DATE: August 30, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

ATTACHMENT 1

Molina Healthcare of California; Molina Healthcare Services; Molina Healthcare of California Partner Plan, Inc.; Alameda Alliance for Health