**William K. Hanagami, SBN 119832**
**THE HANAGAMI LAW FIRM**
**A PROFESSIONAL CORPORATION**
**21700 OXNARD STREET, SUITE 1150**
**WOODLAND HILLS, CA 91367-7572**
**(818) 716-8570 / (818) 716-8569** *FAX*
**BillHanagami@esquire.la**

**Abram J. Zinberg, SBN 143399**
**THE ZINBERG LAW FIRM**
**A PROFESSIONAL CORPORATION**
**412 OLIVE AVENUE, SUITE 528**
**HUNTINGTON BEACH, CA 92648-5142**
**(714) 374-9802 / (714) 969-0910** *FAX*
**AbramZinberg@gmail.com**

Attorneys for Plaintiff and <u>Qui</u> <u>Tam</u> Relator,
Anita Silingo

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ANITA SILINGO,<br><br>                    Plaintiffs,<br><br>vs.<br><br>MOBILE MEDICAL EXAMINATION SERVICES, INC., a California corporation; MEDXM, a business entity, form unknown; WELLPOINT, INC., an Indiana corporation; ANTHEM BLUE CROSS, business entity, form unknown; ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, a California corporation; BLUE CROSS OF CALIFORNIA, a California corporation; HEALTH NET, INC., a Delaware corporation; HEALTH NET OF CALIFORNIA, INC., a California corporation;  HEALTH NET LIFE INSURANCE COMPANY, a California corporation; VISITING NURSE SERVICE OF NEW YORK, a New York corporation; VISITING NURSE SERVICE CHOICE, business organization, form unknown; MOLINA HEALTHCARE, INC., a Delaware corporation; MOLINA HEALTHCARE OF CALIFORNIA, a California corporation; MOLINA HEALTHCARE SERVICES, a California corporation; MOLINA | Case No. SACV13-1348-FMO(SHx)<br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, AND CALIFORNIA LABOR CODE SECTIONS 201, ET SEQ.;  REQUEST FOR JURY TRIAL |

-1-

HEALTHCARE OF CALIFORNIA
PARTNER PLAN, INC., a California
corporation; ALAMEDA ALLIANCE FOR
HEALTH, a business organization, form
unknown,

               Defendants.

COMES NOW, Plaintiff and Qui Tam Relator Anita Silingo, individually and on behalf of the United States of America, and alleges as follows:

<u>JURISDICTION AND VENUE</u>

1.      Plaintiff and Qui Tam Relator Anita Silingo (Relator) files this action on behalf and in the name of the United States Government (Government) seeking damages and civil penalties against the defendants for violations of 31 U.S.C. § 3729(a).  Relator also files this action on her own behalf seeking damages and other remedies against certain defendants for violations of 31 U.S.C. § 3730(h) and *California Labor Code* §§ 201, et seq.

2.      This Court's jurisdiction over the claims for violations of 31 U.S.C. §§ 3729(a) and 3730(h) is based upon 31 U.S.C. § 3732(a).  The Court's jurisdiction over the claims for violations of *California Labor Code* §§ 201, et seq. is based upon 28 U.S.C. § 1367(a).

3.      Venue is vested in this Court under 31 U.S.C. § 3732(a) because at least one of the defendants transacts business in the Central District of California and many acts constituting violations of 31 U.S.C. § 3729(a) occurred in the Central District of California.  Venue is also vested in this Court under 28 U.S.C. § 1391(b) because at least one of the defendants transacts business in the Central District of California and many acts constituting violations of 31 U.S.C. § 3730(h) occurred in the Central District of California.

<u>THE PARTIES</u>

4.      Relator is a citizen of the United States and a resident of the State of California.  Relator brings this action of behalf of the Government under 31 U.S.C. § 3730(b), and on her own behalf under 31 U.S.C. § 3730(h) and *California Labor Code* §§ 201, et seq.

5.      At all times relevant, the Government funded the Medicare program which provides payment of healthcare services for, among others, those 65 years or older.  The

-2-

Government provided a Medicare option known as Medicare Advantage, previously known as Medicare+Choice, in which eligible Medicare beneficiaries can enroll with a managed care organization or health maintenance organization (collectively, "HMO") contracted with the Government for a capitated rate paid by the Government that would provide at least those services provided to standard Medicare beneficiaries.

6.      At all times relevant, defendant Mobile Medical Examination Services, Inc. is and was a corporation formed under the laws of the State of California, and transacted business in, among other places, the Central District of California.  At all times relevant, defendant MEDXM is a business entity, form unknown,  and transacted business in, among other places, the Central District of California.  All defendants referenced in this paragraph are collectively referred to in this Complaint as "MedXM."

7.      At all times relevant, MedXM contracted with various Medicare Advantage HMOs and health plans, including but not limited to the other defendants in this action, to perform physical medical examinations of such HMOs' Medicare Advantage patients at their residence for purposes of documenting HCC risk scores.  In turn, MedXM retained physicians, nurse practitioners and physician assistants as independent contractors to perform such physical medical examinations.

8.      At all times relevant, defendant Wellpoint, Inc. is and was a corporation formed under the laws of the State of Indiana, and transacted business in, among other places, the Central District of California.  At all times relevant, defendant Anthem Blue Cross, previously sued as Anthem Blue Cross and Blue Shield, is and was a business entity, form unknown,  and transacted business in, among other places, the Central District of California.  At all times relevant, defendants Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California are and were corporations formed under the laws of the State of California, and transacted business in, among other places, the Central District of California. All defendants referenced in this paragraph are collectively referred to in this Complaint as "Wellpoint."

9.      At all times relevant, defendant Health Net, Inc. is and was a corporation formed under the laws of the State of Delaware, and transacted business in, among other places, the

Central District of California.  At all times relevant, defendants Health Net of California, Inc. and Health Net Life Insurance Company are and were corporations formed under the laws of the State of California, and transacted business in, among other places, the Central District of California.  All defendants referenced in this paragraph are collectively referred to in this Complaint as "Health Net."

10.    At all times relevant, defendant Visiting Nurse Service of New York is and was a corporation formed under the laws of the State of New York.  At all times relevant Visiting Nurse Service Choice is and was a business organization, form unknown.   All defendants referenced in this paragraph are collectively referred to in this Complaint as "VNS."

11.    At all times relevant, Molina Healthcare, Inc. is and was a corporation formed under the laws of the State of Delaware, and transacted business in, among other places, the Central District of California.  At all times relevant Molina Healthcare of California,  Molina Healthcare Services, and Molina Healthcare of California Partner Plan, Inc. are and were California corporations, and transacted business in, among other places, the Central District of California.  All defendants referenced in this paragraph are collectively referred to in this Complaint as "Molina."

12.    At all times relevant, defendant Alameda Alliance for Health (Alameda) is and was a business organization, form unknown.

13.    At all times relevant, Wellpoint, Health Net, VNS, Molina, and Alameda are and were managed care organizations that contracted with the Government as Medicare Advantage HMOs.  The defendants referenced in this paragraph are collectively referred in this Complaint as "defendant Health Plans."

14.    Relator was employed with MedXM between August 2011 and June 2013, initially as an independent contractor, and then as an employee during and after January 2012.  Relator held the position of Director of Provider Relations throughout her employment with MedXM.   Relator was also MedXM's Compliance Officer from about late spring/early summer of 2012 until or about April 2013.

-4-

Risk Adjustment

15.     At all times relevant, Section 1853(a)(3) of the Social Security Act [42 U.S.C. § 1395w-23(a)(3)] required the Government's Centers for Medicare and Medicaid Services (CMS) to risk adjust payments to Medicare Advantage organizations, such as the defendant Health Plans.  In general, the risk adjustment methodology relied on enrollee diagnoses, as specified by the International Classification of Disease, Ninth Revision Clinical Modification (ICD-9) guidelines, to prospectively adjust capitation payments for a given enrollee based on the health status of the enrollee.  Diagnosis codes (ICD-9 codes) submitted by Medicare Advantage HMOs, such as the defendant Health Plans, to CMS were used to develop Hierarchical Condition Category (HCC)[1] risk scores that are used by the Government to adjust the capitated payment rates paid by the Government to that particular Medicare Advantage HMO.  The risk scores compensated an HMO with a population of patients with more severe illnesses than normal through higher capitation rates.  Likewise, an HMO with a population of patients with less severe illnesses than normal would see a downward adjustment of its capitation rates because it was servicing a healthier than normal population of patients.  By risk adjusting Medicare Advantage HMO payments, CMS attempts to make appropriate and accurate payments for enrollees with differences in expected healthcare costs.  Risk adjustment data records the health status and demographic characteristics of an enrollee.  This process was phased in beginning in or about 2005 and was completed by or about the end of the 2008 risk adjustment data submissions.

MedXM's FRAUDULENT MISCONDUCT

MedXM's Fraudulent Scheme

16.     MedXM conceived and operated a fraudulent scheme of selling and submitting false risk adjustment data to the defendant Health Plans by converting the enrollees' past medical history into current HCC diagnoses and including them in their HCC Assessments and by fabricating and/or exaggerating the severity of HCC diagnosis in order to increase the

---

[1]Not all diagnoses result in a HCC risk score.  Only certain diagnosis codes or combinations thereof result in HCC risk scores.  A HCC risk score will vary upon the diagnosis codes or combinations thereof according to a matrix determined by the Government.

patient's risk score regardless of the availability of the patient's past medical history.  To carry out this scheme, MedXM routinely violated CMS regulations and guidelines requiring that (a) such risk adjustment data be obtained as a result of a face-to-face encounters and  attested to for accuracy, completeness and truthfulness, (b) allied health professionals such as nurse practitioners and physician assistants comply with federal and state licensure laws requiring physician supervision, (c) a comprehensive and effective compliance program be in place to identify and mitigate Medicare fraud, (d) the physicians, nurse practitioners or physician assistants (collectively, "medical examiners") provide a valid signature authenticating the medical records, and (e) the medical records shall preserve original entries made by the medical examiner and any deletions, additions or other changes be clearly identified.

HCC Assessments Performed by NPs and PAs in Violation of Federal and State Laws

17.     Since at least 2010, MedXM has relied heavily on agreements with allied health professionals such as nurse practitioners (NPs) and physician assistants (PAs) to perform HCC Assessments.

18.     In states such as California and New York, approximately 50% to 60% of MedXM's medical examiners are PAs or NPs.  Twenty-two (22) states (including California and New York) require that NPs must work under the supervision and control of a licensed physician who is responsible for their work, and all states require that PAs perform their duties under the direction and control of a supervising licensed physician who is responsible for their work.

19.     As a condition of receiving payment, federal law requires that NPs who provide services to Medicare beneficiaries must do so in collaboration with a licensed Medicare Physician and  in compliance with all state law licensure requirements and restrictions. Failure to comply with any state law, or physician control and supervision requirement, renders the NPs' services outside of their scope of practice. (See, 42 C.F.R. § 410.75;  Medicare Benefit Policy Manual, Ch.15 § 200.)  Similarly, as a condition of receiving payment, federal law requires that PAs who render services to Medicare beneficiaries must do so under the direction and control of a Medicare physician.  Failure of  PAs to comply with any state law licensure

restrictions renders the service outside their scope of practice for Medicare.  (*See,* 42 C.F.R. § 410.74;  Medicare Benefit Policy Manual, Ch.15 § 190.)  Risk adjustment data collected by such allied health care providers in violation of their physician supervision requirements is therefore invalid for risk adjustment data purposes. (See, 42 C.F.R. § 422.310.)

20.    As will be explained detail below, a majority of MedXM's Risk Score assessments, were performed by NPs and PAs in violation of their state and federal physician supervision requirements.  MedXM submitted theses assessments with invalid risk adjustment data to their contracted health plans including the defendant Health Plans, who in turn submitted the Risk Score assessments or risk adjustment data derived therefrom to CMS in order to increase their monthly capitation payments from the Government.

21.    When Relator began her employment with MedXM, Relator was informed by MedXM senior management that MedXM's agreements with NPs and PAs did not require a supervising physician because such allied health professionals were just performing assessments and were not providing any medical care.

22.    Before 2012, MedXM contracted directly with NPs and PAs, and did not know the existence, identity or credentials of any of their supervising physicians regardless of which state such allied health professional was working in.  Further, MedXM did not require any documentation to validate that such NP or PA was in fact being supervised in accordance with state law.  During 2012, Relator learned that MedXM was incorrect regarding the purported lack of need of a supervising physicians for MedXM NPs and PAs.

23.    Before 2012, MedXM had no documentation validating that its NPs were working under the supervision of collaborating physician and/or under the direction and control of a supervising physician as required federal and some state laws.  In 2012, Ohio area NPs insisted that MedXM maintain physician collaboration agreements in accordance with Ohio state law.  MedXM assisted in arranging many of these agreements, knowing that they were sham arrangements and/or credentials for NPs and PAs that worked in Ohio because no meaningful supervision or collaboration of the NPs and PAs occurred.  MedXM's practice was in violation of Ohio state law and federal law governing NPs and PAs:

      i.      Beginning in or about the latter half of 2012, MedXM had its Ohio NPs sign Standard Care Agreements that were also signed by some of MedXM's contracted physicians, including but not limited to Carol Beck, M.D., James Clark, M.D., and Charles Jenkins, M.D., as collaborating physicians, even though such physicians did not, nor intended to, supervise or direct any of the NPs or comply with their obligations under Ohio Revised Code Section 4723.431.  Such Agreements falsely indicated that such Ohio NPs were and would perform services under the direction and supervision of the collaborating physicians.  These representations were false because the HCC Assessments were performed by such Ohio NPs who were not under the supervision of a licensed physician as required by state law.  Further, Ohio Revised Code Section 4723.431 requires a Standard Care Agreement be on file at each site where the NP practices, precluding Ohio NPs from legally providing the in-home HCC Assessments required by MedXM.

24.    New York Education Law § 6901(1) distinguishes the type of diagnostic privilege that NPs can engage in as distinct from making medical diagnoses.  Under New York Education Law § 6902(3), a NP can diagnose illnesses if it is within a specialty area of practice pursuant to a written practice agreement with a collaborating physician who is also qualified within that speciality area. These restrictions prohibited most, if not all, of the diagnoses rendered by New York-based NPs on MedXM HCC Assessments because the NPs did not have the relevant specialty practice areas allowing them to diagnose illness as reported by the HCC Assessment.  Further, New York Education Law § 6542 requires the supervising physician to assign the work to the PA and to provide continuous supervision.  Yet, MedXM contracted and assigned work directly to New York-based PAs who then conducted HCC assessments in violation of these assignment and supervision requirements.

25.    *California Business & Professions Code* §§ 2725 and 2835.7 allow NPs to make

"Observations of the signs and symptoms of illness" but do not permit NPs to make the complex medical diagnoses required by the HCC Assessments.  In California, NPs are not allowed to perform the HCC Assessments unless there are comprehensive written standardized procedures to allow this activity by a clinic, health plan or medical office and such activity is well supervised in accordance with written protocols. *California Business & Professions Code* § 2835.7.  Yet, none of the MedXM California NPs worked out of clinics, medical offices or health systems, and were not rendering services pursuant to agreed upon standardized protocols regarding the HCC Assessments performed for MedXM.  Further, California PAs are required to have all of their work supervised by a physician or surgeon who must countersign at least 5% of the medical charts and records. *California Business & Professions Code* § 3502.  Yet, MedXM contracted directly with California based PAs in violation of their supervision and documentation requirements.

26.    As of at least 2012, the states of California, Nebraska, South Dakota, Kansas, Wisconsin, Missouri, Minnesota, Ohio, Indiana, Illinois, Pennsylvania, New York, Delaware, Virginia, South Carolina, North Carolina Georgia, Florida, Louisiana and Texas had licensure laws restricting the activities of NPs by requiring a licensed physician to supervise and control all work performed.

27.    The NPs, including but not limited to the following, performed HCC Assessments without being under the direction and control of a supervising physician as required by the state laws where the services were performed:

          i.     California:  Alda O'Conner, Carina Viscona-Pons, Catherine Cusi, Christian Eggleston, Colette Spencer, Doreen Urban, Janice Cahambing, Jason Speaks, Jayson Hoppe, Jennifer Pack, Jennie Yeh, Joanna Yoa, Joshua Yi, Julie DePetro, Lillian Harris, Lola Aldrige, Martha Ibarra, Michael Jingo, Patrice Daniels, Patricia Lee, Rick Michel, Sharon Jack, Teresa Magana, Tiffany Johnson, and Viraseni Wu.

          ii.    New York:  Barbra Cohen, Brenda St. Louis, Camellia Corrica, Caryn Moeller, Chaya Wald, Delores McLeod, Denine Polen, Jean O'Doherty,

-9-

1    Jiji George, Karen Chung, Lisa Marie Horne, Lorraine Marshall-
2    Williams, Natasha HarrisRavella Jainarain, Salwa Khouri, Svetlana
3    Sakirsky, Tamara Desvarieux, and Vivian Barber.

4       iii.    Texas:  Brandy Evans, Hawa Stinson, and Munachi Okpala.

5       28.    Discovery may reveal the identity of additional NPs who performed illegal HCC
6    Assessments for MedXM because their services were not supervised by a licensed physician
7    as required by the state laws where the NPs performed such services.

8       29.    NPs, including but not limited to the following, provided MedXM the identity
9    of a supervising physician but such arrangements were a sham and the NPs' HCC Assessments
10   were not supervised by a licensed  physician in violation of the state laws were the NPs
11   performed such services:

12      i.    Ohio:  Arthur Myers, Augusta Boyd, Ashley Simela, Crystal Burke,
13    Kaththryn Koebbe, Linda Kibot, Maureen Kilrain, Melanie Nosan,
14    Melissa Fourmann, Misty Uhi, Monique Howard, Pamela Crider, Raja
15    Shaheen, Rhonda Casey, Robin Sloane, Sandra Smith, Scott Rawlings,
16    Sean Haig, Sharon Noffsinger, Stacey Mathews, Susan Quirk, and Tanya
17    McKnight-Tuffour.

18      30.    Discovery may reveal the identity of additional NPs who performed illegal HCC
19   Assessments by falsely claiming supervision of a licensed physician.

20      31.    All states require that PAs' work is performed under the direction and
21   supervision of a licensed physician.  MedXM's PAs, including but not limited to the
22   following, performed MedXM HCC Assessments without being under the direction and
23   control of a licensed supervising physician: Vadim Troshkin, California; Devin Kaplan, New
24   York; and Tyler Shenk-Foley, New York.  Additional discovery will reveal the identities of
25   additional PAs who illegally performed HCC Assessments on behalf of MedXM or who are
26   misidentified by MedXM as NPs.

27      32.    At all times relevant, MedXM either knew that such NPs and PAs were
28   performing HCC Assessments without being supervised by a licensed physician as required

-10-

by CMS regulations, federal law and state law license requirements or turned a blind eye to the true facts regarding compliance with this requirement.  Likewise, the defendant Health Plans  knew or should have known the same, because federal law requires the defendant Health Plans either approve MedXM's medical examiners or regularly audit such data on an ongoing basis. (*See,* 42 C.F.R. § 422.504(i)(4)(B).)

Unlocked Electronic Medical Records/Improper Electronic Signatures/Improper Alterations

33.    Medicare Advantage health plans must submit risk adjustment data that conform to CMS' requirements for data equivalent to Medicare fee-for-service data and to all relevant national standards. (*See,* 42 C.F.R. § 422.310(d).) At all times relevant, the Government's Centers for Medicare and Medicaid Services (CMS) required electronic medical records be locked, such as in pdf file format, so that the contents therein could not be modified once prepared.  However, MedXM's independent contractor physicians, nurse practitioners and physician assistants that performed medical examinations on MedXM's behalf utilized a computer template that created electronic medical records into unlocked Microsoft Word documents.  The template only permitted the author's name to be typewritten, and did not permit the author to place CMS-required electronic signature.  MedXM's independent contractor physicians, nurse practitioners and physician assistants transmitted such unlocked medical records to MedXM, which were then reviewed by MedXM coders.

34.    CMS requires that electronic medical records bear the author's signature in certain authorized formats.  Although encrypted digital signatures are permitted, simply typing the name of the author on the document is not permitted.  (*See,* Medicare Program Integrity Manual, Ch. 3.3.2.4. (D)-(E).)  All medical examination reports and other medical records prepared by MedXM's independent contractor physicians, nurse practitioners and physician assistants were prepared on Word documents and only bore the typed names of its authors, and did not bear a CMS-required electronic signature.  CMS regulations call for data submitted that does not bear an authenticating signature to be disregarded (*See,* Id.)

35.    None of the Risk Score assessments performed by MedXM on behalf of the defendant Health Plans had valid physician signatures in accordance with CMS regulations.

-11-

A valid physician signature is required to authenticate the medical record entries.  This defect invalidates all of the risk adjustment data submitted by MedXM to the defendant Health Plans and all of the risk adjustment data, derived therefrom, that the Defendant Health Plans submitted to CMS in an effort to increase their monthly capitation payments.  The defendant Health Plans knew or turned a blind eye to the true facts because as a condition of receiving their capitation payments from the Government, they are required to monitor and investigate the integrity of MedXM's risk adjustment data and certify same. (*See,* 42 C.F.R. § 422.504(i)(4)(v), (l).)

36.    The American Health Information Management Association (AHIMA) national guidelines for ethical coding require that when a medical record is amended, the historical integrity of the original prior record be maintained so that the clarifying addition or amendment can easily be distinguished from the information on the original medical record. AHIMA and CMS guidelines also prohibit MedXM from recommending or suggesting to its independent contractor physicians, NPs and PAs a new diagnosis not previously raised or presented by the reviewed medical records.  AHIMA guidelines require each modification or amendment be signed and dated by the author. Any unsigned or undated alteration is to be disregarded even if this result in invalidating the entire record.  AHIMA guidelines also require that all original content is to be clearly preserved, not deleted and provide an acceptable methodology for preserving the original documentation.

37.    MedXM knowingly and routinely ignored these record keeping and documentation requirements resulting in the submission of false and invalid risk adjustment data in violation of, among other things, the False Claims Act.  MedXM coders instructed the MedXM independent contractor physicians, NPs and PAs to improperly modify the assessments performed on the defendant Health Plans' Medicare Advantage enrollees. MedMX coders advised the originating MedXM medical examiners how to modify the unlocked medical records in order to increase the severity of the patients' diagnoses, in an effort to increase the patients' HCC risk scores, and thus payments by Medicare to the defendant Health Plans.  The originating MedXM medical examiners then modified the

unlocked medical records per the MedXM coders' instructions and recommendations, and resubmitted the modified unlocked electronic medical records to MedXM.

38.     When making the above-described alterations, the MedXM medical examiners deleted entire sections of the unlocked medical record (i.e. the assessment) in violation of the AHIMA guidelines requirements to preserve the original text. The deleted text was replaced with new text that supported an additional and/or higher HCC diagnosis.  None of the new additional documentation was properly signed or dated by the originating MedXM medical examiner.

39.     After MedXM's coders decided that the unlocked medical reports contained information supporting the diagnosis codes resulting in the highest HCC risk scores for the examined patients, MedXM's coders then inserted diagnosis codes onto the medical reports so that it appeared as though such codes were already on the reports when they were purportedly "signed" by the author.  (As discussed above, the author's typed name does not comply with CMS electronic signature requirements.)  These reports, as modified by the coders, were then converted into pdf file format and submitted to the appropriate Medicare Advantage HMO, including the defendant Health Plans, who in turn submitted the documentation as risk adjustment data to CMS.

40.     While employed with MedXM, Relator became aware that MedXM coders were improperly instructing MedXM's independent contractor physicians, NPs and PAs (that prepared and sent medical examination reports and other medical records in unlocked Word documents to MedXM) replace entire chart notes and other entries with new chart note and entries recommended by MedXM's coders, and/or recommending or suggesting a new diagnosis not previously raised or presented by the reviewed medical records to MedXM's independent contractor physicians, nurse practitioners and physician assistants.  The authors of such medical examination reports and other medical records made the recommended changes to their medical examination reports and other medical records (which were kept as unlocked Word documents) and then resubmitted them to MedXM.   The resubmitted documents had no indication of the original chart note or entry in violation of CMS regulations

-13-

and AHIMA guidelines.  Approximately 60% of the medical examination reports and other medical records that MedXM submitted to its health plan clients, including the defendant health Plans, were medical records that were altered as described in this paragraph.

Fraudulently Performed HCC Assessments

41.     The MedXM coders and medical examiners used the enrollees' past years' HCC diagnosis codes provided by the defendant Health Plans and/or the enrollee's medical history obtained by the MedXM medical examiner from the patient as the basis to add false and fraudulent HCC diagnoses.  If not already accomplished by the medical examiners, the coders insisted, after the medical examiners had submitted their reports on adding additional diagnoses based on the enrollees' prior HCC diagnosis codes provided by the defendant Health Plans.  In many instances, the medical examiners could not make the complex diagnoses that the coders insisted upon based solely upon the patients' past medical history because the medical examiners did not have access to the patients' medical records or properly performed laboratory and diagnostic test results to confirm such diagnoses.

42.     Absent this information, the medical examiner would have to be able to perform a diagnostic test to confirm many complex diagnoses that were falsely included in the final HCC Assessments.  However, the MedXM medical examiners did not have a portable EKG machine which is necessary to correctly diagnose atherosclerosis of the coronary arteries and other types of heart disease.  Most MedXM medical examiners did not have a portable device to perform spirometry (a physical test for COPD), and this device was not provided to them by MedXM to confirm diagnoses of COPD.  The MedXM medical examiners likewise did not have portable X-ray machines and did not perform any invasive investigative procedures such as colonoscopies and sigmoidoscopies.

43.     Further, MedMX policy forbade its medical examiners from having the enrollees disrobe during the examination.  Besides the obvious fact that clothing prevents the medical examiner from observing malformed limbs, swelling,  rashes, discoloration or lesions in the clothed areas, the clothing impairs the examination of the thorax because such clothing make sounds and/or muffle sounds when using a stethoscope.  Accordingly, clothing interferes with

carefully hearing heart and lung sounds and may prevent the medical examiner from correctly hearing the rales, rubs, ronchi or wheezing (key heart and lung diagnostic sounds) required to make correct diagnoses, such atrial fibrillation, cardiac enlargement, congestive heart failure, COPD and heart valve defects.  In absence of EKG, spirometry testing, radiology, proper blood testing, and the use of other technology (all of which were not utilized by MedXM medical examiners), many of the diagnoses by MedXM medical examiners were unsupported their examinations.

44.    Despite these deficiencies, MedXM medical examiners falsely and improperly confirmed  such complex diagnoses such as atherosclerosis of the coronary arteries and other types of heart disease, COPD, secondary hyperparathyroidism, neoplasm of the small intestine and various musculoskeletal disorders.  These false and improperly confirmed HCC diagnoses inflated the enrollees' risk scores resulting in higher capitation payments to the defendant Health Plans paid by the Government.

Examinations Not Performed In Person

45.    Risk adjustment data must be the result of a face-to-face encounter with a medical examiner.  CMS Medicare Managed Care Manual, Chapter 7, § 40.  MedXM scheduled patients within a 30 mile radius of each contracted physician's, PA's, or NP's home base, (except Manhattan where a 15 mile radius was used).  During the first quarter of each calendar year, MedXM performed few if any HCC Assessments.  For the balance of the year, each contracted medical examiner was assigned an average of 8-12 HCC Assessments per day.  However, MedXM scheduled 20 to 25 in-home HCC Assessments per day for several key medical examiners who requested to perform high volumes of assessments.  Such a high volume of daily in-home face-to-face assessments could not have occurred because of the time required to perform an examination and travel from each patient's home to the next.

46.    As is explained in detail below, MedXM routinely submitted Risk Score assessments to the defendant Health Plans that were not the result of a face-to-face visit in violations of CMS regulations.  The defendant health plan knew this to be the case or acted with reckless disregard regarding these facts because of their requirements to validate all risk

-15-

adjustment data and monitor MedXM's compliance with all federal laws and CMS regulations. (*See*, 42 C.F.R. §§ 422.503(b)(vi), 422.504(i)(4).)

47.     MedXM's unwritten policy and practice was to reward medical examiners who were willing to participate in MedXM's fraudulent scheme of converting enrollees' past medical history into current HCC diagnoses by allowing such participating medical examiners to perform as many HCC Assessments per day as they wanted.  The financial inducement was significant as medical examiners were paid on average $100 per HCC Assessment with the range being between $80 and $125.  If a medical examiner performed between 20 to 25 assessments per day, s/he could earn between $40,000-$60,000 per month without any office overhead expense.

48.     MedXM medical examiners, including but not limited to the following, were consistently scheduled  high visit volumes (in excess of 15 home based visits per day) despite MedXM's knowledge that these examiners failed to comply with the face-to-face encounter requirement and/or submitted false and fraudulent data:

          i.      Dr. Muhammad Awaisi, Michigan, scheduled 20-25 patients per day;

          ii.     Dr. Jeffry Kashuk,  New York, scheduled 20-25 patients per day;

          iii.    Cindy Sprau, NP, Ohio, scheduled 20-25 patients per day;

          iv.     Dr. Mark Christopher, Ohio, scheduled 15-20 patients per day;

          v.      Dr. Robinson, scheduled 20-25 patients per day; and

          vi.     Vadim Trsoshkin, PA, California, scheduled 15-17 patients per day.

49.     During or about December 2012, Molina noticed that MedXM medical examination reports for a number of Molina patients had identical vital statistics for age, weight, sex, height, blood pressure, and heart rate, and similar or identical notes and findings in the physical examination section of such reports, and notified MedXM.  All of the patients involved had assessments performed by the MedXM's Dr. Awasi.  MedXM determined that Dr. Awasi did not actually exam all of these patients as some were seen by his medical assistant who was not credentialed with MedXM.  Further, Dr. Awasi routinely purportedly completed more than 22-25 assessments per day for Molina  traveling over a wide geographic

1    area making it implausible that he actually performed the work that he claimed.

2        50.    Upon finding out about Dr. Awasi's duplicate records relating to the patient

3    assessments, MedXM's COO instructed his staff to call all of Dr. Awasi's patients and

4    interview them under the pretense of performing quality improvement.  Through these

5    interviews, MedXM learned that Dr. Awasi was not performing all of the visits as he claimed,

6    but that his medical assistant was performing a significant number of them in violation of

7    CMS guidelines.  MedXM then had the patients reveal over the telephone their age, height,

8    weight and normal blood-pressure, as well as any other relevant medical information that was

9    related to HCC diagnoses and plotted it on a spread sheet.  This information was forwarded

10   to Dr. Awasi so he could redo the assessments.  Dr Awasi took the information from the

11   spreadsheets and created new medical assessments based on the information provided. These

12   new assessments were then provided to Molina.

13       51.    MedXM's CEO misrepresented to Molina that a printer malfunction caused the

14   data to duplicate.  Molina accepted the explanation and the resubmitted assessments without

15   further question and submitted them to CMS.

16       52.    The assessments were fraudulent because they were not based upon actual

17   examinations by Dr. Awasi, but rather based upon information provided by the patients to

18   MedXM over the telephone, and included findings that Dr. Awasi fabricated.

19       53.    MedXM's investigation of Dr. Awasi's failure to perform face-to-face

20   encounters only went back 60 days, and did not address his encounters prior to then.  Although

21   this cursory investigation confirmed that Dr. Awasi had his medical assistant perform many

22   of the in-home examinations without him being present and that Dr. Awasi was fabricating

23   HCC diagnoses and medical findings, MedXM failed and refused to undertake a

24   comprehensive investigation of the Medicare fraud problem, failed and refused to undertake

25   any corrective action regarding the frauds they discovered, and proceeded to knowingly submit

26   or caused to be submitted false and fraudulent data to CMS.

27       54.    During or about January 2013, Relator recommended to MedXM's CEO, COO

28   and Vice President of Operations that Dr. Awasi be immediately terminated, MedXM disclose

-17-

to Molina the problem created by Dr. Alwasi, MedXM retrieve and withdraw Dr. Alwasi's assessments and create a Corrective Action Plan that included the hiring of a Quality Assurance Director to prevent a repeat of the problem. However, Relator's recommendations were not taken, and Dr. Awasi still actively performs HCC Assessments and other assessment services for MedXM on Molina Medicare and Medicaid enrollees. MedXM's CEO advised Relator that Dr. Awasi's services were needed because of his high volume and willingness to travel. Relator further complained to MedXM's CEO and COO that MedXM was committing Medicare fraud because Dr. Alwasi's assessments were not the result of face-to-face examinations.

55. During March 2013, a similar problem arose with Dr. Robinson's medical examination reports of Molina patients. MedXM coders noticed that approximately 350 of Dr. Robinson's initial assessments had the identical information for the patients' physical examination reports. MedXM's senior management failed and refused to undertake any type of investigation to determine the extent of Dr. Robinson's activities and frauds, or to determine which HCC Assessments were not the result of face-to-face encounters. Rather, MedXM had Dr. Robinson collaborate with MedXM's coding trainer, Brian Hazel, to help her revise her assessments so that they did not have identical information. These improperly modified assessments were then submitted to Molina, and then on to CMS. During or about march 2013, Relator recommended to MedXM's CEO and COO that Dr. Robinson be terminated and retrieve and withdraw the assessments. However, Relator's recommendations were ignored, and Dr. Robinson was not immediately terminated because of her willingness to travel great distances to perform medical assessments and her relationship with Molina, who had requested that MedXM hire Dr. Robinson to perform HCC Assessments on its Medicare enrollees. Relator advised MedXM's CEO and COO that MedXM was committing Medicare fraud because Dr. Robinson's assessments were not the result of face-to-face examinations.

56. The HCC Assessments provided by Dr. Robinson were fraudulent because the physician's findings and physical examinations were fabricated in collaboration with MedXM's coder and were not the result of the physician's observations during face-to-face

-18-

encounters.  MedXM failed to initiate a proper investigation although it was aware of the fraud, failed to take any corrective action and knowingly submitted or caused to be submitted false and fraudulent risk adjustment data to CMS.

57.     Vadim Troshkin, a MedXM PA in the San Diego area, improperly obtained medical information from numerous patients by telephone, instead of obtaining such information from in person visits, and fraudulently completed medical examination reports as if such information was obtained during in visit examinations.

58.     During or about December 2011, an enrollee who received an HCC Assessment examination from Troshkin, called MedXM to complain that he conducted the entire examination over the telephone.  When questioned by MedXM senior management, Troshkin readily admitted to the telephonic examination practice.  Based on Troshkin's disclosures, MedXM knew that the HCC Assessments he had submitted were not the product of face-to-face encounters and constituted a fraudulent submission of risk adjustment data.  MedXM failed and refused to perform an investigation to determine the extent or magnitude of the fraud despite CMS regulations and guidelines to the contrary.  MedXM further failed and refused to initiate a corrective plan or to withdraw Troshkin's HCC Assessments.  Instead, MedXM continued to knowingly submit Troshkin's fraudulent HCC Assessment reports to the enrollee's health plan and ultimately to CMS.

59.     During or about December 2011, Relator complained to MedXM's CEO that Troshkin should be immediately terminated, and that Troshkin's medical examination reports submitted to Medicare Advantage HMOs, including but not limited to the defendant Health Plans, be withdrawn.  Relator is informed and believes that MedXM refused to promptly comply with these recommendations.

Submission of False Blood Test Results

60.     MedXM routinely and knowingly submitted false HCC diagnosis based in whole or in part upon laboratory blood test results that it knew were unreliable.

61.     In order to properly preserve blood test samples, such samples must be spun down in a centrifuge to separate the plasma from the red blood cells and then refrigerated.

-19-

1   MedXM did not provide its medical examiners with either a portable centrifuge or portable

2   coolers to adequately preserve the blood samples.

3       62.     MedXM's medical examiners delivered the blood test at a collection station for

4   the defendant Health Plans' contracted labs.  Typically, the medical examiners' last HCC

5   Assessment examination was after the such collection stations closed so the unprocessed blood

6   samples remained in the examiners' vehicles until the next day.  This process caused the blood

7   test samples to spoil and made the blood test results unreliable.

8       63.     During the latter half of 2012, Relator was informed by representatives from Lab

9   Core and Quest Diagnostic (the two primary laboratories used by the defendant Health Plans)

10  that the all the blood samples that MedXM medical examiners submitted were spoiled because

11  the blood samples had not been promptly spun down in a centrifuge nor properly stored by

12  MedXM medical examiners.  The laboratory representatives informed Relator that the spoilage

13  caused the test values to be higher and also caused a high number of critically high test values.

14  Relator reported this information to MedXM's CEO and COO during or about the latter half

15  of 2012.  The blood spoilage issue was common knowledge at MedXM.

16      64.     The labs returned the test results of the spoiled blood samples to the MedXM

17  medical examiners who originally requested them. These results were always included as part

18  of the HCC Assessments despite the fact that MedXM knew the results were unreliable due

19  to the spoilage of the blood samples.

20      65.     When critically high test values were generated from the spoiled blood samples,

21  the labs placed telephone calls to MedXM's CEO to ensure that MedXM was aware of the

22  unusual result and could take appropriate action.  These phone calls were also received by

23  MedXM's Chief Executive Officer, Sy Zahedi.  However, MedXM failed and refused to

24  conduct any type of follow-up regarding the critically high blood test results.  Further,

25  MedXM never repeated the blood test with blood samples that were not spoiled with regards

26  to the critically high test results.

27      66.     During Relator's employment with MedXM, MedXM made no effort to address

28  or improve the preservation of the blood samples.  MedXM did not inform the defendant

-20-

Health Plans, who were paying the cost of the lab test, that MedXM was knowingly processing and reporting results from spoiled blood samples and that such results were inflated and not reliable.

67.     Throughout Relator's employment with MedXM, the spoiled blood samples were used to make false diagnoses of, among other things, chronic kidney disease, anemia and leukemia, confirmation of vascular disease, heart disease and higher risk of stroke (from tests on cholesterol and triglyceride levels), and the severity of diabetes in type II patients, among other HCC diagnosis.

Other Frauds

68.     One of MedXM's independent contractor physicians, Dr. Hanna Rhee, was licensed to practice medicine in California, but not in Oregon nor Virginia.  However, MedXM assigned Dr. Rhee to conduct medical examinations of Health Net patients in Oregon and Wellpoint patients in Virginia, in spite of knowing through background investigations that Dr. Rhee was not licensed to practice medicine in those states.  Dr. Rhee conducted examinations of such patients in Oregon during or about Fall 2011 and in Virginia during or about Spring 2012, and prepared medical evaluations thereon which were submitted to MedXM, and then forwarded to Health Net and Wellpoint.  Such evaluation reports did not comply with CMS regulations because Dr. Rhee was not licensed to practice medicine in those states.  During or about 2012, Relator advised MedXM's CEO and COO that Dr. Rhea was performing assessments in states for which she was not licensed.  However, MedXM's CEO advised Relator that MedXM sent Dr. Rhee to such states because she was willing to travel, and took no corrective action.

Damages Caused by MedXM's Misconduct

69.     MedXM periodically represented to its Medicare Advantage HMO clients, including the defendant Health Plans, that it complied with all applicable laws, rules and regulations, and that the risk adjustment data it submitted to the defendant Health Plans was accurate and complete.  Such representations were knowingly false and intended to induce the Medicare Advantage HMO clients to pay MedXM monies to perform, and for performing, the

-21-

services rendered.

70.     Correspondingly, MedXM's Medicare Advantage HMO clients, including the defendant Health Plans, submitted to the Government risk adjustment data based on MedXM's improperly performed medical assessments and false and fraudulent HCC diagnoses codes, resulting in the Government paying excessive payments to MedXM's Medicare Advantage HMO clients, including the defendant Health Plans, as a result of HCC risk scores that were procured through non-compliant MedXM medical examinations, records and processes.

<u>DEFENDANT HEALTH PLANS' FRAUDULENT MISCONDUCT</u>

71.     At all times relevant, 42 C.F.R. § 422.503 required the defendant Health Plans to have in place an effective compliance program that met CMS' requirements to prevent, detect, and correct non-compliance with CMS' program requirements, as well as prevent, detect, and correct fraud waste and abuse.  This comprehensive legislation is the centerpiece of CMS' enforcement and regulation of Medicare Advantage HMOs with respect to the detection of fraud, waste and abuse, and creates an affirmative duty on each Medicare Advantage HMO (including its senior management and governing body) to be knowledgeable about compliance requirements and to ensure that the compliance plan is properly implemented, and accomplishing its objectives. (*See,* Medicare Managed Care Manual, Ch. 21 §§ 30-50.)

72.     The minimum basic requirements include, but are not limited to, written comprehensive effective compliance program policies and procedures to prevent, detect, and correct fraud, waste, abuse and non-compliance with CMS's program requirements that are well publicized throughout the organization, ongoing programs of risk assessment, self evaluations and audits designed to validate the compliance program and discover fraud, waste and abuse through and timely investigations of all compliance issues related to payment, regular (at least annually) compliance education of senior management, governing body, and first tier, downstream and related (FDR) entities, regular reports to the Medicare Advantage HMO's governing body regarding compliance efforts, effective lines of communication for

-22-

reporting of compliance issues from Medicare Advantage HMO employees as well as from FDRs, and non-intimidation policies protecting employees from reporting and/or resolving compliance issues.   (*See,* Medicare Managed Care Manual, Ch. 21 §§ 30-50.)

73.    In discussing the Medicare Advantage health plans' requirement to  certify the accuracy of risk adjustment data and new requirement imposing FCA liability for the retention of overpayments set forth at 42 C.F.R. §§ 422.504(l) and 422.326, CMS stated, "[F]or many years organizations have been obligated to submit accurate, complete and truthful payment related data, as described §422.504(l).... Further, CMS has required for many years that diagnoses that MA organizations submit for payment be supported by medical record documentation. Thus we have always expected that MA organizations or Part D sponsor implement, during the routine course of business, appropriate payment evaluation procedures in order to meet the requirements of certifying the data they submit to CMS for purposes of payment. Therefore we do not believe that §422.326 ... represent such a new requirement." 79 Fed. Reg. 29844, 29923 (May 23, 2014).  CMS further explained, "MA organizations ... are expected to have effective and appropriate payment evaluation procedures and effective compliance programs as a way to avoid receiving or retaining overpayments.  Thus, at a minimum, reasonable diligence would include proactive compliance activities conducted in good faith by qualified individuals to monitor for the receipt of overpayments.  However, conducting proactive compliance activities does not mean that the person has satisfied the reasonable diligence standard in all circumstances. In certain circumstances, for example, reasonable diligence might require an investigation conducted in good faith and in a timely manner by qualified individuals in response to credible information of a potential overpayment." *Id.*

74.    A health plan's duty to validate risk data does not stop at the HMO's doors but extends to all of the HMO's FDR entities the HMO contracts with (a first tier entity is one having a direct contract with a HMO for the provision of covered benefits under the HMO's Medicare Advantage contract).  MedXM is a first tier contracting entity of each defendant Health Plan.  The HMOs are required to ensure that their first tier contracted entities are also

-23-

in compliance with all of the regulations and laws affecting the HMOs and their requirements under their Medicare Advantage contracts.   42 C.F.R. §§ 422.504(i), (l)(3); 422.503(b)(4)(iv)(C)(1)-(3), (D).

75.   In order to comply with duties imposed by 42 C.F.R. §§ 422.503 and 422.504, the defendant Health Plans were required to:

    i.    Conduct compliance education and training at MedXM;

    ii.    Validate MedXM's assertions that it had a state of the art computer infrastructure and electronic medical record system;

    iii.    Ensure that MedXM had a HIPAA-complaint computer infrastructure designed to safeguard confidential patient information in accordance with federal law and appropriate policy and procedures related thereto;

    iv.    Ensure that MedXM maintained an electronic medical record system produced a valid electronic signature per CMS signature requirements and that MedXM had appropriate policies and procedures for maintaining the accuracy and integrity of the medical records it created and the data it reported in accordance with federal law and CMS rules, regulations guidelines and standards;

    v.    Ensure that MedXM had a Compliance Officer, a compliance program and appropriate policies and procedures for the effective implementation of the same in accordance with federal law and CMS regulations and guidelines;

    vi.    Regularly and actively monitor MedXM's activities and data submissions for incidents of fraud and respond accordingly; and

    vii.    Promptly investigate and correct any suspected incidences of Medicare fraud.

76.   None of the defendant Health Plans, nor any of the other health plans, that contracted with MedXM to provide HCC Risk Score assessments (except Wellpoint which will be discussed in more detail below) made an attempt of any kind to satisfy the duties set

-24-

forth hereinabove.  Instead, they all turned a blind eye to the truth in exchange for receiving inflated HCC risk assessment data that increased their HCC risk scores and thereby increased their capitation revenue from CMS.  Had the defendant Health Plans made even a modest attempt to certify or validate any of MedXM's claims regarding their coding and documentation policies, signature policies, enrollee/physician scheduling policies, compliance program and related policies, allied health professional credentialing policies and/or computer systems and infrastructure or, if the defendant Health Plans complied with their statutory obligations to maintain an effective compliance program with regards to the MedXM data, the true facts would have become immediately apparent.

77.    The true facts are that:

     i.    MedXM did not have any type of approved electronic medical record software system;

    ii.    MedXM did not have appropriate policies or procedures for documenting physician chart notes or amendments and changes thereto and did not do so in a manner that complied with acceptable charting standards or CMS guidelines;

   iii.    MedXM did not have appropriate policies and procedures for having physicians authenticate the medical records and data they submitted to defendant Health Plans and MedXM physicians did not validly authenticate the medical records or data that was submitted to defendant Health Plans;

    iv.    MedXM did not have an effective compliance program nor policies and procedures to properly train their management and staff regarding fraud, waste and abuse, and MedXM routinely submitted fraudulent and inaccurate data to defendant Health Plans;

    v.    MedXM did not have appropriate policies and procedures or employee training for HIPAA compliance as required by federal law, CMS guidelines and regulations, and did not properly report HIPAA data

breaches when such breaches occurred;

vi.   MedXM condoned physicians completing the assessments without having a face-to-face encounter as required by federal law and CMS regulations and scheduled an unrealistically high number of daily visits for medical examiners who violated this requirement; and

vii.  MedXM did not ensure that contracted NPs and PAs acted under the supervision and control of a physician and/or collaboration with a supervising physician, respectively, in accordance with federal and state laws and further, in instances when documentation of collaboration or supervision was proffered to MedXM, MedXM knew such documentation was bogus and that no actual physician supervision or collaboration occurred.

78.   Wellpoint was the only defendant Health Plan that attempted to perform a pre-contractual audit.  Relator is informed and believes that Wellpoint's first audit was during or about June 2011.  MedXM failed this audit for not having a compliance program, and not conducting and documenting compliance and HIPPA training.  As a result, Wellpoint issued a corrective action plan (CAP) to MedXM to correct same as a condition of starting the Wellpoint/MedXM  contract for risk assessment services.

79.   Wellpoint performed a second audit during or about September 2011 to determine whether MedXM had complied with the CAP.  MedXM also failed this "pre-contractual" audit because MedXM had not conducted and documented compliance and HIPPA training, and did not have a compliance plan.  However, this second "pre-contractual" audit was of no consequence because Wellpoint had already commenced utilizing MedXM to perform HCC assessments and/or the Wellpoint/MedXM contract had already been executed without regard to the results of Wellpoint's second "pre-contractual" audit.

80.   Subsequently, during or about March or April 2012, Wellpoint conducted another "pre-contractual" audit to determine if MedXM had complied with the CAP.  By then, MedXM had manufactured the required compliance plan polices and placed forged and/or

-26-

inaccurate certificates in its staffs' personnel files indicating that they had received the minimally required HIPAA training as part of their employee orientation, as well as training for fraud, waste and abuse. The training that did occur was a sham; not all employees actually received the training as claimed, the training was not done in a serious manner and was otherwise inadequate, and the employees were given the answer key along with the examination that followed the training.  MedXM still had not designated a compliance officer.  During this final pre-contractual audit/CAP follow-up visit, Wellpoint removed its CAP even though the Wellpoint auditors informed MedXM that it did not satisfy the CAP because MedXM still did not have a functional compliance plan until they hired a Compliance Officer.  Wellpoint's contract manager advised MedXM that Wellpoint removed the CAP requirements because MedXM was producing HCC assessments for Wellpoint with high HCC risk scores.

81.     Shortly thereafter, Relator was invited to a celebratory lunch hosted by the MedXM CEO and attended by key Wellpoint managed care network and compliance executives.  The Wellpoint executives revealed that they had instructed their auditor to remove the CAP because of the increased HCC risk scores resulting from MedXM's risk assessment submissions. Wellpoint informed MedXM that it would have to designate someone as an actual compliance officer in time for the annual audit to take place during or about June or July 2012.  This resulted in Relator being named to the post of compliance officer during or about May 2012.  MedXM's CEO advised Relator that she would just hold the position in title on paper only as a figure-head with no additional responsibilities because of her ongoing duties as Director of Provider Relations.  Wellpoint quickly became MedXM's single largest health plan contract.

82.     During or about June 2012, Wellpoint conducted an audit of MedXM and determined that MedXM did not have documentation establishing that MedXM's NPs and PAs were working in collaboration with, or being supervised by, a Medicare physician as required by applicable federal and state law.  Wellpoint issued a CAP to MedXM requiring it to obtain and maintain such documentation.  However, Wellpoint continued to accept HCC risk adjustment data from MedXM NPs and PAs even though such documentation was not

obtained.  Relator is informed and believes that during or about November 2014, Wellpoint again audited MedXM and again determined that MedXM did not have documentation establishing that MedXM's NPs and PAs were working in collaboration with, or being supervised by, a Medicare physician as required by applicable federal and state law.  In spite of MedXM's continuing failure to obtain and maintain such documentation, Wellpoint continued to accept MedXM's HCC risk adjustment data from MedXM NPs and PAs, and took no action to withdraw from CMS the HCC risk scores from same.

83.     Wellpoint's exercise of conducting the audits was not a good faith effort to avoid receiving overpayments nor to reduce fraud.  Instead, it was a sham designed to paper over Wellpoint's and MedXM's collective compliance deficiencies with a vernier of compliance. Wellpoint's actions expedited MedXM's preparation and submission to Wellpoint of false HCC diagnosis and other risk adjustment data.  Wellpoint accepted all of the Risk Score assessments MedXM performed with full knowledge that MedXM did not have a compliance plan, had not conducted any compliance training and did not have a compliance officer.  Wellpoint then submit the Risk Score assessments performed by MedXM and/or the risk adjustment data derived therefrom to CMS in order to increase Wellpoint's HCC risk scores.  Wellpoint's initial audit revealed that:

        i.     MedXM did not perform HIPAA employee training as part of employee orientation;

        ii.    MedXM did not provide employee training for fraud, waste and abuse as part of employee orientation; and

        iii.   MedXM did not have a Compliance Officer, compliance plan or any policy and procedures related thereto.

84.     Instead of suspending further work and voiding any HCC risk score assessments previously submitted by MedXM, Wellpoint increased the volume of HCC risk score assessment assignments performed by MedXM by more than 300% during Relator's employment with MedXM.

85.     At all times relevant, 42 C.F.R. § 422.504(i) required the defendant Health Plans

-28-

to maintain ultimate responsibility for their first tier, downstream and related entities' full compliance with and adherence to all terms and conditions of the defendant Health Plans' contracts with CMS (MedXM was a first tier entity).  Further, the defendant Health Plans' contracts with MedXM are required to contain a provision that the defendant Health Plans must monitor MedXM's performance on an ongoing basis.  This provision makes the defendant Health Plans strictly liable for the acts of their contractors, such as MedXM, and imposes a contractual obligation to monitor such contractors' performance, thereby contractually mandating the ability to perform the compliance plan obligations found in 42 C.F.R. § 422.503(b)(4)(vi), (*see also*, 79 Fed. Reg. 29844, 29923 (May 23, 2014).)  The defendant Health Plans failed to monitor the performance of MedXM and failed to discover and/or acted in reckless disregard for the truth regarding MedXM's failure to adhere and comply with CMS regulations regarding (a) the accuracy of the risk adjustment data that MedXM submitted, (b) compliance with HIPPA regulations, (c) compliance with documentation standards, and (d) physicians' signature requirements.  Further, as previously discussed, the defendant Health Plans utterly failed to implement any type of effective compliance program with regard to the acceptance of risk adjustment data from MedXM. Adherence with the requirements to have an effective compliance program is a material requirement for qualifying for, maintaining, and receiving payment under, a Medicare Advantage contract with CMS.  The defendant Health Plans' failures to implement effective compliance programs and properly monitor the performance of MedXM results in an implied false certification of a material fact to obtain payment from CMS.

86.    At all times relevant, 42 C.F.R. § 422.504(l)(2) required the defendant Health Plans, as a condition of receiving their monthly capitation payments, to certify that all risk adjust data, which includes the HCC Assessments and diagnosis codes at issue here, are accurate, complete and truthful (which includes having compliance programs in place to prevent, detect and correct fraud, waste, abuse and non-compliance with CMS program requirements.)  Further, 42 C.F.R. § 422.504(l)(3) required that in cases where the risk adjustment data is generated by a contractor, such as MedXM, the contractor must also attest

-29-

to the accuracy, completeness and truthfulness of the risk adjustment data it submitted to Medicare Advantage health plans, including the defendant Health Plans (which includes having compliance programs in place to prevent, detect and correct fraud, waste, abuse and non-compliance with CMS program requirements.) .

87.     The attestations made by the defendant Health Plans regarding the accuracy, truthfulness and completeness of any and all risk adjustment data submitted to them by MedXM was either knowingly false or made with a reckless disregard for the truth of the matter.  Because the defendant Health Plans utterly failed to maintain an effective compliance program as required by 42 C.F.R. § 422.503, as explained in the foregoing paragraphs, the defendant Health Plans had no basis on which to make an attestation and no basis on which to accept MedXM's attestation regarding the same.  Because the attestation requirement statute expressly requires compliance as a condition of receiving monthly capitation payments, the defendant Health Plans' violations resulted in an express false certification of a material fact to obtain payment from CMS.  (*See,* 79 Fed. Reg. 29844, 29923 (May 23, 2014).)

88.     42 C.F.R. § 422.326 makes it a violation of the FCA for a Medicare Advantage health plan to retain an overpayment for more than 60 days.  As explained in the foregoing, the defendant Health Plan's failure to have an effective compliance program and lack of reasonable diligence regarding their submission of MedXM Risk Score assessment data to CMS resulted, in the receipt of overpayments from CMS and their retention past the 60 day grace period.

<u>FIRST CLAIM FOR RELIEF</u>

(Violation of 31 U.S.C. § 3729(a) against all defendants)

89.     Relator realleges and incorporates by reference all previous paragraphs of this complaint as though fully set forth at length.

90.     At all times mentioned, defendants routinely and repeatedly violated 31 U.S.C. § 3729(a)(1) by:

          i.     Knowingly presenting and/or causing to present to agents, contractors or employees of the Government false and fraudulent claims for payment

-30-

and approval;

    ii.    Knowingly making, using, and/or causing to make or use false records and statements to get false and excessive claims paid or approved by Medicare;

    iii.    Conspiring among themselves to violate 31 U.S.C. § 3729(a)(1)(A) and (B); and,

    iv.    Knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government.

91.    Relator is informed and believes, and upon such information and belief alleges, that as a result of defendants' fraudulent misconduct, the Government was damaged in excess of $1,000,000,000.

92.    As a result of defendants' conduct, defendants are liable to the Government for three times the amount of damages sustained by the Government as a result of the false and fraudulent claims alleged above.

93.    As a result of defendants' conduct, 31 U.S.C. § 3729(a) provides that defendants are liable to the Government for civil penalties between $5,000 and $10,000 for each such false and fraudulent claim for payment.

94.    Relator is also entitled to recover her attorneys fees, costs and expenses from defendants pursuant to 31 U.S.C. § 3730(d).

## SECOND CLAIM FOR RELIEF

(Violation of 31 U.S.C. § 3730(h) against MedXM)

95.    Relator realleges and incorporates by reference all previous paragraphs of this complaint as though fully set forth at length.

96.    During or about late spring or early summer of 2012, in response to defendant

-31-

Wellpoint's upcoming annual contract audit, MedXM's compliance consultant Katrina Pelto informed MedXM's CEO that MedXM was required to hire a compliance officer, i.e., one who reports directly to the CEO and is vested with the day-to-day operations of MedXM's compliance program requirements, defines the program structure, educational requirements, reporting and complaint mechanisms, response and correction procedures, and compliance expectations of all personnel and FDRs, and does not serve in both compliance and operational areas. (*See,* 42 C.F.R. § 422.504(b)(4)(iv)(B)(1); Medicare Managed Care Manual, Ch 21. §§ 50.2, 50.2.1.) Ms. Pelto suggested Relator be assigned as the near term Compliance Officer for the Wellpoint agreement because she already had a direct reporting relationship with MedXM's CEO, a statutory requirement for the position. Relator accepted with the clear understanding that she would only be the Compliance Officer "on paper" for the near term with respect to the Wellpoint/MedXM agreement. Relator informed MedXM's CEO and Ms. Pelto that Relator had no experience in compliance and had no idea what a compliance officer was supposed to do.

97.     MedXM's CEO assured Relator that she would have virtually no additional responsibilities, duties or expectations as a result of this new "title" and would continue to perform her responsibilities as Director of Provider Relations without change. No one at MedXM explained to Relator any new job functions, duties or responsibilities associated with the Compliance Officer title, and as promised, MedXM's CEO never gave Relator any assignments or tasks related to her Compliance Officer title. No other health plan requested a copy of MedXM's compliance plan and MedXM did not provide a copy to any other health plan or regulatory agency. Relator's job description was not changed in any manner to reflect any Compliance Officer responsibilities and she was not given any additional pay or business cards with the new title. MedXM never sent her to any conferences or training seminars regarding compliance issues or to educate her regarding the Compliance Officer function. Relator never met with anyone inside or outside MedXM as the Compliance Officer and was never called upon to perform any function or task in that capacity.

98.     The compliance plan functions were handled directly by MedXM's CEO with

assistance from his consultant, Ms. Pelto.  Ms. Pelto scheduled two semi-annual compliance committee meetings which Relator attended.  The meeting agendas and minutes were prepared by Ms. Pelto without any input from Relator.  Ms. Pelto chaired both compliance committee meetings and did all of the talking.  Relator was never called upon to speak and gave no input at either meeting.  At the conclusion of the meetings, Ms. Pelto presented the meeting minutes to MedXM's CEO for signature.

99.    The situation began to change for Relator in January 2013 as a result of the fraudulent activity involving in Dr. Awasi previously described.  MedXM's CEO, as well as MedXM's Vice President of Operations, were out of town when the initial call to MedXM was received from Molina informing MedXM that there was a problem with Dr. Awasi's Risk Score assessments.  MedXM's Vice President initially asked Relator to look into the matter on her behalf, as Relator was one of the more experienced health care managers currently onsite. Relator discovered that Dr. Awasi had fabricated patient findings in approximately 750 assessments performed on Molina enrollees (the assessments contained cookie cutter type duplicate findings) and that in many cases Dr. Awasi sent his medical assistant to conduct the home Risk Score assessment in violation of federal law requiring encounters to be the result of face-to-face visits.   After reporting back to MedXM's Vice President, Relator was instructed to let MedXM's COO, Moshen Zahedi, handle the balance of the Dr. Awasi incident.  To Relator's dismay, MedXM's COO instructed the coding staff to telephonically gather new clinical data to provide to Dr. Awasi so he could alter the duplicate findings contained in the Risk Score assessments previously submitted to Molina in addition to altering approximately 350 similarly flawed Risk Score assessments that had not yet been forwarded on to Molina.

100.   Prior to MedXM's COO submitting Dr. Awasi's revised, but still fraudulent, Risk Score assessments back to Molina, during or about January 2013 Silingo spoke with MedXM's CEO and informed him that MedXM needed to withdraw all of Dr. Awasi's pending Risk Score assessments from Molina, notify Molina of the problem with Dr. Awasi's data so Molina could investigate the issue further; terminate Dr. Awasi effective immediately,

and have MedXM conduct a complete investigation to identify the extent of Dr. Awasi's fraud. CEO Zahedi replied, "Dr. Awasi may be a crook but he's our crook" and authorized the submission of the HCC risk score assessments altered by Dr. Awasi that contained new clinical data telephonically collected by MedXM's coders.  MedXM's CEO misrepresented to Molina informing it that Dr. Awasi's duplicate data was the result of a printer glitch and the issue was resolved.  After witnessing MedXM's senior management knowingly submit fraudulently created HCC Risk Score assessments to Molina, Relator became concerned that allowing her employer to use her name as the Compliance Officer could damage her professional reputation.

101.    This concern was soon validated during or about March 2013 when Relator witnessed MedXM's COO instruct MedXM staff to alter Dr. Robinson's HCC Risk Score assessments to conceal the fact the assessments contained duplicate findings are were not the product of face-to-face encounters.

102.    On or about April 1, 2013, relator Silingo sent MedXM's CEO a short note resigning the use of her name as MedXM's Compliance Officer effective immediately citing a conflict of interest.  Later that day, MedXM's CEO came to inquire as to her specific reasons.  During this and other conversations Relator complained to MedXM's CEO that:

    i.    MedXM's medical chart amendments made its medical records fraudulent;

    ii.    MedXM's use of unlocked Word medical records, amendments and corrections thereto, constituted frauds upon the Medicare Advantage HMOs and CMS;

    iii.    MedXM's continued employment and utilization of Dr. Awasi and other physicians and/or allied health providers who MedXM knew fabricated medical findings and routinely violated the face-to-face encounter requirements constituted a frauds upon the Medicare Advantage HMOs and CMS; and,

    iv.    MedXm was retaliating against her for complaining of MedXM's

-34-

fraudulent misconduct by, among other things, advising her that MedXM had employed someone to replace Relator as the Director of Provider Relations.

103.   Relator subsequently had a similar conversation with MedXM's COO.

104.   As a result of Relator complaining of such misconduct, MedXM retaliated against Relator in violation of 31 U.S.C. § 3730(h)(1) by discriminating against Relator in the terms and conditions of her employment and/or subjecting her to a hostile work environment that included, but was not limited to:

    i.    Refusing to correct or take appropriate action to correct the fraudulent misconduct Relator complained of;

    ii.    During June 2013, MedXM's CEO advised Relator that MedXM had employed someone to replace her as the Director of Provider Relations;

    iii.    Shortly after Relator resigned as compliance officer, MedXM's CEO promoted one of Relator's subordinates and direct reports, Brian Hazel, without consulting Relator, to report directly to MedXM's CEO to write MedXM's Coding Division's policies and procedures without informing or consulting Relator (the Coding Managers reported to Relator and the Coding Division was under her directorship);

    iv.    During or about May and/or June 2013, MedXM's CEO excluded Relator from continuing to complete a post discharge project she was working on with defendant Wellpoint without any explanation.  The project was part of Relator's typical job functions as Director of Provider Relations;

    v.    During or about March 2013, MedXm's CEO warned Relator on more than one occasion that, "you are rubbing everyone the wrong way" referencing Relator raising various compliance issues and further warned that she had to stop raising such issues;

    vi.    Hiring Relator's replacement before terminating Relator;

-35-

vii. Terminating Relator's employment on or about June 23, 2013; and

viii. Withholding pay and penalties due Relator at the time of her termination under *California Labor Code* §§ 201(a) and 203.

105. As a result of such retaliation and discrimination, Relator has suffered, and will continue to suffer, emotional distress, worry, anxiety and humiliation in an amount according to proof at trial.

106. In retaliating against Relator, MedXM acted with fraud, oppression and malice, warranting an award of punitive damages against MedXM in an amount to be determined at trial.

107. Relator is also entitled to recover her attorneys fees, costs and expenses pursuant to 31 U.S.C. § 3730(h)(2).

## <u>THIRD CLAIM FOR RELIEF</u>

(Violation of *California Labor Code* §§ 201, et seq. against MedXM)

108. Relator realleges and incorporates by reference all previous paragraphs of this complaint as though fully set forth at length.

109. MedXM wilfully failed to timely pay Relator compensation due her as required by *California Labor Code* § 201(a) in an amount according to proof.

110. In addition to her unpaid compensation, Relator is entitled to recover penalties from MedXM pursuant to *California Labor Code* § 203 in an amount according to proof.

111. Relator is entitled to prejudgment interest on the amount due pursuant to *California Labor Code* § 218.6.

112. Relator is entitled to reasonable attorney's fees and costs incurred pursuant to *California Labor Code* § 218.5.

/ / /

/ / /

-36-

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and <u>Qui</u> <u>Tam</u> Relator prays for relief as follows:

### FOR THE FIRST CLAIM FOR RELIEF

1.    Treble the Government's damages according to proof;

2.    Civil penalties according to proof;

3.    A relator's award of up to 30% of the amounts recovered by or on behalf of the Government;

### FOR THE SECOND CLAIM FOR RELIEF

4.    General damages in amount according to proof;

5.    Reinstatement with the same seniority status that Relator would have had but for the discrimination and retaliation;

6.    Two times the amount of back pay;

7.    Interest on the back pay;

8.    Punitive damages according to proof;

### FOR THE THIRD CLAIM FOR RELIEF

9.    Compensatory damages in amount according to proof;

10.    Penalties pursuant to *California Labor Code* § 203 in an amount according to proof;

11.    Prejudgment interest on the amount due pursuant to *California Labor Code* § 218.6;

12.    Reasonable attorney's fees and costs incurred pursuant to *California Labor Code* § 218.5;

/ / /

/ / /

-37-

1  FOR ALL CLAIMS FOR RELIEF

2      13.   Attorneys fees, expenses, and costs; and

3      14.   Such other and further relief as the Court deems just and proper.

4

5  THE ZINBERG LAW FIRM
   A Professional Corporation

6  THE HANAGAMI LAW FIRM

7  A Professional Corporation

8

9  Dated: January 9, 2015      By:*/s/William K. Hanagami*
        William K. Hanagami

10      Attorneys for Plaintiff and Qui Tam Relator,
        Anita Silingo

11

12 REQUEST FOR JURY TRIAL

13 Plaintiff and Qui Tam Relator hereby requests a trial by jury.

14

15 THE ZINBERG LAW FIRM
   A Professional Corporation

16 THE HANAGAMI LAW FIRM

17 A Professional Corporation

18

19 Dated: January 9, 2015      By:*/s/William K. Hanagami*
        William K. Hanagami

20      Attorneys for Plaintiff and Qui Tam Relator,
        Anita Silingo

21 Complaint.P03.wpd

22

23

24

25

26

27

28

-38-