**FILED**
CLERK, U.S. DISTRICT COURT

APRIL 29 2019

CENTRAL DISTRICT OF CALIFORNIA
BY: vdr_____ DEPUTY

Hon. Rosalyn M. Chapman (Ret.)
JAMS
555 West 5th Street, 32nd Floor
Los Angeles, CA 90013
213-253-9706
rchapman@jamsadr.com
alieu@jamsadr.com
SPECIAL MASTER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. ANITA SILINGO, | ) ) ) |
| Plaintiff, | ) Case No: SACV 13-1348- FMO (JCx) |
| v. | ) |
| | ) (JAMS Ref. No: 1220060795) |
| MOBILE MEDICAL EXAMINATION SERVICES, INC., a California Corporation; et al., | ) ) ) ) |
| Defendants. | ) ) |

## ORDER RE TEMPORAL SCOPE OF DISCOVERY

On January 18, 2019, the parties submitted Joint Report and Rule 26(f) Discovery Plan. (Dkt. No. 162). Although the parties agreed on many discovery matters, they were unable to reach an agreement as to the period of time the discovery should cover, i.e., the temporal scope of discovery. Accordingly, they agreed to submit the issue to the Special Master, to establish a briefing schedule, and to waive their right to file Objections and to seek review by the District

1

Court under Rule 53(f) of the Special Master's ruling.  Pursuant to the parties' agreement, on March 29, 2019, Plaintiff/Relator Anita Silingo filed (with JAMS; not ECM) a legal memorandum re temporal scope of discovery with several exhibits ("Relator's Memo."), including her own declaration (the "Silingo Declaration").  (Exhibit 1).  On April 5, 2019, Defendants jointly filed (with JAMS; not ECM) a legal memorandum in support of limiting the time frame for discovery to the period of August 2011 to June 2013 ("Defendants' Memo."). (Exhibit 2).

Oral argument was held on April 26, 2019.  William K. Hanagami, attorney-at-law, appeared on behalf of Plaintiff/Relator Anita Silingo; Michael Maddigan, a partner  with Hogan Lovells US LLP, appeared on behalf of Defendants WellPoint, Inc., Blue Cross of California dba Anthem Blue Cross Life and Health Insurance Company; Spencer Turnbull and Michael Galdes, attorneys with Latham & Watkins appeared on behalf of Defendants Health Net of California, Inc. and Health Net Life Insurance Company; Scott Voelz an attorney with O'Melveny & Myers LLP, appeared on behalf of Defendants Molina Healthcare of California, and Molina HealthCare of California Partner Plan; Jonah Retzinger,  an attorney with Epstein, Becker & Green PC, appeared on behalf of Defendant Visiting Nurse Service Choice; and Anthony Eaton, an attorney with Daponde Simpson Rowe, appeared on behalf of Defendant Alameda Alliance for Health.

## I.  Relevant Background.

On August 30, 2013, Plaintiff and *qui tam* Relator Anita Silingo ("Relator" or "Silingo") filed under seal a complaint against Defendants MedXM and Mobile Medical Examination Services (collectively, "MedXM") and Defendants WellPoint, Inc., Blue Cross of California dba

Anthem Blue Cross Life and Health Insurance Company, Health Net of California, Inc., Health Net Life Insurance Company, Molina Healthcare, Inc., Molina Healthcare of California, Molina HealthCare of California Partner Plan, Visiting Nurse Service of New York, Visiting Nurse Service Choice, and Alameda Alliance for Health (collectively, "Defendants") alleging violations of the False Claims Act.[1]   (Dkt. No. 1).   On May 21, 2014, Relator filed a First Amended Complaint against MedXM and Defendants. (Dkt. No. 10).   On or about May 14, 2014, the Government elected not to intervene in the action (Dkt. No. 11), and the District Court unsealed the documents.  (Dkt. No. 12).  After obtaining leave from the District Court (Dkt. No. 32), Relator filed a Second Amended Complaint against MedXM and Defendants on January 9, 2015.  (Dkt. No. 39).  On September 25, 2015, the District Court granted, in part, Defendants' motion to dismiss the Second Amended Complaint, with leave to amend in part.  (Dkt. No. 78).

On October 22, 2015, Silingo filed the Third Amended Complaint (TAC) against MedXM and Defendants asserting violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A) and (B).  (Dkt. No. 81).  On March 18, 2016, the Relator notified the District Court the action was settled against MedXM, who was then dismissed from the case.  (Dkt. Nos. 115-116, 123).  On July 11, 2016, the District Court granted Defendants' motion to dismiss the TAC, without leave to amend, under Rule 12(b)(6) for failure to state a claim under the heightened pleading standards of Rule 9(b).   *United States ex rel. Silingo v. Mobile Medical Examination Servs., Inc.*, 2016 WL 6802485, *3-*5 (C.D. Cal. 2016).

---

[1]   Molina Healthcare, Inc. and Visiting Nurse Service of New York later were terminated as Defendants.

3

On appeal, the Court of Appeals concluded: "The crux of the [Third Amended] [C]omplaint is that the [Defendants] retained MedXM to fraudulently increase, or at least maintain, their capitation payments for enrollees whose risk scores were set to expire and revert to the unadjusted Medicare beneficiary average." *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 674 (9th Cir. 2018). "Silingo advance[s] six theories of liability under the False Claims Act" in the TAC: (1) "[D]efendants violated 31 U.S.C. § 3729(a)(1)(A) by making, or causing to be made, a claim for payment that is 'factually false.' A factually false claim is one in which 'the claim for payment is itself literally falsely or fraudulent.…'"; (2 & 3) "[D]efendants violated [31 U.S.C.] § 3729(a)(1)(A) by making claims that were 'legally false.' There are two cognizable theories of liability for legally false claims: express false certifications and implied false certification.…"; (4) "[A] false records claim under … [31 U.S.C.] § 3729(a)(1)(B). Such a claim imposes liability where a party 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'"; (5) "[A] violation of the False Claims Act's 'reverse false claim' provision, [31 U.S.C.] § 3729(a)(1)(G)"; and (6) "[C]onspiring to violate the False Claims Act. *See* 31 U.S.C. § 3729(a)(1)(C)." *Id*. at 675-676. "Silingo timely appealed the dismissal of her causes of action for factually false claims, express false certifications, false records, and reverse false claims[,]" *id*. at 676; however, she was found to have abandoned the reverse false claim, and was prevented from reviving that claim on appeal. *Id*. at 681.

Further, the Court of Appeals found Silingo alleges the following facts in the TAC:

Anita Silingo is a former Compliance Officer and Director of Provider Relations

4

for []MedXM.[2]  MedXM employs physicians, nurse practitioners, and physician assistants to conduct in-home health assessments of Medicare beneficiaries. Silingo alleges that *from 2010 to 2014*, MedXM contracted with the [Defendants] to provide up-to-date codes and medical documentation for enrollees who otherwise may not have had an eligible medical encounter during a calendar year. First, Silingo claims that MedXM used inappropriate software so that it could edit health records to exaggerate medical diagnoses.… Once in the hands of MedXM's coders, these [health assessment] reports were allegedly modified to delete information showing little risk and insert new information to support diagnoses with higher risk scores…. Silingo asserts that all of MedXM's health assessment reports violated [Centers for Medicare and Medicaid Services ("CMS")]'s requirements for electronic medical records, and that more than half of them had been tampered with in this manner.

Next, Silingo claims that MedXM's fleet of mostly nurse practitioners and physician assistants were not legally authorized to make conclusive medical diagnoses, so their examinations could not support the risk adjustment data that was submitted.  *Before 2012*, MedXM allegedly contracted directly with these healthcare providers without ensuring that they practiced under the supervision of licensed physicians.  *From 2012 to 2014*, MedXM allegedly had contract physicians fraudulently sign standard care agreements with these non-physician

---

[2]  Silingo alleges she was employed by MedXM as an independent contractor and employee between August 2011 and June 2013, and from late spring 2012 until about April 1, 2013, she was MedXM's Compliance Officer.  TAC ¶ 14.

providers without properly supervising their work.  Silingo also claims MedXM systematically fabricated complex diagnoses that its medical examiners could not have possible confirmed during an in-home assessment….

\* \* \*

Silingo contends that the defendant[s] made false claims for payment by submitting MedXM's risk adjustment data to CMS *for several years*, either with actual knowledge that the data were invalid or with reckless disregard or deliberate ignorance as to their validity.  In doing so, the organizations allegedly violated the certification requirements of 42 C.F.R. § 422.504(1)(2), which is an express condition of payment….

*Id*. at 674-675 (footnotes inserted; italics added).

On appeal, the Ninth Circuit reversed, in part, affirmed, in part, and remanded to the District Court "for further proceedings on Silingo's causes of action for factual false claims, express false certifications, and false records."  *Id.* at 681.  In doing so, the Court of Appeals noted:  "Some discovery appears to have already taken place, but Silingo is entitled to continue taking discovery before her claims are resolved on summary judgment or at trial."  *Id*.

**II. Discovery Dispute.**

Relator asserts she is entitled to discovery of: "(a) evidence and information related to

6

2010-2014 risk assessment data and MedXM Health Assessments [("reports")];[3] and (b) evidence and information beyond 2014 to determine, among other thing, [i] the defendants' revenue received therefrom (2010-2015), [ii] defendants' knowledge that the Health Assessment reports were invalid (no temporal limit), [iii] audits and investigations concerning MedXM's Health Assessment reports (no temporal limit), and [iv] any mitigation of damage efforts (no temporal limit).   The temporal scope of discovery is not limited to the time Relator was employed with MedXM…."  Relator's Memo. at 1:7-13.

Relator asserts she has "voluntarily narrowed" her claims "to the defendants' submission of risk assessment data to CMS (and subsequent receipt of inflated capitated payments) based on MedXM assessment reports that defendants knew (a) did not have valid signatures, and/or (b) were performed by nurse practitioners practicing beyond their legally authorized scope of practice."  Memo. at 7:3-7.  She contends that under Rule 26(b)(1), the scope of discovery she seeks is proportional to the needs of the case when the rule's factors are considered:  the information is essential to the issues at stake in the action, including an accurate determination of damages; the amount in controversy exceeds $1 billion or $2,000 per patient on the average; Defendants have exclusive possession and control of the information; Defendants are large corporate entities with substantial financial and technical resources; the information is essential to resolving the issues and calculating damages for the false claims paid; and the benefits of the discovery for redressing the fraud against the public fisc outweigh any burden or expense on Defendants.

---

[3]   Relator also asserts such information should come from third parties or non-MedXM sources in order to identify possibly duplicative diagnoses, which may have been invalid and, thus, MedXM was not overpaid for the particular Medicare beneficiary.  This issue, however, is not properly before the Special Master at this time.

Additionally, Relator argues, there is little precedent in *qui tam* actions for placing a temporal limitation on discovery stemming from the relator's period of employment.  And those few cases in which district courts have limited discovery have mistakenly conflated Rule 9(b) pleading requirements with discovery, misapplied Rule 26(b)(1) or misunderstood the False Claims Act.  Moreover, as explained in the Silingo Declaration, the alleged fraudulent activity occurred both before and after her employment with MedXM.

Defendants argue that since Relator's claims of wrongdoing in violation of the False Claims Act and the factual allegations in the TAC are based solely on information she allegedly obtained while employed by MedXM between August 2011 and June 2013, her discovery should be limited to that period.  Defendants' Memo. at 1-6.  The TAC does not plead any specific allegations of misconduct before or after her employment with MedXM; thus, she should not be entitled to discovery before and after the dates of her employment.  The limited temporal nature of the TAC's allegations is further highlighted by Relator's use of verbs in the past tense, which indicates she has no direct knowledge of events after her employment ended.

Moreover, information beyond the time frame when Relator was employed by MedXM is not proportional to the needs of the case. The TAC is based on allegations stemming from Relator's  22-month employment; whereas, Relator requests discovery of home assessment reports covering 2010 through 2014 – a period of 60 months.  For other categories of discovery, Relator seeks information to the present, which would impose significant cost and burden on Defendants, and the likely benefits therefrom would not outweigh the burden.

8

Federal courts routinely consider Rule 9(b)'s boundaries when determining the temporal scope of discovery in False Claims Act cases, and nothing in the Ninth Circuit's opinion on appeal addresses this issue. Although Defendants' yearly revenue is based on the prior calendar year, this means discovery of revenues should be limited to 2012 through 2014, based on Relator's period of employment during 2011 to 2013; not beyond.   Defendants' actual knowledge, deliberate ignorance or reckless disregard of allegedly false claims or certifications goes to the time the claims and submissions were made to CMS; not what is learned years later. Further, although it is not clear what information regarding mitigation Relator seeks or how such information is relevant, discovery of mitigation should be limited to health assessments performed between 2011 and 2013.  Finally, Relator cannot broaden the scope of her pleading by submitting her declaration; thus, the Silingo Declaration should be disregarded.   Even if considered, the declaration relies entirely on speculation and conjecture, rather than personal knowledge.

**III.  Discussion.**

*A. False Claims Act*

The False Claims Act, 31 U.S.C. §§ 3729-3733:

>    prohibits knowingly submitting to the federal government a false or fraudulent claim for payment.  As one enforcement mechanism, the FCA authorizes private parties, known as "relators," to bring civil qui tam suits on the government's behalf against entities who have allegedly defrauded the government.  In these

suits, the relators seek reimbursement of the defrauded amounts on the government's behalf.  Where, as here, the government declines to intervene in the suit, the relator stands to receive between 25% and 30% of any recovery.

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1123 (9th Cir. 2015) (footnote and citations omitted).  "The FCA authorizes whistleblowing private citizens to file suit after discovering that the federal government has been defrauded."  *Id.* at 1123-1124. "The United States is the real party in interest in a *qui tam* action under the FCA even if it is not controlling the litigation."  *United States ex rel. Walker v. R&F Props. of Lake County, Inc.*, 433 F.3d 1349, 1359 (11th Cir. 2005) (citations omitted).  As such, the "FCA is remedial in nature and thus [the courts] construe its provisions broadly to effectuate its purpose."  *Townsend v. Bayer Corp.*, 774 F.3d 446, 459 (8th Cir. 2014) (citation omitted); *United States ex rel. Rigsby v. State Farm Life & Cas. Co.*, 794 F.3d 457, 468 (9th Cir. 2015).

"Under the False Claims Act, any person may serve as a *qui tam* relator.  The relator need not have any relation at all to the defendant.  Neither is there a requirement that the relator suffer injury at the hands of the defendant in order to state a claim under the False Claims Act." *Walker*, 433 F.3d at 1359 (internal quotation marks and citations omitted).  "Accordingly, Congress has amended the FCA several times to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior."  *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 16 (1st Circ. 2009) (internal quotation marks and citation omitted).

*B. Discovery Legal Standards*

"Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *see also Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) ("Broad discretion is vested in the trial court to permit or deny discovery…." (internal quotations and citations omitted)); *Schism v. United States*, 316 F.3d 1259, 1300 (Fed. Cir. 2002) ("A trial court has wide discretion in setting the limits of discovery." (internal quotation marks and citation omitted)). Nevertheless, "[l]iberal discovery 'serves the integrity and fairness of the judicial process by promoting the search for the truth.'" *United States ex rel. Fiederer v. Healing Hearts Home Care, Inc.*, 2014 WL 4666531, at *2 (D. Nev. 2014) (quoting *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993)).

Rule 26(b)(1) governs discovery in our action:

> … Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

11

Fed.R.Civ.P. 26(b)(1). "Information is discoverable under the revised Rule 26(b)(1) if it is relevant to any party's claim or defense and is proportional to the needs of the case." *Advisory Comm. Notes to the 2015 Amendment to Rule 26*.

Rule 26(b)(2)(C) requires restrictions or limitations to discovery in certain circumstances: "On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, and less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues. Fed.R.Civ.P. 26(b)(2)(C) (emphasis added). Subsection (iii) restates most of the factors courts must consider when determining proportionality under Rule 26(b)(1).

*C. Analysis*

The parties dispute the temporal period for discovery. Relator asserts that, based on the allegations in the TAC, discovery of the allegedly fraudulent health assessment reports should cover the period of 2010 through 2014. On the other hand, Defendants assert the discovery should cover the period of 2010 through 2013, based on Relator's employment with MedXM, which was for 22 months starting in August 2011 and ending in June 2013, since the allegations and claims in the TAC are based solely on information Relator allegedly obtained while

employed by MedXM.  The Special Master concludes there is no merit to Defendants' argument.

Initially, Defendants do not assert the information Relator seeks regarding risk assessment data and reports is not relevant to the claims and defenses raised by the parties within the meaning of Rule 26(b)(1).  It is.  And there is scant authority or reason to support limiting discovery to a relator's period of employment.  First, a relator may not necessarily have been employed by a defendant in a FCA case.  *Walker*, 433 F.3d at 1359.  Second, and more importantly, "the limitation of a relator's discovery rights to only the duration of his or her employment contract would undermine the purpose behind *qui tam* actions under the … FCA[], which is to vindicate the government's rights with regard to a defendant contractor's fraudulent activity.  Such a restraint regarding the discoverable timeframe would place a limit on *qui tam* actions that do not exist for government-initiated actions."  *Dalitz v. Amsurg Corp.*, 2015 WL 8717398, *3 (E.D. Cal. 2015); *Walker*, 433 F.3d at 1359.  And third, "it would dissuade whistleblowing by limiting a relator's claim, not to the plausible allegations regarding the submission of false claims – which is the [False Claims] Act's focus – but the duration of the relator's employment, on which the Act is silent."  *Fiederer*, 2014 WL 4666531 at *5.

Defendants also argue that Rule 9(b) supports limiting discovery of risk assessment data and reports to the period of Relator's employment with MedXM.  The Special Master disagrees.  As well-recognized, "Rule 9(b) is a pleading rule" intended to provide defendant with fair notice of a claim.  *Rigsby*, 794 F.3d at 466-468; *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016).  The cases Defendants cite to support applying Rule 9(b)'s heightened pleading standard to discovery appear to be idiosyncratic to the facts of the

particular cases, as well as devoid of any substantive analysis of the legislative purposes behind the False Claims Act.  *Cf. United States ex rel. Galmines v. Novartis Pharmaceuticals Corp.*, 88 F.Supp.3d 447, 453-455 (E.D. Pa. 2015) (distinguishing "fishing expedition" cases).  Here, the TAC survived Defendants' challenge under Rule 9(b). Moreover, Rule 9(b) is not necessarily applicable to discovery, especially in the context of a remedial statute such as the FCA.  *Rigsby*, 794 F.3d  at 468.   And even if Rule 9(b) were applicable, Relator, here, is not seeking to "[e]xtend[] discovery based on non-specific claims of continued misconduct or allegations not in the pleadings…."  *Uchytil on behalf of United States v. Avande, Inc.*, 2018 WL 4150889, at 2 (W.D. Wa. 2018).  Rather, as discussed below, Relator has alleged fraudulent conduct occurred from 2010 through 2014.

Defendants' oral argument focused primarily on the propriety of Relator's discovery of health assessment reports and data for the year 2014.  Defendants argued that the pleadings in the TAC do not cover the year 2014, which was after Relator stopped working for MedXM.  Relator disagreed, citing several paragraphs in the TAC, including paragraphs 24 and 79.  The language of those paragraphs is critical.  See, e.g., TAC ¶ 24 ("During and between 2010 and 2014, MedXM sent its health assessment reports to the defendant[s] on an ongoing daily basis."); TAC ¶ 79  ("During and between 2010 and 2014, MedXM sent its health assessment reports to the defendant[s].").  Clearly, the use of the word "during" is sufficient to allege fraudulent conduct in each of the years 2010, 2011, 2012, 2013 and 2014.  The Court of Appeals appears to agree, as quoted in Part I above.

Generally, Defendants challenge the relevancy of all information to the present, or post-

employment information, related to Defendants' audits and investigations and knowledge of the falsity of reports, arguing only Defendants' knowledge of the fraud at the time the allegedly false claims or certifications were submitted is relevant under the FCA.  The Special Master again disagrees.  Information related to Defendants' knowledge of the falsity of the reports, as well as audits or investigations subsequent to 2014, may be relevant for discovery purposes.  Often information subsequent to allegedly unlawful conduct or events may assist a party in uncovering or analyzing information directly related to the unlawful conduct or events.  Such subsequent information, thus, "appears reasonably calculated to lead to the discovery of admissible evidence" within the meaning of Rule 26(b)(1).  *See Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005) ("District courts have broad discretion in determining relevancy for discovery purposes.").

Defendants further contend Relator's discovery is not proportional to the needs of the case and, thus, limitations should be placed on the discovery's temporal period.  Consideration of the factors set forth in Rule 26(b)(1), however, supports Relator's assertion that the discovery she seeks is proportional and should not be limited to the years she worked for MedXM.  *Longacre v. AB Home Health Care, LLC.*, 2018 WL 6037517, at *5-*6    (D. Me. 2018).  First, it is undisputed that "the issues at stake in th[is] action" are of tremendous importance  -- not just to the litigants, but to the public.  Second, it is undisputed that "the amount in controversy" may be $1 billion, as Relator alleges -- a huge amount of money to recover.  Third, it is undisputed that Defendants have exclusive possession and control of the information essential for Relator to prove her case.  Fourth, it is undisputed that Defendants' resources are considerably more substantial than Relator's resources, especially since the Government has not intervened.  Fifth,

it is undisputed the discovery Relator seeks is important to "resolving the issues" in the case, including the amount of damages.

The only factor disputed by the parties is the sixth factor – "whether the burden or expense of the proposed discovery outweighs its likely benefit."  Defendants baldly assert that not limiting the temporal period would cause them substantial burden.  However, Defendants have not presented any evidence to support this assertion, which they must.  *See e.g., Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 303-308 (S.D. N.Y. 2012) (recognizing that a specific and detailed showing of burden or expense is the starting point for the proportionality analysis under Rule 26); 8 Charles A. Wright et al., *Federal Practice and Procedure* § 2008.1 (3d ed. 2017 update) (Courts "will scrutinize claims that the burden of producing requested information is disproportionate, and an unsupported burden objection is not guaranteed protection against respondent to discovery.").  Considering the dearth of discovery afforded Relator to date, Defendants are hard-pressed to show any burden or expense.  In any event, there is no evidence that Relator's proposed temporal period for discovery would substantially burden Defendants – let alone that the burden or expense outweighs the likely benefit of the discovery.[4]  Thus, Defendants have not met their burden to show Relator's discovery is not proportional to the needs of the case or that proportionality requires the imposition of a temporal limitation on Relator's discovery.

For all these reasons, the Special finds no merit to Defendants' request to limit the scope

---

[4] The Special Master notes the time period pleaded in *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016), a *qui tam* action related to Medicare fraud similar to our action, was eight years (2005 through 2012) – considerably longer than our five year period (2010 through 2014).

of discovery to the period of Relator's employment by MedXM, and Relator's request for a broader temporal period of discovery is granted.[5]


# ORDER

1.  Relator's request for discovery is granted, and Relator shall be permitted to conduct discovery seeking the following:

(a) information covering the period of 2010 through 2014 related to health assessment reports or risk adjustment data and MedXM's reports;

(b) information related to Defendants' revenue covering the period of 2010 through 2015;

(c) information to the present related to audits and investigations, provided the audits and investigations cover the period of 2010 through 2015;

(d) information to the present related to Defendants' knowledge that MedXM's risk assessment or adjustment data and reports were invalid during the period of 2010 through 2014; and

(e) information to the present related to Defendants' mitigation of damages affecting the receipt of revenues during the period of 2010 through 2015.


2.  Defendants' request to limit the temporal scope of discovery to the period of August 2011 through June 2013 is denied.

_____

[5]   The parties' agreement to submit this issue to the Special Master does not appear to preclude either side from submitting supporting or opposing declarations.  Thus, the Special Master has considered the Silingo Declaration, and given it the appropriate weight.  Nevertheless, the conclusions herein are not based on the Silingo Declaration. Similarly, the conclusions herein are not based on the cases Defendants cite for the proposition that the use of past tense verbs in a pleading indicate past events, which should govern discovery in this case.  As discussed herein, Relator pleaded fraudulent conduct in 2014.

3.  The JAMS Case Manager shall serve the Order on the parties and the District Court.

Date:  April 29, 2019

By: _____

1220060795.4B

Hon. Rosalyn Chapman (Ret.)
Special Master

18

**EXHIBIT 1**

1 | **William K. Hanagami, SBN 119832**
**THE HANAGAMI LAW FIRM**
2 | **A PROFESSIONAL CORPORATION**
**5950 CANOGA AVENUE, SUITE 130**
3 | **WOODLAND HILLS, CA 91367-5035**
**(818) 716-8570 / (818) 716-8569 *FAX***
4 | **BillHanagami@esquire.la**

5 | **Abram J. Zinberg, SBN 143399**
**THE ZINBERG LAW FIRM**
6 | **A PROFESSIONAL CORPORATION**
**412 OLIVE AVENUE, SUITE 528**
7 | **HUNTINGTON BEACH, CA 92648-5142**
**(714) 374-9802 / (714) 969-0910 *FAX***
8 | **AbramZinberg@gmail.com**

9 | Attorneys for Plaintiff and Qui Tam Relator,
Anita Silingo

10

11 | UNITED STATES DISTRICT COURT

12 | CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ANITA SILINGO, | Case No.: SACV13-1348-FMO(JCx) |
| Plaintiffs, | PLAINTIFF AND RELATOR ANITA SILINGO'S MEMORANDUM OF POINTS AND AUTHORITIES RE TEMPORAL SCOPE OF DISCOVERY |
| vs. | |
| MOBILE MEDICAL EXAMINATION SERVICES, INC., et al., | |
| Defendants. | |

COMES NOW, plaintiff and relator Anita Silingo (Silingo), and submits the following Memorandum of Points and Authorities regarding the temporal scope of discovery.

THE ZINBERG LAW FIRM
A Professional Corporation

THE HANAGAMI LAW FIRM
A Professional Corporation

Dated: March 29, 2019

By: */s/William K. Hanagami*
William K. Hanagami
Attorneys for Plaintiff and Qui Tam Relator,
Anita Silingo

-i-

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION AND SUMMARY OF ARGUMENT.

Because the pending *qui tam* complaint concerns the Government's overpayments to defendant Medicare Advantage health plans arising from improper and invalid MedXM Health Assessments reports performed during and between 2010 and 2014, Relator is entitled to seek discovery of (a) evidence and information related to 2010-2014 risk adjustment data and MedXM Health Assessments, and (b) evidence and information beyond 2014 to determine, among other things, the defendants' revenue received therefrom (2010-2015), defendants' knowledge that the Health Assessment reports were invalid (no temporal limit), audits and investigations concerning MedXM's Health Assessment reports (no temporal limit), and any mitigation of damage efforts (no temporal limit).  The temporal scope of discovery is not limited to the time Relator was employed with MedXM as contended by defendants.

### II.   SUMMARY OF FACTS.

Silingo sues the defendant Medicare Advantage (MA) Health Plans for violations of the False Claims Act, 31 U.S.C. § 3729, et seq., for submitting to the Government's Centers for Medicare and Medicaid Services (CMS) diagnosis codes arising from MEDXM in-home health assessment reports that the Defendant knew (a) did not have valid electronic signatures, and/or (b) were performed by Nurse Practitioners (NPs) outside of the scope of their licensure.  Dkt. #81 at ¶¶20-24, 30-45, 79, 92, 102, 104, 107, 109, 112, 114, 117, 120;  Dkt. #162 at pp. 4-5.  The pending Third Amended Complaint alleges that the  defendant MA Plans violated by False Claims Act, 31 U.S.C. § 3729(a), (FCA) by submitting to the Government risk adjustment data from such knowingly invalid **2010-2014** MedXM Health Assessment reports performed on their behalf, which resulted in Government overpaying the defendant MA Plans in excess of $1 billion.  Dkt. #81 at ¶¶24, 79, 99, 30, 128; *United States ex rel. Silingo v. Wellpoint Inc.*, 904 F.3d 667, 674 (9th Cir. 2018) ["Silingo alleges that from 2010 to 2014, MedXM contracted with the defendant Medicare Advantage organizations to provide up-to-date diagnosis codes and medical documentation for enrollees who otherwise may not

-1-

1    have had an eligible medical encounter during a calendar year.").

2    <u>Medicare Advantage and Risk Adjustment</u>

3       Under Medicare Part C, also known as Medicare Advantage (MA), the Government
4 (through the Centers for Medicare and Medicaid Services (CMS)) contracts with managed care
5 health plans, including the defendant MA Plans, to provide its beneficiaries at least those
6 medical benefits available under Medicare Parts A and B (original Medicare, also known as
7 fee-for-service (FFS) Medicare) in exchange for monthly capitated payments paid by CMS.
8 Dkt. #81 at ¶5. At all times relevant, capitated payments to a MA Plan are adjusted by risk
9 scores that enhance or lower CMS's capitated payments to the MA Plan on a
10 member-by-member basis depending on the member's relative expected healthcare
11 expenditures under Medicare FFS as compared to the average Medicare FFS beneficiary. (42
12 C.F.R. § 422.308(c). Generally, the more severe the diagnoses, the higher the risk scores, and
13 thus, the greater the capitated payments paid by CMS to the MA Plan. Dkt. #81 at ¶16.

14       In general, the risk adjustment methodology relies on MA patients' diagnoses, as
15 specified by the International Classification of Disease, Ninth Revision Clinical Modification
16 guidelines (ICD-9), to prospectively adjust capitation payments for a given enrollee based on
17 the health status of the enrollee. Dkt. #81 at ¶16. Diagnosis codes (ICD-9 codes) submitted
18 by MA Plans, such as the Defendant MA Plans, to CMS were used to develop Hierarchical
19 Condition Category (HCC) risk adjustment scores that are used by CMS to adjust the capitated
20 payment rates paid by CMS to that particular MA Plan. *Id.* The risk adjustment scores
21 compensated a MA Plan with a population of patients with more severe illnesses than normal
22 through higher capitation rates. Likewise, a MA Plan with a population of patients with less
23 severe illnesses than normal would see a downward adjustment of its capitation rates because
24 it was servicing a healthier than normal population of patients. *Id.* By risk adjusting MA Plan
25 payments, CMS attempted to make appropriate and accurate payments for enrollees with
26 differences in expected healthcare costs. *Id.*

27       In order to obtain an HCC risk adjustment score for a MA enrollee for a given year, the
28 enrollee must have an encounter with a medical provider or examiner that generates a

-2-

1  diagnosis code or codes, also known as risk adjustment data (RAD), which were timely

2  submitted to CMS.  If a MA enrollee does not have a reported encounter with a medical

3  provider or examiner that generates RAD during the year, the following year CMS will pay

4  the MAO a capitated rate for that MA enrollee as though s/he was perfectly healthy, even

5  though in prior years the MA enrollee had a number of diagnoses that resulted in significant

6  HCC risk adjustment scores and correspondingly high capitation rates. Dkt. #81 at ¶17.

7       RAD submitted by or on behalf of the Defendant MA Plans to CMS must be supported

8  by a properly documented medical record.[1]  Dkt. #81 at ¶18.  In order to be a properly

9  documented medical record, the medical record entries must, among other things, (1) be the

10 result of a MA enrollee's face-to-face encounter with a medical provider or examiner legally

11 authorized to perform the service rendered under applicable Medicare laws, regulations and

12 rules, (2) that accurately and truthfully documents the findings necessary to support the

13 medical diagnoses by the medical provider/examiner in accordance with applicable Medicare

14 laws, regulations and rules, and (3) signed by the medical provider/examiner as required by

15 Medicare. *Id.* Failure to meet any of these required elements results in the medical record not

16 being properly documented and being unable to support RAD arising therefrom, and the RAD

17 being invalid. *Id.*; *Silingo,* 904 F.3d at 674.

18 MedXM Health Assessment Reports

19       The Defendant MA Plans hired MedXM perform in-home health assessments of their

20 MA beneficiaries during and between 2010 and 2014. Dkt. #81 at ¶¶7, 24, 79, 99;  *Silingo,*

21 904 F.3d at 674. However, the RAD arising from MedXM's Heath Assessment reports are

22 invalid and should not have been submitted to CMS because (a) the Health Assessments were

23 not validly signed, and/or (b) the Health Assessments were performed by MedXM nurse

24 practitioners (NPs) outside the scope of their licensure. Dkt. #81 at ¶¶23-24, 27-28, 30-45, 77-

25

26      [1]42 C.F.R. §§ 422.310(c)(2) and (d), 422.504(l); Medicare Managed Care Manual, Ch. 7, § 40
27 [Medicare Advantage Organizations "must . . . [e]nsure the accuracy and integrity of risk adjustment
   data submitted to CMS. All diagnosis codes must be documented in the medical record and must be
   documented as a result fo a face-to-face visit. . . ."]; see also, 79 Fed. Reg. No. 100, 29844, 29923
28 (May 23, 2014) ["Further, CMS has required for many years that diagnoses that MA organizations
   submit for payment be supported by medical record documentation."]

-3-

1   79, 81-126; *Silingo,* 904 F.3d at 674. The Defendant MA Plans knew that the MedXM Health

2   Assessment reports were invalid and could not support the RAD they submitted to increase

3   the following year's capitated payments paid by CMS. Dkt. #81 at ¶¶23-24, 27-28, 30-45, 77-

4   79, 81-126.

5   Discovery propounded

6       Attached as Exhibits 1 through 4 are representative examples of Relator's written

7   discovery propounded upon the Defendant MA Plans.

8   III.   LEGAL ARGUMENT.

9       A.   THE PENDING FCA COMPLAINT IS BASED UPON RISK
            ADJUSTMENT DATA SUBMITTED FROM IMPROPER AND
10          INVALID MEDXM HEALTH ASSESSMENT REPORTS
            PERFORMED DURING AND BETWEEN 2010 AND 2014.

11

12      The TAC is based upon risk adjustment data submitted from improper and invalid

13   MedXM Health Assessment reports performed during and between 2010 and 2014. Dkt. #81

14   at ¶24, 30-45, 79, 99, 128; *Silingo,* 904 F.3d at 674 ["Silingo alleges that from 2010 to 2014,

15   MedXM contracted with the defendant Medicare Advantage organizations to provide

16   up-to-date diagnosis codes and medical documentation for enrollees who otherwise may not

17   have had an eligible medical encounter during a calendar year."].

18      Because the pending *qui tam* complaint concerns the Government's overpayments to

19   defendant Medicare Advantage health plans arising from improper and invalid MedXM Health

20   Assessments reports performed during and between 2010 and 2014, Relator is entitled to seek

21   discovery of (a) evidence and information related to 2010-2014 risk adjustment data and

22   MedXM Health Assessments,[2] and (b) evidence and information beyond 2014 to determine,

23   among other things, the defendants' revenue received therefrom (2010-2015), defendants'

24   knowledge that the Health Assessment reports were invalid (no temporal limit), audits and

25   investigations concerning MedXM's Health Assessment reports (no temporal limit), and any

26      [2]This includes risk adjustment and encounter data for the MedXM-examined MA beneficiaries
     that arose from non-MedXM sources. Relator needs such information to identify those MedXM-
27   related diagnosis codes that were duplicated from a non-MedXM source. For instance, if a MA
     beneficiary had an invalid diagnosis from a 2010 MedXM assessment but also had the same diagnosis
28   from a 2010 non-MedXM encounter, that MedXM diagnosis did not result in a CMS overpayment the
     following year.

                                        -4-

1   mitigation of damage efforts (no temporal limit).  The temporal scope of discovery is not

2   limited to the time Relator was employed with MedXM as contended by defendants.

3       B.    RELATOR IS ENTITLED TO SEEK DISCOVERY OF ANY NON-
        PRIVILEGED MATTER THAT IS RELEVANT TO HER PENDING
4       COMPLAINT, CONSIDERING THE IMPORTANCE OF THE ISSUES
        AT STAKE IN THE ACTION, THE AMOUNT IN CONTROVERSY,
5       THE PARTIES' RELATIVE ACCESS TO RELEVANT
        INFORMATION, THE PARTIES' RESOURCES, THE IMPORTANCE
6       OF THE DISCOVERY IN RESOLVING THE ISSUES, AND
        WHETHER THE BURDEN OR EXPENSE OF THE PROPOSED
7       DISCOVERY OUTWEIGHS ITS LIKELY BENEFIT.

8           The Supreme Court has made clear that the basic premise underlying the construction

9   of discovery rules is "that the deposition-discovery rules are to be accorded a broad and liberal

10  treatment to effectuate their purpose that civil trials in the federal courts no longer need be

11  carried on in the dark." *Schlagenhauf v. Holder*, 379 U.S. 104, 114–15, 85 S. Ct. 234, 241, 13

12  L. Ed. 2d 152 (1964) (Internal quotations and other citations omitted.)  The instant discovery

13  dispute is properly resolved through the application of Rule 26(b)(1). Pursuant to that rule,

14  "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any

15  party's claim or defense and proportional to the needs of the case[.]"  Fed. R. Civ. P. 26(b)(1).

16  "Relevant information need not be admissible at the trial if the discovery appears reasonably

17  calculated to lead to the discovery of admissible evidence." *U.S. ex rel Walker v. R&F*

18  *Properties of Lake Cty., Inc.*, 433 F.3d 1349, 1359 (11th Cir. 2005).  Rule 26 sets forth six

19  factors relevant to the evaluation of proportionality: (i) the importance of the issues at stake

20  in the action, (ii) the amount in controversy, (iii) the parties' relative access to relevant

21  information, (iv) the parties' resources, (v) the importance of the discovery in resolving the

22  issues, and (vi) whether the burden or expense of the proposed discovery outweighs its likely

23  benefit.

24          1.    Importance of the Issues at Stake in the Action.

25          The discovery sought by Silingo goes to the core elements of her complaint.  Silingo's

26  discovery seeks information concerning the falsity of the MedXM Health Assessments and the

27  risk adjustment data, claims and encounter data obtained therefrom which was submitted by

28  the defendants to CMS for use in calculating the following year's capitation payments for the

-5-

defendants' MA beneficiaries that were assessed.  In addition, the discovery sought goes to the defendants' knowledge of the invalidity of such assessments and related data, as well as allowing Silingo to determine that amount of actual damages, i.e., the extent to which the RAD arising from the invalid MedXM assessments inflated the following year's capitated payments to the defendants.  Without the discovery requested, Silingo will not be able to prove her claims nor accurately determine damages.

2.    The Amount in Controversy.

The pending Complaint estimates the amount in controversy as in excess of $1 billion. Dkt. #81 at ¶128. This estimate is based upon the defendants having contracted with MedXM to collectively perform approximately 500,000 to 600,000 invalid in-home assessments, and that on average, the RAD obtained from each assessment increased capitation payments by $2,000 per patient the year following the assessment.

3.    The Parties' Relative Access To Relevant Information.

The discovery sought is in the defendants' possession and control.  Silingo does not have access to any of the information or data that it has requested via discovery.  Much of the data requested, such as RAD, claims and encounter data submissions to CMS, and related calculations and reports utilizing such data, are regularly compiled and/or created in the defendants' normal course of business as part of performing their MA business.   Likewise, policy and procedures regarding electronic signature protocols, nurse practitioner's scope of practice and the in-home assessments in question are also in the defendants' sole possession and are available to Silingo.

4.    The Parties' Resources.

The defendants are all institutional MA Plans contracted with the CMS to provide health care services to MA beneficiaries. Most of the defendants are publically traded companies operating nationwide in multiple states.  Typically, each of the defendants has a wholly owned subsidiary with a state HMO license to regionally service the MA beneficiaries of that state.  Each of the defendants has substantial MA contracts with CMS and significant financial and technical resources.  As a result, complying with Relator's discovery request

-6-

1    should not be overly burdensome.

2           5.    The Importance of the Discovery in Resolving the Issues.

3           The discovery sought is central to the Relator's claims which have been voluntarily

4    narrowed to the defendants' submission of RAD to CMS (and subsequent receipt of inflated

5    capitated payments) based upon MedXM assessment reports that defendants knew (a) did not

6    have valid signatures, and/or (b) were performed by nurse practitioners practicing beyond their

7    legally authorized scope of practices.  The scope of the fraudulent activity (i.e., use of invalid

8    in-home assessments to inflate CMS's capitated payments) that is clearly alleged in the

9    pending Complaint is stated as occurring during and between 2010 and 2014.  Dkt. # 81 ¶¶24

10   &79 ["During and between 2010 and 2014, MedXM sent its health assessment reports to the

11   defendant Health Plans.  All of the MedXM health assessment reports only bore the medical

12   examiner's typewritten name, and not a signature permitted by CMS."]; *Silingo*, 904 F.3d at

13   674.  However, RAD from 2014 MedXM assessments affects 2015 capitation payments.  Dkt.

14   #81 at ¶17.  Damage mitigation by the defendants can take place anytime up to including the

15   present.  Without being able to obtain the discovery requested Silingo will be unable to prove

16   her case or calculate damages for the false claims paid to the defendants from the MA

17   program.

18           6.    Whether the Burden or Expense of the Proposed Discovery

19                 Outweighs its Likely Benefit.

20           Here, the benefits of complying with proper discovery requests to redress a fraud

21   against the public fisc clearly outweighs the burden or expense caused thereby.

22   C.    THE TEMPORAL SCOPE OF DISCOVERY IS NOT LIMITED

23         TO THE TIME RELATOR WAS EMPLOYED WITH MEDXM.

24           The majority of courts that have looked at restricting the temporal scope of discovery

25   in qui tam actions to the Relator's period of employment have rejected the idea based on

26   Fed.R.Civ.P. 26(b), the scope of the fraudulent activity alleged in the pending complaint, and

27   the language of the FCA which contains no such restrictions.

28           In *Longacre v. AB Home Health Care*, the court reviewed several cases concluding that

-7-

1 the temporal scope of discovery cannot be limited by the relator's term of employment nor

2 based on the facts related to satisfying Rule 9(b), but rather on the scope of the fraudulent

3 activity alleged on the complaint.  *Longacre v. AB Home Health Care, LLC,* No.

4 2:16-CV-00279-NT, 2018 WL 6037517 at *4 (D.Me. Nov. 15, 2018) ["case law from other

5 jurisdictions is not monolithic, with courts declining to limit discovery in qui tam actions to

6 the particularized allegations of the complaint pursuant to Rule 9(b), including the period of

7 a relator's employment, see, e.g., *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.,*

8 794 F.3d 457, 466-67 (5th Cir. 2015) ("Applying Rule 9(b) [after a motion to dismiss is

9 denied] presents a square peg/round hole problem....Rule 9(b) is not meant to supplant

10 discovery.") (citation and internal quotation marks omitted); *United States ex rel. Walker v.*

11 *R&F Props. of Lake Cty., Inc.,* 433 F.3d 1349, 1358-59 (11th Cir. 2005) (holding that district

12 court committed reversible error when it "misconstrued the False Claims Act" in "limit[ing]

13 discovery to the term of Walker's employment"); *United States ex rel. Bibby v. Wells Fargo*

14 *Bank, N.A.,* 165 F. Supp.3d 1340, 1354 & n.15 (N.D.Ga. 2015) (denying defendant's motion

15 for a protective order to the extent defendant sought geographic or temporal limits on

16 discovery; noting that the "temporal cutoff decision is ... one that must be made on a

17 case-by-case basis.")].

18    In *Silingo,* the Ninth Circuit correctly concluded that Silingo's allegations for the

19 fraudulent conduct was during and between 2010 and 2014, even though this time begins prior

20 to and concludes after Silingo's employment with MedXM.  *Silingo,* 904 F.3d at 674  Dkt.

21 #81 at ¶¶ 24 & 79.  Similar to *Silingo,* in *Walker,* the Eleventh Circuit pointed out the alleged

22 fraudulent conduct occurred before, during and after the relator's employment in overturning

23 the lower court's decision limiting the temporal scope of discovery to the relators term of

24 employment.  *Walker,* 433 F.3d at 1359.  Most decisions that limited the temporal scope have

25 conflated Rule 9(b) pleading requirements with discovery, used examples of frauds alleged

26 in the complaint to incorrectly define the scope of fraudulent activity, failed to correctly apply

27 Fed.R.Civ.P. 26(b), or misapplied the FCA.  *See, Walker, supra; United States ex rel. Rigsby*

28 *v. State Farm Fire & Cas. Co.,* 794 F.3d 457, 466-67 (5th Cir. 2015);  *Longacre,* 2018 WL

1   6037517 at *4; *United States ex rel. Fiederer v. Healing Hearts Home Care, Inc.*, No.

2   2:13-CV-1848-APG-VCF, 2014 WL 4666531 at *5 (D.Nev. Sept. 18, 2014).

3       It is improper to limit the temporal scope of discovery to the terms of Silingo's

4   employment with MedXM.[3] In *Walker,* the Eleventh Circuit reviewed a nurse practitioner's

5   scope of practice False Claims Act fraud claim and limitations placed on the temporal scope

6   of discovery by the District Court. The Eleventh Circuit held that limiting the temporal scope

7   of discovery to the relator's employment term with the defendant was a misapplication of the

8   False Claims Act causing reversible error. The *Walker* Court stated, "The relator need not

9   have any relation at all to the defendant. Neither is there a requirement that the relator suffer

10   injury at the hands of the defendant in order to state a claim under the False Claims Act. The

11   United States is the real party in interest in a qui tam action under the FCA even if it is not

12   controlling the litigation." *Walker,* 433 F.3d at 1359 (Internal quotations and other citations

13   omitted). Further, the Eleventh Circuit in *Walker* held that such a limitation was inconsistent

14   with the purpose and function of Fed.R.Civ.P. Rule26(b). *Id.* ["Thus, Walker should have

15   been permitted discovery of all information relevant to her claims, on behalf of the United

16   States, that false claims for payment were made by LFM."]

17       Other Courts have reached similar conclusions. In *Dalitz v. AmSurg Corp.*, in ruling

18   on a motion to compel where the defendant sought to limit the temporal scope of discovery

19   to the relator's term of employment, the District Court held, "[t]he limitation of a relator's

20   discovery rights to only the duration of his or her employment contract would undermine the

21   purpose behind *qui tam* actions under the federal and California FCAs, which is to vindicate

22   the government's rights with regard to a defendant contractor's fraudulent activity." *Dalitz v.*

23   *AmSurg Corp.*, No. 2:12-CV-2218-TLN-CKD, 2015 WL 8717398, at *3 (E.D.Cal. Dec. 15,

24   2015). Likewise, in *United States ex rel. Fiederer v. Healing Hearts Home Care,* the relator

25   worked for the defendant for 28 days but alleged fraudulent activity going back six years,

26   consistent with the FCA's statute of limitations. In ruling on a motion to compel that sought

27

28       [3] Anita Silingo's attached declaration reflects why she contends that the subject fraudulent activity occurred both before and after her employment with MedXM.

-9-

1   to limit discovery to the term of 28 days of the relator's employment the Court held that 28 day

2   term of the relator's employment was irrelevant and the court's inquiry was limited to

3   determining relevancy under Fed.R.Civ.P. 26. *United States ex rel. Fiederer v. Healing*

4   *Hearts Home Care, Inc.*, No. 2:13-CV-1848-APG-VCF, 2014 WL 4666531 at *5 (D.Nev.

5   Sept. 18, 2014). The Court also held regarding the FCA, "Limiting a relator's discovery rights

6   to the duration of her employment would weaken the Act by placing limits on qui tam actions

7   that do not exist for government-initiated actions." *Id.*

8   ## IV.   CONCLUSION.

9       For the reasons set forth hereinabove, Relator is entitled to seek relevant discovery

10  pursuant to Fed.R.Civ.P. 26(b) before, during and after her term of employment with MedXM

11  related to the MedXM assessments. Because the pending *qui tam* complaint concerns the

12  Government's overpayments to defendant MA Plans arising from improper and invalid

13  MedXM assessments reports performed during and between 2010 and 2014, Relator is entitled

14  to seek discovery of (a) evidence and information related to 2010-2014 risk adjustment data

15  and MedXM Health Assessments, and (b) evidence and information beyond 2014 to

16  determine, among other things, the defendants' revenue received therefrom (2010-2015),

17  defendants' knowledge that the Health Assessment reports were invalid (no temporal limit),

18  audits and investigations concerning MedXM's Health Assessment reports (no temporal limit),

19  and any mitigation of damage efforts (no temporal limit). The temporal scope of discovery

20  is not limited to the time Relator was employed with MedXM as contended by defendants.

21

22              THE ZINBERG LAW FIRM
                A Professional Corporation
23
                THE HANAGAMI LAW FIRM
24              A Professional Corporation

25
    Dated: March 29, 2019          By:/s/William K. Hanagami
26                                     William K. Hanagami
                                       Attorneys for Plaintiff and Qui Tam Relator,
27                                     Anita Silingo

28

-10-

SILINGO'S MEMORANDUM OF POINTS AND AUTHORITIES
SACV13-1348-FMO(JCx)

# Exhibit 1

1  **William K. Hanagami, SBN 119832**
   **THE HANAGAMI LAW FIRM**
2  **A PROFESSIONAL CORPORATION**
   **5950 CANOGA AVENUE, SUITE 130**
3  **WOODLAND HILLS, CA 91367-5035**
   **(818) 716-8570 / (818) 716-8569** *FAX*
4  **BillHanagami@esquire.la**

5  **Abram J. Zinberg, SBN 143399**
   **THE ZINBERG LAW FIRM**
6  **A PROFESSIONAL CORPORATION**
   **412 OLIVE AVENUE, SUITE 528**
7  **HUNTINGTON BEACH, CA 92648-5142**
   **(714) 374-9802 / (714) 969-0910** *FAX*
8  **AbramZinberg@gmail.com**

9  Attorneys for Plaintiff and Qui Tam Relator,
   Anita Silingo

10                 UNITED STATES DISTRICT COURT

11               CENTRAL DISTRICT OF CALIFORNIA

12

13  UNITED STATES OF AMERICA, *ex rel.*          Case No.: SACV13-1348-FMO(JCx)
    ANITA SILINGO,

14          Plaintiffs,                          PLAINTIFF AND RELATOR'S
                                                 FIRST AMENDED
15  vs.                                          INTERROGATORIES, SET 1, TO
                                                 DEFENDANTS MOLINA
16  MOBILE MEDICAL EXAMINATION
    SERVICES, INC., et al.,

17          Defendants.

18

19  PROPOUNDING PARTY:        Plaintiff and Relator, Anita Silingo

20  RESPONDING PARTY:         Defendants Molina Healthcare, Inc., Molina Healthcare of

21                            California, and Molina Healthcare of California Partner

22                            Plan, Inc.

23  SET NUMBER:               One

24          COMES NOW, plaintiff and relator Anita Silingo, and propounds the following First

25  Amended Interrogatories, Set No. 1, upon defendants Molina Healthcare, Inc., Molina

26  Healthcare of California, and Molina Healthcare of California Partner Plan, Inc. pursuant to

27  Fed.R.Civ.P. 33.

28

                                            -1-

                                                                    INTERROGATORIES
                                                                    SACV13-1348-FMO(JCx)

<u>DEFINITIONS</u>

1.      "PLAINTIFF" means Anita Silingo.

2.      "YOU" and "YOUR" refer to defendants Molina Healthcare, Inc., Molina Healthcare of California, and Molina Healthcare of California Partner Plan, Inc., their respective parent, affiliate and subsidiary business entities, and agents, officers, attorneys and employees.

3.      "MedXM" refers to Mobile Medical Examination Services, Inc. and MedXM, and their respective agents, officers, attorneys and employees.

4.      "Third Amended Complaint" and "TAC" refer to the Third Amended Complaint filed in the above-captioned action on or about October 22, 2015.

5.      "DOCUMENT" means all writings, recordings, photographs, originals, duplicates, and electronically stored information, all as defined by Federal Rule of Evidence 1001, and all those things encompassed in the lists set forth in Fed.R.Civ.P. 34(a)(1) and that are in YOUR actual or constructive possession, custody, care or control. The term "DOCUMENT" includes but is not limited to draft versions.

6.      "IDENTIFY" has the following meanings:

a.      With respect to a person, YOU shall furnish information sufficient to enable the propounding party to locate the person, including, without limitation, the person's name and last-known business and residence addresses, business and residence telephone numbers, and position(s).

b.      With respect to a communication, YOU shall state the date of the communication; indicate whether the communication was oral or written; if it was written (or if the oral communication was recorded in any manner in writing), identify the DOCUMENT containing the communication; and if the communication was oral, identify the persons who were present at or had knowledge of the communication and the substance of what was said.

c.      With respect to DOCUMENTS, YOU shall specifically (i) state the type of DOCUMENT (e.g. letter, memorandum, agreement), (ii) provide information sufficient to enable the propounding party to specify and to locate the document, such as its date, the name

-2-

of the addressee of addressees, the name of the signatory or signatories, the title or heading of the document, as well as its number of pages; (iii) identify all persons to whom copies of the document were sent; and (iv) identify the last-known possessor(s) of the original of the documents (or if that is not available, of the most legible copy or copies).

7.     "REFLECT OR REFER TO" mean, without limitation, regarding, referring to, related to, concerning, alluding to, responding to, connected with, commenting upon, about, announcing, explaining, discussing, showing, describing, reflecting or analyzing.

8.     "CMS" means the Centers for Medicare and Medicaid Services and its administrative contractors, representatives and agents, but excludes any contracted Medicare Advantage health plan, health maintenance organization and preferred provider organization

9.     "Diagnosis Codes" means the medical diagnosis codes set forth in the International Classification of Disease 10th Revision, Clinical Modification, or the International Classification of Disease 9th Revision, Clinical Modification, required or allowed by CMS for reporting to CMS.

10.     "Risk Adjustment Data" has the meaning defined in 42 C.F.R. § 422.310 [" all data that are used in the development and application of a risk adjustment payment model."]

11.     "Risk Adjustment Processing System" or "RAPS" means the CMS system through which Risk Adjustment Data is processed.

12.     "RAPS data" means the Risk Adjustment Data, Diagnosis Codes, beneficiary identification information and medical provider or examiner identification information submitted, or to be submitted, to CMS's Risk Adjustment Processing System in electronic flat file format as required by CMS.

13.     "RAPS Return File" means "RAPS Return File" referenced on page 24 of the CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide (http://www.cssoperations.com/Internet/Cssc3.Nsf/files/2013_RA101ParticipantGuide_5 CR_081513.pdf/$File/2013_RA101ParticipantGuide_5CR_081513.pdf).

14.     "Hierarchical Condition Category" or "HCC" means a diagnosis grouping with a relative value, referred to as risk adjustment factor, assigned to the HCC by CMS for each

-3-

1  model segment used in the CMS HCC Risk Adjustment Model.[1]

2       15.   "Risk Adjustment Score" means the sum of HCC risk adjustment factors

3  determined by the valid Diagnosis Codes and demographic data of a particular MA beneficiary

4  for a given calendar year.

5       16.   "Medicare Advantage" or "MA" means the Medicare program referred to as

6  Medicare Part "C" as set forth in 42 U.S.C. §§ 1395w–21 through 1395w-28 wherein

7  beneficiaries obtain their benefits through a Medicare Advantage Plan.

8       17.   "Medicare Advantage Plan" or "MA Plan" means health benefits coverage

9  offered under a policy, contract, or plan by a Medicare Advantage organization pursuant to and

10 in accordance with a contract with CMS under section 42 U.S.C. § 1395w–27 that provides

11 all required benefits for a pre-paid monthly capitated fee paid by CMS on behalf of each

12 assigned beneficiary.

13      18.   "Electronic Signature" means encrypted or digital electronic signature acceptable

14 to CMS for use in authenticating a electronic medical record's documentation of a face-to-face

15 encounter by a medical provider or examiner.[2]

16 / / /

17 / / /

18

---

19 [1] CMS HCC Risk Adjustment Model means "CMS HCC Risk Adjustment Model" as
20 referenced in Medicare Managed Care Manual, Ch. 7 § 70.2 available at https://www.cms.gov/
   Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html.

21 [2] CMS requires that an electronic signature must have (a) the medical provider's or examiner's
   signature, credentials (e.g., M.D., N.P., P.A. etc.), and date, (b) an authentication by the medical
22 provider or examiner (e.g., "approved by," "signed by," "electronically signed by"), (c) is used
   exclusively by the individual medical provider or examiner, and (d) is created with computer software
23 that prohibits others from using such medical provider's or examiner's electronic signature (e.g.,
   password protected, encryption, etc.). Medicare Program Integrity Manual, Ch. 4 § 3.3.2.4(E). As
24 of September 27, 2017, CMS limits acceptable medical provider or examiner authentication to
   "Accepted by – Acknowledged by – Approved by– Authenticated by – Charted by – Closed by –
25 Completed by – Confirmed by – Created by – Digitally signed by – Electronically authored by –
   Electronically signed by – Entered by – Entered data sealed by – Finalized by – Generated by – Read
26 by – Released by – Reviewed by – Sealed by – – signature on file {date/time signed} – Signed by –
   Validated by – Verified by – Written by – Performed by (when meaning the exam and related
27 documentation are being performed by the same physician/practitioner)." CMS-Contract-Level Risk
   Adjustment Data Validation Medical Record Reviewer Guidance, at P.16, available at
28 https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-
   Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Coders-Guidance.pdf.
   -4-

## INTERROGATORIES

1.     IDENTIFY the full legal name and address of each of YOU and YOUR parent, subsidiary and affiliate business entities (a) that contracted with MedXM to perform in-home health assessments during or between 2010 and 2018, or (b) whose Medicare Advantage beneficiaries were the subject of MedXM in-home health assessments performed during or between 2010 and 2018. Please organize and label your response by year and indicate whether each such IDENTIFIED entity contracted with MedXM to perform in-home health assessments and/or had Medicare Advantage beneficiaries that were the subject of MedXM in-home health assessments.

2.     IDENTIFY every in-home health assessment report of YOUR Medicare Advantage beneficiaries YOU received from MedXM in which the in-home heath assessment examination encounter occurred during or between 2010 and 2018. Please organize and label your response by the year of such encounters, and then by the Medicare Health Insurance Claim (HIC) number of the Medicare Advantage beneficiaries.

3.     For each health assessment IDENTIFIED in response to Interrogatory No. 2, state the name of YOUR MA beneficiary, his or her HIC number, YOUR identification number for the beneficiary, date of the MedXM in-home health assessment examination, the name and credential (i.e., M.D., N.P. or P.A.) of the MedXM medical examiner that ostensibly performed the MedXM health assessment examination and YOUR submitter number[3] used for submitting such beneficiary's Risk Adjustment Data to CMS. Please organize and label your response by the year of such MedXM in-home health assessment examinations, and then by the HIC number of the Medicare Advantage beneficiaries.

4.     How many of the in-home health assessment reports YOU IDENTIFIED in response to Interrogatory No. 2 bore the handwritten signature of the medical examiner that ostensibly performed the corresponding in-home health assessment examination? Please organize and label the responses by year.

---

[3] Every entity that submits Risk Adjustment Data to CMS is issued a unique submitter number for each MA contract.

-5-

5.    How many of the in-home health assessment reports YOU IDENTIFIED in response to Interrogatory No. 2 bore the typewritten name of the medical examiner that ostensibly performed the corresponding in-home health assessment examination?  Please organize and label the responses by year.

6.    How many of the in-home health assessment reports YOU IDENTIFIED in response to Interrogatory No. 2 bore the Electronic Signature (that is not simply the typewritten name) of the medical examiner that ostensibly performed the corresponding in-home health assessment examination?  Please organize and label the responses by year.

7.    For each in-home health assessment report YOU IDENTIFIED in your response to Interrogatory No. 6 that bore the Electronic Signature of the medical examiner that ostensibly performed the corresponding in-home health assessment examination, state the name of YOUR MA beneficiary, his or her Medicare Health Insurance Claim (HIC) number, YOUR identification number for the beneficiary, date of the MedXM in-home health assessment examination, the name and credential (i.e., M.D., N.P. or P.A.) of the MedXM medical examiner that performed the healthcare assessment and YOUR Medicare submitter number used for submitting such beneficiary's Risk Adjustment Data to CMS.   Please organize and label your response by the year of such MedXM in-home health assessment examinations, and then by the HIC number of the Medicare Advantage beneficiaries.

8.    For those MedXM in-home assessment reports that you contend in your response to Interrogatory No. 6 that have Electronic Signatures (that are not simply the typewritten name) of the medical examiners that ostensibly performed the corresponding in-home health assessment examinations, state all facts upon which you base your contentions that such Electronic Signatures are valid.

9.    For each and every MA beneficiary that YOU submitted Risk Adjustment Data to CMS arising from MedXM in-home health assessment examinations during or between 2010 and 2018, IDENTIFY the community base capitation rate (i.e., Risk Adjustment Score equals 1.00) for the calender year immediately after YOUR MA beneficiary received such MedXM in-home assessment examination.   Please organize and label the responses by the

-6-

1   year of the MedXM encounters, and then by the HIC number of the Medicare Advantage

2   beneficiaries.

3         10.    For each of YOUR Medicare Advantage beneficiaries that had a MedXM in-

4   home health assessment examination encounter during or between 2010 and 2018, state the

5   name of YOUR MA beneficiary, his or her HIC number, YOUR identification number for the

6   beneficiary, the year of the MedXM examination, and all Diagnosis Codes and HCCs arising

7   therefrom that YOU submitted to CMS. Please organize and label the responses by the year

8   of the MedXM encounters, and then by the HIC number of the Medicare Advantage

9   beneficiaries.

10        11.    If YOU contend that any of the HCCs or Diagnosis Codes that YOU identified

11   in YOUR response to Interrogatory No. 10 were duplicated, superseded or replaced by

12   Diagnosis Codes or HCCs that arose from sources other than MedXM during the same

13   calendar year as the MedXM encounter, state the name of YOUR MA beneficiary, his or her

14   HIC number, YOUR identification number for the beneficiary, the year of the MedXM

15   examination, and the Diagnosis Codes and HCCs from the non-MedXM encounters. Please

16   organize and label the responses by the year of the MedXM encounters, and then by the HIC

17   number of the Medicare Advantage beneficiaries.

18        12.    If YOU contend that YOU relied upon the advice of an attorney as a defense to

19   any claim for relief or claim in the TAC, IDENTIFY the attorneys upon whose advice YOU

20   relied upon, the advice the attorneys gave to YOU, all persons with knowledge of such advice,

21   and all DOCUMENTS and communications that REFLECT OR REFER TO such advice.

22

23                              THE ZINBERG LAW FIRM
                                A Professional Corporation

24

25                              THE HANAGAMI LAW FIRM
                                A Professional Corporation

26

27   Dated: January 31, 2019         By:
                             William K. Hanagami

28                              Attorneys for Plaintiff and Qui Tam Relator,
                             Anita Silingo

-7-

PROOF OF SERVICE

1

2      I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled action.

3

4      On January 31, 2019, I served a copy of the above attached document(s) by transmitting via e-mail or electronic transmission of it/them to the person(s) at the email addresses set forth below:

5      Michael M. Maddigan                          Attorneys for Defendants, Wellpoint, Inc., Blue
       Poopak Nourafchan                            Cross of California, dba Anthem Blue Cross, et
6      HOGAN LOVELLS US LLP                          al.
       1999 Avenue of the Stars, Suite 1400
7      Los Angeles, CA 90067
       michael.maddigan@hoganlovells.com
8      poopak.nourafchan@hoganlovells.com

9      Miranda L. Berge                             Attorneys for Defendants, Wellpoint, Inc., Blue
       HOGAN LOVELLS US LLP                         Cross of California, dba Anthem Blue Cross, et
10     555 Thirteenth Street, NW                    al.
       Washington, D.C. 20004
11     Miranda.berge@hoganlovells.com

12     David J. Schindler                           Attorneys for Defendants, Health Net, Inc.,
       Spencer K. Turnbull                          Health Net Life Insurance Company, Health Net
13     LATHAM & WATKINS LLP                         of California
       355 S. Grand Avenue, Suite 100
14     Los Angeles, CA 90071-1560
       David.Schindler@lw.com
15     spencer.turnbull@lw.com

16     Anne W. Robinson                             Attorneys for Defendants, Health Net, Inc.,
       LATHAM & WATKINS LLP                         Health Net Life Insurance Company, Health Net
17     555 Eleventh Street NW, Suite 1000           of California
       Washington, DC 20004
18     anne.robinson@lw.com

19     R. David Jacobs                              Attorneys for Defendants, Visiting Nurse Service
       Jonah D. Retzinger                           Choice, Visiting Nurse Service of New York
20     Epstein, Becker & Green
       1925 Century Park East, Suite 500
21     Los Angeles, CA 90067
       djacobs@ebglaw.com
22     jretzinger@ebglaw.com

23     Elizabeth M. Bock                            Attorneys for Defendants, Molina Healthcare,
       David M. Deaton                              Inc., et al.
24     Sabrina H. Strong
       Scott Voelz
25     O'MELVENY & MYERS LLP
       400 S. Hope Street
26     Los Angeles, CA 90071-2899
       ebock@omm.com
27     ddeaton@omm.com
       sstrong@omm.com
28     svoelz@omm.com

-8-

| | | |
|---|---|---|
| 1 | David Leviss | Attorneys for Defendants, Molina Healthcare, |
| | Amanda M.B. Santella | Inc., et al. |
| 2 | O'MELVENY & MYERS LLP | |
| | 1625 Eye Street NW | |
| 3 | Washington, DC 20006 | |
| | dleviss@omm.com | |
| 4 | asantella@omm.com | |
| | | |
| 5 | Michael J. Daponde | Attorneys for Defendant, Alameda Alliance for |
| | Anthony R. Eaton | Health |
| 6 | DAPONDE SIMPSON ROWE PC | |
| | 500 Capitol Mall, Suite 2260 | |
| 7 | Sacramento, CA 95814 | |
| | aeton@dsrhealthlaw.com | |
| 8 | mdaponde@dsrhealthlaw.com | |
| | | |
| 9 | Abram J. Zinberg | Co-Counsel for Plaintiff and Relator, Anita |
| | THE ZINBERG LAW FIRM, A.P.C. | Silingo |
| 10 | 412 Olive Avenue, Suite 528 | |
| | Huntington Beach, CA 92648 | |
| 11 | AbramZinberg@gmail.com | |
| | | |
| 12 | John E. Lee | Attorneys for Plaintiff, United States of America |
| | OFFICE OF | |
| 13 | THE UNITED STATES ATTORNEY | |
| | 300 N. Los Angeles Street, Room 7516 | |
| 14 | Los Angeles, CA 90012 | |
| | john.lee2@usdoj.gov | |

15
16     Executed on January 31, 2019 at Incline Village, Nevada.

     I hereby certify that I am a member of the Bar of the United States District Court, Central
17 District of California, and that the foregoing is true and correct.

18
19                        William K. Hanagami

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

STATE OF CALIFORNIA      )
                         )
COUNTY OF ORANGE         )

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Orange, State of California, and not a party to the above-entitled cause.

On January 31, 2019, I served a true copy of the above-attached document(s) by depositing it/them in the United States Mail at Huntington Beach, California in a sealed envelope with the postage thereon fully prepaid addressed to the following:

R. David Jacobs                         Attorneys for Defendants, Visiting Nurse
Jonah D. Retzinger                      Service of New York and Visiting Nurse
Epstein, Becker & Green                 Service Choice
1925 Century Park East, Suite 500
Los Angeles, CA 90067

Executed on January 31, 2019 at Huntington Beach, California.

I hereby certify that I am a member of the Bar of the United States District Court, Central District of California, and that the foregoing is true and correct.

Abram J. Zinberg

# Exhibit 2

1  **William K. Hanagami, SBN 119832**
   **THE HANAGAMI LAW FIRM**
2  **A PROFESSIONAL CORPORATION**
   **5950 CANOGA AVENUE, SUITE 130**
3  **WOODLAND HILLS, CA 91367-5035**
   **(818) 716-8570 / (818) 716-8569** *FAX*
4  **BillHanagami@esquire.la**

5  **Abram J. Zinberg, SBN 143399**
   **THE ZINBERG LAW FIRM**
6  **A PROFESSIONAL CORPORATION**
   **412 OLIVE AVENUE, SUITE 528**
7  **HUNTINGTON BEACH, CA 92648-5142**
   **(714) 374-9802 / (714) 969-0910** *FAX*
8  **AbramZinberg@gmail.com**

9  Attorneys for Plaintiff and Qui Tam Relator,
   Anita Silingo

10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA, *ex rel.*      Case No.: SACV13-1348-FMO(JCx)
    ANITA SILINGO,
14
              Plaintiffs,
15                                            PLAINTIFF AND RELATOR'S
    vs.                                       FIRST AMENDED
16                                            INTERROGATORIES, SET 2, TO
    MOBILE MEDICAL EXAMINATION                DEFENDANTS MOLINA
17  SERVICES, INC., et al.,

18            Defendants.

19

20  PROPOUNDING PARTY:        Plaintiff and Relator, Anita Silingo

21  RESPONDING PARTY:         Defendants, Molina Healthcare, Inc., Molina Healthcare

22                            of California, and Molina Healthcare of California Partner

23                            Plan, Inc.

24  SET NUMBER:               Two

25        COMES NOW, plaintiff and relator Anita Silingo, and propounds the following First

26  Amended Interrogatories, Set No. 2, upon defendants Molina Healthcare, Inc., Molina

27  Healthcare of California, and Molina Healthcare of California Partner Plan, Inc., pursuant to

28  Fed.R.Civ.P. 33.

                              -1-

## DEFINITIONS

1.    "PLAINTIFF" means Anita Silingo.

2.    "YOU" and "YOUR" refer to defendants Molina Healthcare, Inc., Molina Healthcare of California, and Molina Healthcare of California Partner Plan, Inc., their respective parent, affiliate and subsidiary business entities, and agents, officers, attorneys and employees.

3.    "MedXM" refers to Mobile Medical Examination Services, Inc. and MedXM, their respective agents, officers, attorneys and employees.

4.    "Third Amended Complaint" and "TAC" refer to the Third Amended Complaint filed in the above-captioned action on or about October 22, 2015.

5.    "DOCUMENT" means all writings, recordings, photographs, originals, duplicates, and electronically stored information, all as defined by Federal Rule of Evidence 1001, and all those things encompassed in the lists set forth in Fed.R.Civ.P. 34(a)(1) and that are in YOUR actual or constructive possession, custody, care or control.   The term "DOCUMENT" includes but is not limited to draft versions.

6.    "IDENTIFY" has the following meanings:

    a.    With respect to a person, YOU shall furnish information sufficient to enable the propounding party to locate the person, including, without limitation, the person's name and last-known business and residence addresses, business and residence telephone numbers, and position(s).

    b.    With respect to a communication, YOU shall state the date of the communication; indicate whether the communication was oral or written; if it was written (or if the oral communication was recorded in any manner in writing), identify the DOCUMENT containing the communication; and if the communication was oral, identify the persons who were present at or had knowledge of the communication and the substance of what was said.

    c.    With respect to DOCUMENTS, YOU shall specifically (i) state the type of DOCUMENT (e.g. letter, memorandum, agreement), (ii) provide information sufficient to enable the propounding party to specify and to locate the document, such as its date, the name

-2-

of the addressee of addressees, the name of the signatory or signatories, the title or heading of the document, as well as its number of pages; (iii) identify all persons to whom copies of the document were sent; and (iv) identify the last-known possessor(s) of the original of the documents (or if that is not available, of the most legible copy or copies).

7.      "REFLECT OR REFER TO" mean, without limitation, regarding, referring to, related to, concerning, alluding to, responding to, connected with, commenting upon, about, announcing, explaining, discussing, showing, describing, reflecting or analyzing.

8.      "CMS" means the Centers for Medicare and Medicaid Services and its administrative contractors, representatives and agents but excludes any contracted Medicare Advantage health plan, health maintenance organization and preferred provider organization

9.      "Diagnosis Codes" means the medical diagnosis codes set forth in the International Classification of Disease 10th Revision, Clinical Modification or for Diagnosis Codes prior or its predecessor, the International Classification of Disease 9th Revision, Clinical Modification required or allowed by CMS for documenting and reporting Risk Adjustment Data.

10.      "Risk Adjustment Data" has the meaning defined in 42 C.F.R. § 422.310, [" all data that are used in the development and application of a risk adjustment payment model."]

11.      "Risk Adjustment Processing System" or "RAPS" means the CMS system through which Risk Adjustment Data is processed.

12.      "RAPS data" means the submission of Risk Adjustment Data, Diagnosis Codes, beneficiary identification information and medical provider or examiner identification information submitted to CMS's Risk Adjustment Processing System in electronic flat file format as required by CMS.

13.      "RAPS Return File" means "RAPS Return File" referenced on page 24 of the CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide (http://www.csscoperations.com/Internet/Cssc3.Nsf/files/2013_RA101ParticipantGuide_5 CR_081513.pdf/$File/2013_RA101ParticipantGuide_5CR_081513.pdf).

14.      "Hierarchical Condition Category" or "HCC" means a diagnosis grouping with

-3-

a relative value, referred to as risk adjustment factor, assigned to the HCC by CMS for each model segment used in the CMS HCC Risk Adjustment Model.[1]

15.    "Risk Adjustment Score" means the sum of HCC risk adjustment factors determined by the valid Diagnosis Codes and demographic data of a particular MA beneficiary for a given calendar year..

16.    "Medicare Advantage" or "MA" means Medicare program referred to as Medicare Part "C" as set forth in 42 U.S.C. §§ 1395w–21 through 1395w-28 wherein beneficiaries obtain their benefits through a Medicare Advantage Plan.

17.    "Medicare Advantage Plan" or "MA Plan" means health benefits coverage offered under a policy, contract, or plan by a Medicare Advantage organization pursuant to and in accordance with a contract with CMS under section 42 U.S.C. § 1395w–27 that provides all required benefits for a pre-paid monthly capitated fee paid by CMS on behalf of each assigned beneficiary.

## INTERROGATORIES

13.    For each and every MedXM nurse practitioner that performed an in-home health assessment examination of YOUR Medicare Advantage beneficiary at any time during or between 2010 and 2018, state (a) such nurse practitioner's name and National Provider Identifier (NPI), (b) the states in which he or she is licensed as a nurse practitioner, (c) any licensed physician with whom such nurse practitioner works in collaboration as required by 42 C.F.R § 410.75(c)(3)(i)-(ii) and made applicable to Medicare Advantage by 42 C.F.R § 422.101(a) and (b)(1)-(3), and Medicare Managed Care Manual, Ch. 4 § 10.2, while performing such in-home health assessment examinations, and (d) for each and every MedXM health assessment report prepared by such nurse practitioner, the name and Medicare Health Insurance Claim (HIC) number of the Medicare Advantage beneficiary and the date of the in-

---

[1]CMS HCC Risk Adjustment Model means "CMS HCC Risk Adjustment Model" as referenced in Medicare Managed Care Manual, Ch. 7 § 70.2 available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html.

home health assessment examination.  Please organize and label your response by the NPI.

14.     For those MedXM nurse practitioners licensed as a nurse practitioners in Alabama, Arkansas, California, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Mississippi,  Missouri, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, South Carolina, South Dakota, Texas, Tennessee, Utah, Virginia, West Virginia or Wisconsin that performed an in-home health assessment examination of YOUR Medicare Advantage beneficiary at any time during or between 2010 and 2018, state all actions that YOU performed during or between 2010 and 2018 to determine whether MedXM had documented such nurse practitioners' compliance with the provisions of 42 C.F.R. § 410.75(c)(3)(i), made applicable to Medicare Advantage by 42 C.F.R § 422.101(a) and (b)(1)-(3), and Medicare Managed Care Manual, Ch. 4 § 10.2.

15.     For those MedXM nurse practitioners licensed as a nurse practitioners in Arizona, Colorado, Connecticut,  Idaho, Iowa, Maine, Maryland, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, Oregon, Vermont, Washington, or  Wyoming that performed an in-home health assessment examination of YOUR Medicare Advantage beneficiary at any time during or between 2010 and 2018, state all actions that YOU performed during or between 2010 and 2018 to determine whether MedXM had documented such nurse practitioners' compliance the provisions of 42 C.F.R. § 410.75(c)(3)(ii), made applicable to Medicare Advantage by 42 C.F.R § 422.101(a) and (b)(1)-(3), and Medicare Managed Care Manual, Ch. 4 § 10.2.

16.     If YOU contend that YOU complied with the requirements of 42 C.F.R. § 422.504(i)(4)(iv)(A) and/or (B) during and between 2010 and 2018 with respect to MedXM nurse practitioners, please state all facts and IDENTIFY all witnesses and DOCUMENTS that support such contention.

/ / /

/ / /

-5-

1 | THE ZINBERG LAW FIRM
2 | A Professional Corporation

THE HANAGAMI LAW FIRM
3 | A Professional Corporation

4

5 | Dated: January 31, 2019            By: _____
                                        William K. Hanagami
6                                       Attorneys for Plaintiff and Qui Tam Relator,
                                        Anita Silingo
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-6-

1                                <u>PROOF OF SERVICE</u>

2          I, the undersigned, certify and declare that I am over the age of 18 years, employed in the
County of Los Angeles, State of California, and not a party to the above-entitled action.

3

4          On January 31, 2019, I served a copy of the above attached document(s) by transmitting via
e-mail or electronic transmission of it/them to the person(s) at the email addresses set forth below:

5   Michael M. Maddigan                        Attorneys for Defendants, Wellpoint, Inc., Blue
    Poopak Nourafchan                          Cross of California, dba Anthem Blue Cross, et
6   HOGAN LOVELLS US LLP                       al.
    1999 Avenue of the Stars, Suite 1400
7   Los Angeles, CA 90067
    michael.maddigan@hoganlovells.com
8   poopak.nourafchan@hoganlovells.com

9   Miranda L. Berge                           Attorneys for Defendants, Wellpoint, Inc., Blue
    HOGAN LOVELLS US LLP                       Cross of California, dba Anthem Blue Cross, et
10  555 Thirteenth Street, NW                  al.
    Washington, D.C. 20004
11  Miranda.berge@hoganlovells.com

12  David J. Schindler                         Attorneys for Defendants, Health Net, Inc.,
    Spencer K. Turnbull                        Health Net Life Insurance Company, Health Net
13  LATHAM & WATKINS LLP                       of California
    355 S. Grand Avenue, Suite 100
14  Los Angeles, CA 90071-1560
    David.Schindler@lw.com
15  spencer.turnbull@lw.com

16  Anne W. Robinson                           Attorneys for Defendants, Health Net, Inc.,
    LATHAM & WATKINS LLP                       Health Net Life Insurance Company, Health Net
17  555 Eleventh Street NW, Suite 1000         of California
    Washington, DC 20004
18  anne.robinson@lw.com

19  R. David Jacobs                            Attorneys for Defendants, Visiting Nurse Service
    Jonah D. Retzinger                         Choice, Visiting Nurse Service of New York
20  Epstein, Becker & Green
    1925 Century Park East, Suite 500
21  Los Angeles, CA 90067
    djacobs@ebglaw.com
22  jretzinger@ebglaw.com

23  Elizabeth M. Bock                          Attorneys for Defendants, Molina Healthcare,
    David M. Deaton                            Inc., et al.
24  Sabrina H. Strong
    Scott Voelz
25  O'MELVENY & MYERS LLP
    400 S. Hope Street
26  Los Angeles, CA 90071-2899
    ebock@omm.com
27  ddeaton@omm.com
    sstrong@omm.com
28  svoelz@omm.com

-7-

| | | |
|---|---|---|
| 1 | David Leviss | Attorneys for Defendants, Molina Healthcare, Inc., et al. |
| 2 | Amanda M.B. Santella<br>O'MELVENY & MYERS LLP | |
| 3 | 1625 Eye Street NW<br>Washington, DC 20006 | |
| 4 | dleviss@omm.com<br>asantella@omm.com | |
| 5 | Michael J. Daponde | Attorneys for Defendant, Alameda Alliance for Health |
| 6 | Anthony R. Eaton<br>DAPONDE SIMPSON ROWE PC | |
| 7 | 500 Capitol Mall, Suite 2260<br>Sacramento, CA 95814 | |
| 8 | aeton@dsrhealthlaw.com<br>mdaponde@dsrhealthlaw.com | |
| 9 | Abram J. Zinberg | Co-Counsel for Plaintiff and Relator, Anita Silingo |
| 10 | THE ZINBERG LAW FIRM, A.P.C.<br>412 Olive Avenue, Suite 528 | |
| 11 | Huntington Beach, CA 92648<br>AbramZinberg@gmail.com | |
| 12 | John E. Lee | Attorneys for Plaintiff, United States of America |
| 13 | OFFICE OF<br>THE UNITED STATES ATTORNEY | |
| 14 | 300 N. Los Angeles Street, Room 7516<br>Los Angeles, CA 90012 | |
| 15 | john.lee2@usdoj.gov | |

16  Executed on January 31, 2019 at Incline Village, Nevada.

17  I hereby certify that I am a member of the Bar of the United States District Court, Central District of California, and that the foregoing is true and correct.

William K. Hanagami

-8-

1

STATE OF CALIFORNIA

2

COUNTY OF ORANGE

3

PROOF OF SERVICE

)
)
)

4

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the

5

County of Orange, State of California, and not a party to the above-entitled cause.

6

On January 31, 2019, I served a true copy of the above-attached document(s) by depositing

7

it/them in the United States Mail at Huntington Beach, California in a sealed envelope with the

8

postage thereon fully prepaid addressed to the following:

9

R. David Jacobs
Jonah D. Retzinger
Epstein, Becker & Green

10

1925 Century Park East, Suite 500
Los Angeles, CA 90067

Attorneys for Defendants, Visiting Nurse
Service of New York and Visiting Nurse
Service Choice

11

12

Executed on January 31, 2019 at Huntington Beach, California.

13

I hereby certify that I am a member of the Bar of the United States District Court, Central

14

District of California, and that the foregoing is true and correct.

15

16

Abram J. Zinberg

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 3

1  **William K. Hanagami, SBN 119832**
   **THE HANAGAMI LAW FIRM**
2  **A PROFESSIONAL CORPORATION**
   **5950 CANOGA AVENUE, SUITE 130**
3  **WOODLAND HILLS, CA 91367-5035**
   **(818) 716-8570 / (818) 716-8569** *FAX*
4  **BillHanagami@esquire.la**

5  **Abram J. Zinberg, SBN 143399**
   **THE ZINBERG LAW FIRM**
6  **A PROFESSIONAL CORPORATION**
   **412 OLIVE AVENUE, SUITE 528**
7  **HUNTINGTON BEACH, CA 92648-5142**
   **(714) 374-9802 / (714) 969-0910** *FAX*
8  **AbramZinberg@gmail.com**

9  Attorneys for Plaintiff and <u>Qui</u> <u>Tam</u> Relator,
   Anita Silingo
10

11              UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA, *ex rel.*       Case No.: SACV13-1348-FMO(JCx)
    ANITA SILINGO,
14
              Plaintiffs,
15                                             PLAINTIFF AND RELATOR'S
    vs.                                        FIRST AMENDED REQUESTS
16                                             FOR PRODUCTION, SET 1, TO
    MOBILE MEDICAL EXAMINATION                 DEFENDANTS MOLINA
17  SERVICES, INC., et al.,

18            Defendants.

19
    PROPOUNDING PARTY:        Plaintiff and Relator, Anita Silingo
20
    RESPONDING PARTY:         Defendants, Molina Healthcare, Inc., Molina Healthcare
21
                              of California, and Molina Healthcare of California Partner
22
                              Plan, Inc.
23
    SET NUMBER:               One
24
          COMES NOW, plaintiff and relator, Anita Silingo, and propounds the following First
25
    Amended Requests for Production of Documents and Things, Set No. 1, upon defendants
26
    Molina Healthcare, Inc., Molina Healthcare of California, and Molina Healthcare of California
27
    Partner Plan, Inc., pursuant to Fed.R.Civ.P. 34.  The production of electronically stored
28
    information should be made in the form or forms in which it is ordinarily maintained or that

                                          -1-

1  is reasonably usable given the nature of the electronically stored information, unless otherwise

2  agreed by the requesting and producing parties.  The production for inspection and copying

3  of such documents and things is to take place at the offices of The Hanagami Law Firm, A

4  Professional Corporation, located at 5950 Canoga Avenue, Suite 130, Woodland Hills,

5  California 91367 at 10:00 a.m. on March 5, 2019.

DEFINITIONS

7  1.  "PLAINTIFF" means Anita Silingo.

8  2.  "YOU" and "YOUR" refer to defendants Molina Healthcare, Inc., Molina

9  Healthcare of California, and Molina Healthcare of California Partner Plan, Inc., their

10 respective parent, affiliate and subsidiary business entities, and agents, officers, attorneys and

11 employees.

12 3.  "MedXM" refers to Mobile Medical Examination Services, Inc. and MedXM,

13 their respective agents, officers, attorneys and employees.

14 4.  "Third Amended Complaint" and "TAC" refer to the Third Amended Complaint

15 filled in the above-captioned action on or about October 22, 2015.

16 5.  "DOCUMENT" means all writings, recordings, photographs, originals,

17 duplicates, and electronically stored information, all as defined by Federal Rule of Evidence

18 1001, and all those things encompassed in the lists set forth in Fed.R.Civ.P. 34(a)(1) and that

19 are in your actual or constructive possession, custody, care or control.  The term

20 "DOCUMENT" includes but is not limited to draft versions.

21 6.  "REFLECT OR REFER TO" mean, without limitation, regarding, referring to,

22 related to, concerning, alluding to, responding to, connected with, commenting upon, about,

23 announcing, explaining, discussing, showing, describing, reflecting or analyzing.

24 7.  "CMS" means the Centers for Medicare and Medicaid Services and its

25 administrative contractors, representatives and agents but excludes any contracted Medicare

26 Advantage health plan, health maintenance organization and preferred provider organization.

27 8.  "Diagnosis Codes" means the medical diagnosis codes set forth in the

28 International Classification of Disease 10th Revision, Clinical Modification, or the

-2-

International Classification of Disease 9th Revision, Clinical Modification, required or allowed by CMS for reporting to CMS.

9.    "Risk Adjustment Data" has the meaning defined in 42 C.F.R. § 422.310 [" all data that are used in the development and application of a risk adjustment payment model."]

10.    "Risk Adjustment Processing System" or "RAPS" means the CMS system through which Risk Adjustment Data is processed.

11.    "RAPS data" means the Risk Adjustment Data, Diagnosis Codes, beneficiary identification information and medical provider or examiner identification information submitted, or to be submitted, to CMS's Risk Adjustment Processing System in electronic flat file format as required by CMS.

12.    "RAPS Return File" means "RAPS Return File" referenced on page 24 of the CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide (http://www.cssoperations.com/Internet/Cssc3.Nsf/files/2013_RA101ParticipantGuide_5 CR_081513.pdf/$File/2013_RA101ParticipantGuide_5CR_081513.pdf).

13.    "Hierarchical Condition Category" or "HCC" means a diagnosis grouping with a relative value, referred to as risk adjustment factor, assigned to the HCC by CMS for each model segment used in the CMS HCC Risk Adjustment Model.[1]

14.    "Risk Adjustment Score" means the sum of HCC risk adjustment factors determined by the valid Diagnosis Codes and demographic data of a particular MA beneficiary for a given calendar year.

15.    "Medicare Advantage" or "MA" means Medicare program referred to as Medicare Part "C" as set forth in 42 U.S.C. §§ 1395w–21 through 1395w-28 wherein beneficiaries obtain their benefits through a Medicare Advantage Plan.

16.    "Medicare Advantage Plan" or "MA Plan" means health benefits coverage offered under a policy, contract, or plan by a Medicare Advantage organization pursuant to and in accordance with a contract with CMS under section 42 U.S.C. § 1395w–27 that provides

---

[1]CMS HCC Risk Adjustment Model means "CMS HCC Risk Adjustment Model" as referenced in Medicare Managed Care Manual, Ch. 7 § 70.2 available at https://www.cms.gov/ Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html.

-3-

all required benefits for a pre-paid monthly capitated fee paid by CMS on behalf of each assigned beneficiary. "RAPS" means Risk Adjustment Processing System.

17.     "Electronic Signature" means encrypted or digital electronic signature acceptable to CMS for use in authenticating a electronic medical record's documentation of a face-to-face encounter by a medical provider or examiner.[2]

## DOCUMENT REQUESTS

1.     All contracts and agreements between YOU and MedXM in effect at any time during or between 2010 and 2018.

2.     All Medicare Advantage contracts between YOU and CMS in effect at any time during or between 2010 and 2018 under which one or more Medicare Advantage beneficiaries received a MedXM health assessment.

3.     All DOCUMENTS sent to or received from MedXM that REFLECT OR REFER TO the practices, procedures, requirements and/or guidelines used, or to be used, by MedXM medical examiners at any time during or between 2010 and 2018 when signing health assessment reports of YOUR MA beneficiaries and/or Diagnosis Codes contained therein.

4.     All DOCUMENTS sent to or received from MedXM that REFLECT OR REFER TO the practices, procedures, requirements and/or guidelines used, or to be used, by MedXM medical examiners at any time during or between 2010 and 2018 when utilizing

---

[2]CMS requires that an electronic signature must have (a) the medical provider's or examiner's signature, credentials (e.g., M.D., N.P., P.A. etc.), and date, (b) an authentication by the medical provider or examiner (e.g., "approved by," "signed by," "electronically signed by"), (c) is used exclusively by the individual medical provider or examiner, and (d) is created with computer software that prohibits others from using such medical provider's or examiner's electronic signature (e.g., password protected, encryption, etc.). <u>Medicare Program Integrity Manual</u>, Ch. 4 § 3.3.2.4(E). As of September 27, 2017, CMS limits acceptable medical provider or examiner authentication to "Accepted by – Acknowledged by – Approved by– Authenticated by – Charted by – Closed by – Completed by – Confirmed by – Created by – Digitally signed by – Electronically authored by – Electronically signed by – Entered by – Entered data sealed by – Finalized by – Generated by – Read by – Released by – Reviewed by – Sealed by – – signature on file {date/time signed} – Signed by – Validated by – Verified by – Written by – Performed by (when meaning the exam and related documentation are being performed by the same physician/practitioner)." <u>CMS-Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance,</u> at P.16, available at, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Coders-Guidance.pdf.

-4-

electronic signatures on MedXM health assessment reports and electronic medical records.

5. All DOCUMENTS sent to or received from MedXM that REFLECT OR REFER TO the practices, procedures, requirements and/or guidelines used, or to be used, by MedXM at any time during or between 2010 and 2018 to prepare its health assessment reports of YOUR Medicare Advantage beneficiaries.

6. All DOCUMENTS sent to or received from MedXM that REFLECT OR REFER TO the practices, procedures, requirements and/or guidelines used, or to be used, by MedXM at any time during or between 2010 and 2018 to transmit its health assessment reports of YOUR Medicare Advantage beneficiaries to YOU.

7. All DOCUMENTS sent to or received from MedXM that REFLECT OR REFER TO the practices, procedures, requirements and/or guidelines used, or to be used, by MedXM at any time during or between 2010 and 2018 to transmit encounter data to YOU.

8. All DOCUMENTS sent to or received from MedXM that REFLECT OR REFER TO the practices, procedures, requirements and/or guidelines used, or to be used, by MedXM at any time during or between 2010 and 2018 to transmit Risk Adjustment Data to YOU.

9. All DOCUMENTS sent to or received from MedXM that REFLECT OR REFER TO the practices, procedures, requirements and/or guidelines used, or to be used, by MedXM at any time during or between 2010 and 2018 to transmit RAPS data to YOU.

10. All DOCUMENTS sent to or received from MedXM that REFLECT OR REFER TO the practices, procedures, requirements and/or guidelines used, or to be used, by MedXM at any time during or between 2010 and 2018 to transmit claims data to YOU.

11. All MedXM health assessment reports of YOUR Medicare Advantage beneficiaries received by YOU that REFLECT OR REFER TO MedXM health assessment examinations conducted during or between 2010 and 2018.

12. All electronic encounter data YOU received from MedXM that REFLECT OR REFER TO YOUR Medicare Advantage beneficiaries that were the subject of MedXM health assessment examinations conducted at any time during or between 2010 and 2018.

-5-

13.    All electronic Risk Adjustment Data YOU received from MedXM that REFLECT OR REFER TO YOUR Medicare Advantage beneficiaries that were the subject of MedXM health assessment examinations conducted at any time during or between 2010 and 2018.

14.    All electronic RAPS data YOU received from MedXM that REFLECT OR REFER TO YOUR Medicare Advantage beneficiaries that were the subject of MedXM health assessment examinations conducted at any time during or between 2010 and 2018.

15.    All electronic claims data YOU received from MedXM that REFLECT OR REFER TO YOUR Medicare Advantage beneficiaries that were the subject of MedXM health assessment examinations conducted at any time during or between 2010 and 2018.

16.    All DOCUMENTS that REFLECT OR REFER TO MedXM's charges for performing health assessment examinations, and/or providing related health assessment reports, Risk Adjustment Data, encounter data or electronic claims, of YOUR Medicare Advantage beneficiaries during or between 2010 and 2018, including but not limited to invoices, checks, electronic funds transfers and payment vouchers.

17.    YOUR electronic files and databases that contain the Risk Adjustment Data, Encounter Data and/or claims data of YOUR MA beneficiaries that had a MedXM health assessment during or between 2010 and 2018.

18.    YOUR electronic files and databases that contain the Risk Adjustment Data, Encounter Data and/or claims data of YOUR MA beneficiaries for those years that such Medicare Advantage beneficiaries had a MedXM health assessment examination during or between 2010 and 2018.

19.    All electronic files and databases that contain the data and information used to reconcile the risk adjusted capitated payments YOU received from CMS for YOUR Medicare Advantage beneficiaries that had MedXM in-home health assessment examinations conducted during or between 2010 and 2018.

20.    All electronic files and databases that contain the data and information used to reconcile the risk adjusted capitated payments YOU received from CMS for YOUR Medicare

-6-

Advantage beneficiaries as a result, in whole or in part, from MedXM in-home health assessment examinations conducted during or between 2010 and 2018.

21.     All CMS reports and electronic data received by YOU to reconcile YOUR MA beneficiary enrollment and/or YOUR capitated payments for those MA beneficiaries that had a MedXM in-home assessment examination during or between 2010 and 2018.

22.     All DOCUMENTS prepared by YOU that determine or estimate the risk adjustment factors and Risk Adjustment Scores arising from the Diagnosis Codes obtained from MedXM in-home health assessment examinations during or between 2010 and 2018.

23.     All DOCUMENTS that REFLECT OR REFER TO YOUR audits, reviews, investigations and/or corrective action plans during or between 2010 and 2018 concerning MedXM's electronic signature process used or to be used in its in-home health assessment reports.

24.     All DOCUMENTS YOU caused to be transmitted to CMS to correct or report errors concerning HCC diagnosis codes and/or RAPS data submitted to CMS that YOU obtained from MedXM health assessment examinations during or between 2010 and 2018.

25.     All DOCUMENTS that REFLECT OR REFER TO YOUR calculation or estimate of the Risk Adjustment Scores for YOUR Medicare Advantage beneficiaries who had MedXM health assessment examinations during or between 2010 and 2018.

26.     All electronic RAPS Return Files that YOU received from CMS or its contractors or representatives that REFLECT OR REFER TO YOUR RAPS submissions arising from MedXM health assessment examinations during or between 2010 and 2018.

27.     All DOCUMENTS that REFLECT OR REFER TO the calculation, estimation and/or reconciliation of Risk Adjustment Scores of YOUR Medicare Advantage beneficiaries for whom both (a) YOU received a MedXM in-home health assessment examination report arising from encounters during or between 2010 and 2018, and (b) YOU received Risk Adjustment Data, from sources other than MedXM, during the same calender year that of such MedXM in-home health assessment examination encounter.  Please organize and label the responses by the year of the MedXM encounters, and then (if applicable) by the HIC number

-7-

of the Medicare Advantage beneficiaries.

28.     All DOCUMENTS that REFLECT OR REFER TO the calculation, estimation and/or reconciliation of Risk Adjustment Scores of YOUR Medicare Advantage beneficiaries that are based solely upon (a) Risk Adjustment Data arising from MedXM in-home health assessment reports arising from encounters during or between 2010 and 2018, and (b) such Medicare Advantage beneficiaries' demographic data (i.e., the age, sex and county of residence HCCs and related risk adjustment factors) assigned by CMS. Please organize and label the responses by the year of the MedXM encounters, and then (if applicable) by the HIC number of the Medicare Advantage beneficiaries.

29.     All DOCUMENTS that REFLECT OR REFER TO the calculation, estimation and/or reconciliation of monthly prospective capitation payments paid or to be paid to YOU by CMS for YOUR Medicare Advantage beneficiaries as a result of both (a) YOUR receipt of Risk Adjustment Data arising from MedXM in-home health assessment examinations during or between 2010 and 2018, and (b) YOUR receipt of Risk Adjustment Data from sources other than MedXM, during the same calender year of such MedXM in-home health assessment examination encounter. Please organize and label the responses by the year of the MedXM encounters, and then (if applicable) by the HIC number of the Medicare Advantage beneficiaries.

30.     All DOCUMENTS that REFLECT OR REFER TO the calculation, estimation and/or reconciliation of the monthly prospective capitation payments paid or to be paid to YOU by CMS for YOUR Medicare Advantage beneficiaries that are based solely upon both (a) Risk Adjustment Data arising from MedXM in-home health assessment examination encounters during or between 2010 and 2018, and (b) such Medicare Advantage beneficiaries' demographic data (i.e, the beneficiary's age, sex and county of residence HCCs and related risk adjustment factors) assigned by CMS. Please organize and label the responses by the year of the MedXM encounters, and then (if applicable) by the HIC number of the Medicare Advantage beneficiaries.

31.     All YOUR certifications pursuant to 42 C.F.R. § 422.504(*l*)(2) during or

-8-

between 2010 and the present for those MA Plans that had a Medicare Advantage beneficiary that had a MedXM in-home health assessment examination, including but not limited to certifications by YOU that the Risk Adjustment Data YOU caused to be submitted to CMS pursuant to 42 C.F.R. § 422.310 that originated from MedXM were accurate, complete and truthful.

32.   All DOCUMENTS that REFLECT OR REFER TO MedXM's certifications pursuant to 42 C.F.R. § 422.504(*l*)(3) received, or to be received, by YOU during or between 2010 and the present.

33.   All DOCUMENTS that REFLECT OR REFER TO any analyses YOU performed of the HCCs and/or Risk Adjustment Data obtained from MedXM's in-home health assessment examinations of YOUR Medicare Advantage beneficiaries conducted during and between 2010 and 2018.

34.   All DOCUMENTS that REFLECT OR REFER TO reviews, investigations and/or audits that YOU performed, or were performed on YOUR behalf, during or between 2008 and 2018 that addressed (a) MedXM's computer infrastructure and electronic medical record system, and/or (b) whether MedXM maintained an electronic medical record system that produced or retained valid Electronic Signatures per CMS's signature requirements as set forth in the Medicare Program Integrity Manual, Ch. 4 § 3.3.2.4, and CMS-Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance at pp.14-16.

35.   All DOCUMENTS that REFLECT OR REFER TO YOU reporting overpayments to CMS, pursuant to 42 C.F.R. § 422.326 or otherwise, concerning any Risk Adjustment Data that YOU caused to be submitted to CMS pursuant to 42 C.F.R. § 422.310 during and between 2010 until the present, which Risk Adjustment Data originated from MedXM in-home assessment examinations conducted during or between 2010 and 2018. Please organize and label production by year, and then (if applicable) by YOUR MA beneficiary's HIC.

36.   All DOCUMENTS that REFLECT OR REFER TO the record layouts, database and/or field structures, and definitions of data codes of any of the electronic files, databases

-9-

1  and/or records requested, or produced in response to, this set of Requests for Production

2    37.   For each of your responses to PLAINTIFF's First Amended Interrogatories, Set

3  1, all DOCUMENTS identified or referred to in that response.  Pursuant to Fed.R.Civ.P.

4  34(b)(2)(E)(i), YOU are requested to organize and to label the documents to correspond with

5  each such interrogatory response.

6

7                                        THE ZINBERG LAW FIRM
                                         A Professional Corporation
8
                                         THE HANAGAMI LAW FIRM
9                                        A Professional Corporation

10

11  Dated: January 31, 2019          By: _____
                                         William K. Hanagami
12                                       Attorneys for Plaintiff and Qui Tam Relator,
                                         Anita Silingo
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        -10-

## PROOF OF SERVICE

1

2    I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled action.

3

4    On January 31, 2019, I served a copy of the above attached document(s) by transmitting via e-mail or electronic transmission of it/them to the person(s) at the email addresses set forth below:

5    Michael M. Maddigan                                 Attorneys for Defendants, Wellpoint, Inc., Blue
     Poopak Nourafchan                                   Cross of California, dba Anthem Blue Cross, et
6    HOGAN LOVELLS US LLP                                al.
     1999 Avenue of the Stars, Suite 1400
7    Los Angeles, CA 90067
     michael.maddigan@hoganlovells.com
8    poopak.nourafchan@hoganlovells.com

9    Miranda L. Berge                                    Attorneys for Defendants, Wellpoint, Inc., Blue
     HOGAN LOVELLS US LLP                                Cross of California, dba Anthem Blue Cross, et
10   555 Thirteenth Street, NW                           al.
     Washington, D.C. 20004
11   Miranda.berge@hoganlovells.com

12   David J. Schindler                                  Attorneys for Defendants, Health Net, Inc.,
     Spencer K. Turnbull                                 Health Net Life Insurance Company, Health Net
13   LATHAM & WATKINS LLP                                of California
     355 S. Grand Avenue, Suite 100
14   Los Angeles, CA 90071-1560
     David.Schindler@lw.com
15   spencer.turnbull@lw.com

16   Anne W. Robinson                                    Attorneys for Defendants, Health Net, Inc.,
     LATHAM & WATKINS LLP                                Health Net Life Insurance Company, Health Net
17   555 Eleventh Street NW, Suite 1000                  of California
     Washington, DC 20004
18   anne.robinson@lw.com

19   R. David Jacobs                                     Attorneys for Defendants, Visiting Nurse Service
     Jonah D. Retzinger                                  Choice, Visiting Nurse Service of New York
20   Epstein, Becker & Green
     1925 Century Park East, Suite 500
21   Los Angeles, CA 90067
     djacobs@ebglaw.com
22   jretzinger@ebglaw.com

23   Elizabeth M. Bock                                   Attorneys for Defendants, Molina Healthcare,
     David M. Deaton                                     Inc., et al.
24   Sabrina H. Strong
     Scott Voelz
25   O'MELVENY & MYERS LLP
     400 S. Hope Street
26   Los Angeles, CA 90071-2899
     ebock@omm.com
27   ddeaton@omm.com
     sstrong@omm.com
28   svoelz@omm.com

-11-

| | | |
|---|---|---|
| 1 | David Leviss<br>Amanda M.B. Santella | Attorneys for Defendants, Molina Healthcare, Inc., et al. |
| 2 | O'MELVENY & MYERS LLP<br>1625 Eye Street NW | |
| 3 | Washington, DC 20006<br>dleviss@omm.com | |
| 4 | asantella@omm.com | |
| 5 | Michael J. Daponde<br>Anthony R. Eaton | Attorneys for Defendant, Alameda Alliance for Health |
| 6 | DAPONDE SIMPSON ROWE PC<br>500 Capitol Mall, Suite 2260 | |
| 7 | Sacramento, CA 95814<br>aeton@dsrhealthlaw.com | |
| 8 | mdaponde@dsrhealthlaw.com | |
| 9 | Abram J. Zinberg<br>THE ZINBERG LAW FIRM, A.P.C. | Co-Counsel for Plaintiff and Relator, Anita Silingo |
| 10 | 412 Olive Avenue, Suite 528<br>Huntington Beach, CA 92648 | |
| 11 | AbramZinberg@gmail.com | |
| 12 | John E. Lee<br>OFFICE OF | Attorneys for Plaintiff, United States of America |
| 13 | THE UNITED STATES ATTORNEY<br>300 N. Los Angeles Street, Room 7516 | |
| 14 | Los Angeles, CA 90012<br>john.lee2@usdoj.gov | |

15

16          Executed on January 31, 2019 at Incline Village, Nevada.

17          I hereby certify that I am a member of the Bar of the United States District Court, Central District of California, and that the foregoing is true and correct.

18

19                                         William K. Hanagami

20

21

22

23

24

25

26

27

28

-12-

1

<u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA )

2                                      )

COUNTY OF ORANGE )

3

4    I, the undersigned, certify and declare that I am over the age of 18 years, employed in the

5  County of Orange, State of California, and not a party to the above-entitled cause.

6    On January 31, 2019, I served a true copy of the above-attached document(s) by depositing

7  it/them in the United States Mail at Huntington Beach, California in a sealed envelope with the

8  postage thereon fully prepaid addressed to the following:

R. David Jacobs                          Attorneys for Defendants, Visiting Nurse
9  Jonah D. Retzinger                       Service of New York and Visiting Nurse
Epstein, Becker & Green                  Service Choice
10 1925 Century Park East, Suite 500
Los Angeles, CA 90067
11

12    Executed on January 31, 2019 at Huntington Beach, California.

13    I hereby certify that I am a member of the Bar of the United States District Court, Central

14 District of California, and that the foregoing is true and correct.

15

16

Abram J. Zinberg

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 4

1  William K. Hanagami, SBN 119832
   THE HANAGAMI LAW FIRM
2  A PROFESSIONAL CORPORATION
   5950 CANOGA AVENUE, SUITE 130
3  WOODLAND HILLS, CA 91367-5035
   (818) 716-8570 / (818) 716-8569 *FAX*
4  BillHanagami@esquire.la

5  Abram J. Zinberg, SBN 143399
   THE ZINBERG LAW FIRM
6  A PROFESSIONAL CORPORATION
   412 OLIVE AVENUE, SUITE 528
7  HUNTINGTON BEACH, CA 92648-5142
   (714) 374-9802 / (714) 969-0910 *FAX*
8  AbramZinberg@gmail.com

9  Attorneys for Plaintiff and Qui Tam Relator,
   Anita Silingo
10

11              UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA, *ex rel.*      Case No.: SACV13-1348-FMO(JCx)
    ANITA SILINGO,
14
                 Plaintiffs,
15                                           PLAINTIFF AND RELATOR'S
    vs.                                      FIRST AMENDED REQUESTS
16                                           FOR PRODUCTION, SET 2, TO
    MOBILE MEDICAL EXAMINATION               DEFENDANTS MOLINA
17  SERVICES, INC., et al.,
18               Defendants.
19

20  PROPOUNDING PARTY:      Plaintiff and Relator, Anita Silingo

21  RESPONDING PARTY:       Defendants, Molina Healthcare, Inc., Molina Healthcare

22                          of California, and Molina Healthcare of California Partner

23                          Plan, Inc.

24  SET NUMBER:             Two

25          COMES NOW, plaintiff and relator Anita Silingo, and propounds the following First

26  Amended Requests for Production of Documents and Things, Set No. 2, upon defendants

27  Molina Healthcare, Inc., Molina Healthcare of California, and Molina Healthcare of California

28  Partner Plan, Inc. pursuant to Fed.R.Civ.P. 34.  The production of electronically stored

    information should be made in the form or forms in which it is ordinarily maintained or that

                                    -1-

is reasonably usable given the nature of the electronically stored information, unless otherwise agreed by the requesting and producing parties. The production for inspection and copying of such documents and things is to take place at the offices of The Hanagami Law Firm, A Professional Corporation, located at 5950 Canoga Avenue, Suite 130, Woodland Hills, California 91367-5035 at 10:00 a.m. on March 5, 2019.

<u>DEFINITIONS</u>

1.      "PLAINTIFF" means Anita Silingo.

2.      "YOU" and "YOUR" refer to defendants Molina Healthcare, Inc., Molina Healthcare of California, and Molina Healthcare of California Partner Plan, Inc., their respective parent, affiliate and subsidiary business entities, and agents, officers, attorneys and employees.

3.      "MedXM" refers to Mobile Medical Examination Services, Inc. and MedXM, their respective agents, officers, attorneys and employees.

4.      "Third Amended Complaint" and "TAC" refer to the Third Amended Complaint filled in the above-captioned action on or about October 22, 2015.

5.      "DOCUMENT" means all writings, recordings, photographs, originals, duplicates, and electronically stored information, all as defined by Federal Rule of Evidence 1001, and all those things encompassed in the lists set forth in Fed.R.Civ.P. 34(a)(1) and that are in your actual or constructive possession, custody, care or control. The term "DOCUMENT" includes but is not limited to draft versions.

6.      "REFLECT OR REFER TO" mean, without limitation, regarding, referring to, related to, concerning, alluding to, responding to, connected with, commenting upon, about, announcing, explaining, discussing, showing, describing, reflecting or analyzing.

7.      "CMS" means the Centers for Medicare and Medicaid Services and its administrative contractors, representatives and agents but excludes any contracted Medicare Advantage health plan, health maintenance organization and preferred provider organization.

8.      "Diagnosis Codes" means the medical diagnosis codes set forth in the International Classification of Disease 10th Revision, Clinical Modification, or the

-2-

International Classification of Disease 9th Revision, Clinical Modification, required or allowed by CMS for reporting to CMS.

9.    "Risk Adjustment Data" has the meaning defined in 42 C.F.R. § 422.310 [" all data that are used in the development and application of a risk adjustment payment model."]

10.    "Risk Adjustment Processing System" or "RAPS" means the CMS system through which Risk Adjustment Data is processed.

11.    "RAPS data" means the Risk Adjustment Data, Diagnosis Codes, beneficiary identification information and medical provider or examiner identification information submitted, or to be submitted, to CMS's Risk Adjustment Processing System in electronic flat file format as required by CMS.

12.    "RAPS Return File" means "RAPS Return File" referenced on page 24 of the CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide (http://www.csscoperations.com/Internet/Cssc3.Nsf/files/2013_RA101ParticipantGuide_5 CR_081513.pdf/$File/2013_RA101ParticipantGuide_5CR_081513.pdf).

13.    "Hierarchical Condition Category" or "HCC" means a diagnosis grouping with a relative value, referred to as risk adjustment factor, assigned to the HCC by CMS for each model segment used in the CMS HCC Risk Adjustment Model.[1]

14.    "Risk Adjustment Score" means the sum of HCC risk adjustment factors determined by the valid Diagnosis Codes and demographic data of a particular MA beneficiary for a given calendar year.

15.    "Medicare Advantage" or "MA" means Medicare program referred to as Medicare Part "C" as set forth in 42 U.S.C. §§ 1395w–21 through 1395w-28 wherein beneficiaries obtain their benefits through a Medicare Advantage Plan.

16.    "Medicare Advantage Plan" or "MA Plan" means health benefits coverage offered under a policy, contract, or plan by a Medicare Advantage organization pursuant to and in accordance with a contract with CMS under section 42 U.S.C. § 1395w–27 that provides

---

[1]CMS HCC Risk Adjustment Model means "CMS HCC Risk Adjustment Model" as referenced in Medicare Managed Care Manual, Ch. 7 § 70.2 available at https://www.cms.gov/ Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html.

-3-

1  all required benefits for a pre-paid monthly capitated fee paid by CMS on behalf of each

2  assigned beneficiary."RAPS" means Risk Adjustment Processing System.

3      17.    "Electronic Signature" means encrypted or digital electronic signature acceptable

4  to CMS for use in authenticating a electronic medical record's documentation of a face-to-face

5  encounter by a medical provider or examiner.[2]

6

7                    DOCUMENT REQUESTS

8      38.    For each of YOUR responses to PLAINTIFF's First Amended Interrogatories,

9  Set 2, all DOCUMENTS identified or referred to in that response.  Pursuant to Fed.R.Civ.P.

10  34(b)(2)(E)(i), YOU are requested to organize and to label the documents to correspond with

11  each such interrogatory response.

12      39.    For each and every MedXM Nurse Practitioner who performed health

13  assessment examinations of YOUR Medicare Advantage beneficiaries at any time during or

14  between 2010 and 2018, produce all DOCUMENTS that REFLECT OR REFER TO whether

15  such Nurse Practitioners performed such health assessments while working in collaboration

16  with a physician as defined and required by 42 C.F.R. § 410.75(c)(3)(i) or (ii), made applicable

17  to Medicare Advantage by 42 C.F.R. § 422.101(a) and (b)(1)-(3) and Medicare Managed Care

18  Manual, Ch. 4 §10.2.  Please organize YOUR production by the Nurse Practitioner's NPI.

19      40.    For each and every MedXM Nurse Practitioner licensed as a nurse practitioner

20

21      [2]CMS requires that an electronic signature must have (a) the medical provider's or examiner's
signature, credentials (e.g., M.D., N.P., P.A. etc.), and date, (b) an authentication by the medical
22  provider or examiner (e.g., "approved by," "signed by," "electronically signed by"), (c) is used
exclusively by the individual medical provider or examiner, and (d) is created with computer software
23  that prohibits others from using such medical provider's or examiner's electronic signature (e.g.,
password protected, encryption, etc.).  Medicare Program Integrity Manual, Ch. 4 § 3.3.2.4(E).  As
24  of September 27, 2017, CMS limits acceptable medical provider or examiner authentication to
"Accepted by – Acknowledged by – Approved by– Authenticated by – Charted by – Closed by –
25  Completed by – Confirmed by – Created by – Digitally signed by – Electronically authored by –
Electronically signed by – Entered by – Entered data sealed by – Finalized by – Generated by – Read
26  by – Released by – Reviewed by – Sealed by – – signature on file {date/time signed} – Signed by –
Validated by – Verified by – Written by – Performed by (when meaning the exam and related
27  documentation are being performed by the same physician/practitioner)." CMS-Contract-Level Risk
Adjustment Data Validation Medical Record Reviewer Guidance, at P.16, available at,
28  https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-
Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Coders-Guidance.pdf.
                    -4-

in Alabama, Arkansas, California, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, South Carolina, South Dakota, Texas, Tennessee, Utah, Virginia, West Virginia or Wisconsin, who performed health assessment examinations of YOUR Medicare Advantage beneficiaries at any time during or between 2010 and 2018, produce all DOCUMENTS that REFLECT OR REFER TO such Nurse Practitioner's compliance with the requirements of 42 C.F.R. § 410.75(c)(3)(i), as made applicable to Medicare Advantage by 42 C.F.R. § 422.101(a) and (b)(1)-(3) and Medicare Managed Care Manual, Ch. 4  §10.2, including but not limited to (a) collaboration agreements  in effect during or between 2010 and 2018, (b) agreements and/or guidelines addressing the physician's supervision of the nurse practitioner in effect during or between 2010 and 2018, and (c) DOCUMENTS that REFLECT OR REFER TO the expansion of such nurse practitioner's scope of practice to make medical diagnoses in effect during or between 2010 and 2018. Please organize YOUR production by the Nurse Practitioner's NPI.

41.     For each and every MedXM Nurse Practitioner licensed as a nurse practitioner in Arizona, Colorado, Connecticut, Idaho, Iowa, Maine, Maryland, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, Oregon, Vermont, Washington, or Wyoming, produce all DOCUMENTS that REFLECT OR REFER TO such Nurse Practitioner's compliance with the physician collaboration requirements of 42 C.F.R. § 410.75(c)(3)(ii), as made applicable to Medicare Advantage by 42 C.F.R. § 422.101(a) and (b)(1)-(3) and Medicare Managed Care Manual, Ch. 4  §10.2, including but not limited to (a) collaboration agreements  in effect during or between 2010 and 2018, (b) agreements and/or guidelines addressing the physician's supervision of the nurse practitioner in effect during or between 2010 and 2018, and (c) DOCUMENTS that REFLECT OR REFER TO the expansion of such nurse practitioner's scope of practice to make medical diagnoses in effect during or between 2010 and 2018.  Please organize YOUR production by the Nurse Practitioner's NPI.

42.     For each and every MedXM Nurse Practitioner that performed in-home health assessment examinations in California of YOUR Medicare Advantage beneficiaries during or

-5-

between 2010 and 2018, produce the "standardized procedures" in effect during or between 2010 and 2018 required by California Business and Professions Code § 2725(c)-(d) and California Code of Regulations, Title 16 § 1474, when performing such health assessment examinations.

43.    All DOCUMENTS that REFLECT OR REFER TO YOUR policies, practices, procedures and/or guidelines in effect at any time during or between 2010 and 2018 to verify that MedXM Nurse Practitioners worked in collaboration with a physician as required by 42 C.F.R. § 410.75(c)(3)(i) or (ii) and made applicable to Medicare Advantage by 42 C.F.R. § 422.101(a), (b).

44.    All DOCUMENTS that list the identity of MedXM medical examiners that performed in-home health assessment examinations of YOUR Medicare Advantage beneficiaries at anytime during or between 2010 and 2018.

45.    ALL DOCUMENTS that list the identities of YOUR Medicare Advantage beneficiaries that MedXM performed a in-home health assessment examinations of at any time during or between 20010 and 2018, including any lists, work orders, or electronically transmitted information.

46.    All DOCUMENTS that REFLECT OR REFER TO the prior medical conditions or HCC diagnoses of any of YOUR Medicare Advantage beneficiaries that YOU provided to MedXM during or between 2010 and 2018, including but not limited to lists, work orders, and electronically transmitted information.

47.    All DOCUMENTS that REFLECT OR REFER TO MedXM's performance under its contract(s) to provide in-home health assessments of YOUR Medicare Advantage beneficiaries at anytime during or between 2010 and 2018.

48.    All DOCUMENTS that REFLECT OR REFER TO communications and meetings between YOU and MedXM during or between 2010 and 2018 concerning MedXM's performance under its contract(s) with YOU to provide health assessments of YOUR Medicare Advantage beneficiaries, including but not limited to notes, agendas, correspondence, reports, memoranda, and emails.

-6-

1  49.     All DOCUMENTS upon which YOU rely in your defense against the claims in
2  the TAC.

3

4                                    THE ZINBERG LAW FIRM
                                     A Professional Corporation
5
                                     THE HANAGAMI LAW FIRM
6                                    A Professional Corporation

7

8  Dated: January 31, 2019          By: _____
9                                        William K. Hanagami
                                         Attorneys for Plaintiff and Qui Tam Relator,
10                                       Anita Silingo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        -7-

## PROOF OF SERVICE

1

2          I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled action.

3

4          On January 31, 2019, I served a copy of the above-attached document(s) by transmitting via e-mail or electronic transmission of it/them to the person(s) at the email addresses set forth below:

5    Michael M. Maddigan                        Attorneys for Defendants, Wellpoint, Inc., Blue
     Poopak Nourafchan                          Cross of California, dba Anthem Blue Cross, et
6    HOGAN LOVELLS US LLP                        al.
     1999 Avenue of the Stars, Suite 1400
7    Los Angeles, CA 90067
     michael.maddigan@hoganlovells.com
8    poopak.nourafchan@hoganlovells.com

9    Miranda L. Berge                            Attorneys for Defendants, Wellpoint, Inc., Blue
     HOGAN LOVELLS US LLP                        Cross of California, dba Anthem Blue Cross, et
10   555 Thirteenth Street, NW                   al.
     Washington, D.C. 20004
11   Miranda.berge@hoganlovells.com

12   David J. Schindler                          Attorneys for Defendants, Health Net, Inc.,
     Spencer K. Turnbull                         Health Net Life Insurance Company, Health Net
13   LATHAM & WATKINS LLP                        of California
     355 S. Grand Avenue, Suite 100
14   Los Angeles, CA 90071-1560
     David.Schindler@lw.com
15   spencer.turnbull@lw.com

16   Anne W. Robinson                            Attorneys for Defendants, Health Net, Inc.,
     LATHAM & WATKINS LLP                        Health Net Life Insurance Company, Health Net
17   555 Eleventh Street NW, Suite 1000          of California
     Washington, DC 20004
18   anne.robinson@lw.com

19   R. David Jacobs                             Attorneys for Defendants, Visiting Nurse Service
     Jonah D. Retzinger                          Choice, Visiting Nurse Service of New York
20   Epstein, Becker & Green
     1925 Century Park East, Suite 500
21   Los Angeles, CA 90067
     djacobs@ebglaw.com
22   jretzinger@ebglaw.com

23   Elizabeth M. Bock                           Attorneys for Defendants, Molina Healthcare,
     David M. Deaton                             Inc., et al.
24   Sabrina H. Strong
     Scott Voelz
25   O'MELVENY & MYERS LLP
     400 S. Hope Street
26   Los Angeles, CA 90071-2899
     ebock@omm.com
27   ddeaton@omm.com
     sstrong@omm.com
28   svoelz@omm.com

-8-

1   David Leviss                              Attorneys for Defendants, Molina Healthcare,
    Amanda M.B. Santella                      Inc., et al.
2   O'MELVENY & MYERS LLP
    1625 Eye Street NW
3   Washington, DC 20006
    dleviss@omm.com
4   asantella@omm.com

5   Michael J. Daponde                        Attorneys for Defendant, Alameda Alliance for
    Anthony R. Eaton                          Health
6   DAPONDE SIMPSON ROWE PC
    500 Capitol Mall, Suite 2260
7   Sacramento, CA 95814
    aeton@dsrhealthlaw.com
8   mdaponde@dsrhealthlaw.com

9   Abram J. Zinberg                          Co-Counsel for Plaintiff and Relator, Anita
    THE ZINBERG LAW FIRM, A.P.C.              Silingo
10  412 Olive Avenue, Suite 528
    Huntington Beach, CA 92648
11  AbramZinberg@gmail.com

12  John E. Lee                               Attorneys for Plaintiff, United States of America
    OFFICE OF
13  THE UNITED STATES ATTORNEY
    300 N. Los Angeles Street, Room 7516
14  Los Angeles, CA 90012
    john.lee2@usdoj.gov

15
        Executed on January 31, 2019 at Incline Village, Nevada.
16
        I hereby certify that I am a member of the Bar of the United States District Court, Central
17  District of California, and that the foregoing is true and correct.

18

19                                          William K. Hanagami

20

21

22

23

24

25

26

27

28

                                          -9-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATE OF CALIFORNIA         PROOF OF SERVICE

)

)

COUNTY OF ORANGE            )

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Orange, State of California, and not a party to the above-entitled cause.

On January 31, 2019, I served a true copy of the above-attached document(s) by depositing it/them in the United States Mail at Huntington Beach, California in a sealed envelope with the postage thereon fully prepaid addressed to the following:

R. David Jacobs                    Attorneys for Defendants, Visiting Nurse
Jonah D. Retzinger                 Service of New York and Visiting Nurse
Epstein, Becker & Green            Service Choice
1925 Century Park East, Suite 500
Los Angeles, CA 90067

Executed on January 31, 2019 at Huntington Beach, California.

I hereby certify that I am a member of the Bar of the United States District Court, Central District of California, and that the foregoing is true and correct.

Abram J. Zinberg

# Anita Silingo Declaration

## DECLARATION OF ANITA SILINGO

I, Anita Silingo, declare as follows:

1.      I am over eighteen years of age.  I have personal knowledge of the facts stated herein, and if called upon as a witness I would and could competently testify to the truth of the matters set forth below.

2.      I am the Relator in the above captioned matter and was employed by Mobile Medical Examination Services, Inc. ("MedXM") between August 2011 and June 2013, initially as an independent contractor and then as an employee during and after January 2012. Throughout my employment with MedXM, I held the position of Director of Provider Relations. MedXM also designated me as its Compliance Officer from about late spring/early summer of 2012 until or about April 1, 2013.

3.      During my employment with MedXM, I became aware of MedXM's use of improper signatures on its Health Assessment reports, and learned from my review of Health Assessment reports and my discussions with other MedXM employees that such practices had been regularly utilized by MedXM since at least 2010.  When I left MedXM's employment during or about June 2013, I was aware that MedXM continued to regularly utilize its practice of using improper signatures on its Health Assessment reports, and that there were no plans at MedXM to alter such practices during at least 2014.

4.      During my employment with MedXM, I became aware that MedXM's contracted nurse practitioners that performed Health Assessments and prepared Health Assessment reports were working outside the scope of their practice or licensure, were not working in collaboration with licensed physicians, and/or were not working in compliance with applicable state or Medicare laws.  I learned from my discussions with MedXM's Credentialing Coordinators, Ava Ward and Noor Tahmass, that such improper practices were regularly utilized by MedXM since at least 2010.  When I left MedXM's employment during or about June 2013, I was aware that MedXM continued such improper practices, and that there were no plans at MedXM to alter such practices during at least 2014.

-1-

1    I declare under penalty of perjury under the laws of the United States that the foregoing

2  is true and correct, and that this declaration was executed on March 29, 2019 at Anderson,

3  Alabama.

4

5

6    Anita Silingo

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

**EXHIBIT 2**

HOGAN LOVELLS US LLP
Michael M. Maddigan (Bar No. 163450)
Poopak Nourafchan (Bar No. 193379)
1999 Avenue of the Stars, Suite 1400
Los Angeles, California  90067
Telephone:   (310) 785-4600
Facsimile:    (310) 785-4601
michael.maddigan@hoganlovells.com
poopak.nourafchan@hoganlovells.com

Attorneys for Defendants
WELLPOINT, INC., BLUE CROSS OF
CALIFORNIA D/B/A ANTHEM BLUE
CROSS, and ANTHEM BLUE CROSS
LIFE AND HEALTH INSURANCE
COMPANY

[Counsel for all Defendant Health Plans
identified in signature blocks.]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, *ex rel.*
ANITA SILINGO,

Plaintiffs,

vs.

MOBILE MEDICAL EXAMINATION
SERVICES, INC., a California
corporation; MEDXM, a business entity,
form unknown; WELLPOINT, INC., an
Indiana corporation; ANTHEM BLUE
CROSS, business entity, form unknown;
ANTHEM BLUE CROSS LIFE AND
HEALTH INSURANCE COMPANY, a
California Corporation; HEALTH NET,
INC., a Delaware corporation; HEALTH
NET OF CALIFORNIA, INC., a
California corporation; HEALTH NET
LIFE INSURANCE COMPANY, a
California corporation; VISITING
NURSE SERVICE OF NEW YORK, a
New York corporation; VISITING
NURSE SERVICE CHOICE, business
organization, form unknown; MOLINA
HEALTHCARE, INC., a Delaware
corporation; MOLINA HEALTHCARE
OF CALIFORNIA, a California
corporation; MOLINA HEALTHCARE
SERVICES, a California corporation;

Case No.  SACV13-1348-FMO(JCx)

[*Special Master Hon. Rosalyn M. Chapman (Ret.)*]

**DEFENDANTS' JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIMITING THE TIME FRAME FOR DISCOVERY TO AUGUST 2011 TO JUNE 2013**

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

1  MOLINA HEALTHCARE OF
   CALIFORNIA PARTNER PLAN, INC., a
2  California corporation; ALAMEDA
   ALLIANCE FOR HEALTH, a business
3  organization, form unknown,

4          Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

## INTRODUCTION

Rule 26 demands that the scope of discovery be determined by the allegations in the complaint.  Disregarding that fundamental requirement, Relator seeks discovery of wide-ranging information that goes significantly beyond the temporal scope of both the initial complaint, filed in August 2013, as well as the current Third Amended Complaint ("TAC").  The Court should reject Relator's effort to obtain this over-reaching discovery.

Relator's False Claims Act ("FCA") claims are based on information she allegedly obtained while employed by former defendants Mobile Medical Examination Services, Inc. and MedXM (collectively "MedXM") between August 2011 and June 2013.  *See, e.g.*, TAC ¶¶ 14, 29, 34-35, 71, ECF No. 81. Specifically, Relator alleges that she learned of misconduct by MedXM while working there — misconduct that purportedly rendered invalid MedXM's home health assessments conducted during that period and the risk adjustment data associated with those assessments.  *See, e.g., id.* ¶¶ 29, 71 ("During Relator's employment with MedXM…").  Based on Relator's own allegations, discovery should be limited to information concerning home assessments conducted while she was employed at MedXM from August 2011 to June 2013.  Relator's requests for discovery of information outside of that time period go far beyond any fraud allegations in the TAC and are not proportional to the needs of the case.  Relator's request to expand discovery beyond the August 2011-June 2013 time period should be denied.

## I.  THE FRAUD ALLEGATIONS IN RELATOR'S TAC SHOULD DETERMINE THE RELEVANT TIME PERIOD FOR DISCOVERY.

"[D]iscovery in *qui tam* actions must be limited and tailored to the specificity of the complaint."  *U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 2008 WL 4057549, at *1 (M.D. Fla. Aug. 27, 2008); *see also Uchytil on behalf of U.S. v. Avande, Inc.*, 2018 WL 4150889, at *1 (W.D. Wash. Feb. 27, 2018) (plaintiff's

1  allegations of fraud "logically shape the scope of discovery") (quoting *U.S. ex rel.*
2  *Jacobs v. CDS, P.A.*, 2016 WL 4146077, at *2 (D. Idaho Aug. 3, 2016)). This
3  settled approach prevents discovery, "because of its burden and expense," from
4  becoming "the centerpiece of litigation strategy." *U.S. ex rel. McCartor v. Rolls-*
5  *Royce Corp.*, 2013 WL 5348536, at *7 (S.D. Ind. Sept. 24, 2013) This approach
6  also is consistent with the policies underlying the Federal Rules, which make clear
7  that "the parties … have no entitlement to discovery to develop new claims or
8  defenses that are not already identified in the pleadings." Fed R. Civ. P. 26(b)(1)
9  Advisory Committee Note to 2000 Amendments.

10      Consistent with these principles, courts routinely consider Rule 9(b)'s
11  heightened pleading standard when determining the temporal bounds of discovery
12  in FCA cases.[1]  Claims governed by Rule 9(b) must have "discernable boundaries
13  and manageable discovery limits." *Spay*, 2013 WL 4525226, at *3 (quoting *U.S. ex*
14  *rel. Clausen v. Lab. Corp. Of Am., Inc.*, 198 F.R.D. 560, 564 (N.D. Ga. 2000), *aff'd*
15  290 F.3d 1301 (11th Cir. 2002)).  Consequently, "extending discovery based on
16  non-specific claims of continued misconduct or allegations not in the pleadings
17  would be inconsistent with this principle." *Uchytil*, 2018 WL 4150889, at *2
18  ("[g]iven the heightened pleading standard for fraud claims under [Rule] 9(b),"
19  general allegations are not sufficient to extend the scope of discovery).  Relator's
20  contention that it is *improper* for courts to consider Rule 9(b) in determining the
21  temporal scope of discovery is simply wrong.[2]

22
23  ─────────────────
[1] *See, e.g., U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31, 39 (1st Cir. 2013)
    (affirming limiting discovery to allegations satisfying Rule 9(b)'s particularity requirement); *U.S.*
24  *ex rel. Spay v. CVS Caremark, Corp.*, 2013 WL 4525226, at *4 (E.D. Pa. Aug. 27, 2013)
    (declining "to allow such a fishing expedition into potential fraudulent claims beyond 2007 absent
25  some particularized pleading that any such claims occurred"); *Bane*, 2008 WL 4057549, at*1 n.2
    (court "must still be guided by Rule 9(b)'s parameters and discovery should still be limited to the
26  constraints of the relator's allegations").
[2] For example, in *U.S. ex rel. Rigsby v. State Farm Fire & Casualty Co.*, Br. 8, the Fifth Circuit
27  reviewed the district court's decision to limit additional discovery ***after plaintiff prevailed at trial***
    on the merits of a "test case," and the Fifth Circuit concluded that applying Rule 9(b) in such
28  circumstances presented a "square peg/round hole problem." 794 F.3d 457, 466-67 (5th Cir.

Time and time again, Courts have limited the relevant time period for discovery in FCA cases to the specific time period during which the complaint alleges that particular instances of wrongdoing occurred. Similarly, courts consistently have refused to allow relators to take expansive discovery based only on generalized allegations of continuing illegal activity. For example, in *Uchytil*, the court refused to allow discovery beyond the April 2010-December 2012 time period identified in the complaint's specific allegations of misconduct. 2018 WL 4150889, at *1 (holding that "vague language in the pleading[]" was insufficient to extend discovery.) Likewise, the *Jacobs* court rejected the relator's request for discovery to the present because the complaint "focuse[d] on the period August 2010 through May 2013." 2016 WL 4146077, at *2.[3] Courts in FCA cases also have limited discovery based on the date of the relator's original *qui tam* complaint (here August 2013). *See, e.g., U.S. ex re. Walker v. R & F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1359 (11th Cir. 2005).[4] Relator's suggestion (Br. 8) that all of these cases limiting the temporal scope of discovery were wrongly decided is spurious at best and simply underscores her inability to meaningfully distinguish them.

Relator also misses the point by repeatedly asserting that courts decline to

---

2015). Nothing in *Rigsby* suggests that the Fifth Circuit intended to depart from prior precedent holding that Rule 9(b) serves a "screening function" whereby it operates "as a gatekeeper to discovery." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). *U.S. ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1319 (N.D. Ga. 2015) is inapposite, and in the other cases Relator cites, the courts nevertheless limited the temporal scope of discovery based on the complaint's allegations. *E.g. Longacre v. AB Home Health Care, LLC*, 2018 WL 6037517 (D. Me. Nov. 15, 2018).

[3] *See also U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*, 2015 WL 13649823, at *3-4 (S.D.N.Y. July 29, 2015) (limiting discovery to Jan. 1, 2002 to Nov. 30, 2011 when there were no allegations before Jan. 1, 2002 and "no specific allegations of illegal conduct after November 2011"); *Spay*, 2013 WL 4525226, at *2-4 (three cursory allegations of continuing misconduct made on information and belief were "unquestionably insufficient to open the door to broad and burdensome discovery ... over the course of more than seven years"); *U.S. ex rel. King v. Solvay S.A.*, 2013 WL 820498, at *3-4 (S.D. Tex. Mar. 5, 2013) (allegations of conduct "from 1996 to 2002 *and beyond*" and "from at least 1994 *to the present*" were insufficient "to justify the burden of allowing discovery to the present" (internal quotations omitted)).

[4] *See also Dalitz v. AmSurg Corp.*, 2015 WL 8717398, at *4 (E.D. Cal. Dec. 15, 2015); *Bane*, 2008 WL 4057549, at *1; *U.S. ex rel. Stewart v. Louisiana Clinic*, 2003 WL 21283944, at *9 (E.D. La. June 4, 2003).

limit the temporal scope of discovery to the time period when a *qui tam* relator was employed by a defendant.  Br. 7, 9, 10.  Contrary to Relator's suggestion, Defendants do ***not*** contend that discovery should be limited to the August 2011-June 2013 time period merely because that encompasses the period when Relator worked for MedXM, but rather that discovery should be limited to the time period during which both the initial complaint and TAC allege specific instances of purported wrongdoing.  That August 2011-June 2013 time period happens to correspond to Relator's employment at MedXM, but only because, as she herself acknowledges, her employment at MedXM is the exclusive basis of her knowledge of any purported fraud.  *See e.g.* TAC ¶¶ 29, 59, 60, 71.  The TAC does not plead any specific allegations of misconduct that occurred after her termination, and Relator therefore should not be entitled to any discovery related to that period.

## II.   THE TAC'S ALLEGATIONS OF MISCONDUCT ARE LIMITED TO THE 2011-2013 TIME PERIOD.

Relator's allegations regarding MedXM's purported wrongdoing are based entirely on conduct that Relator supposedly observed during her employment with MedXM.  TAC ¶ 14.  The vast majority of those allegations are cursory in nature, lacking any dates or details.  But nearly all of the allegations that do include a date explicitly reference the August 2011-June 2013 time period during which Relator worked at MedXM.  For example, the TAC alleges:

- issues with credentialing and supervision of nurse practitioners "**[b]efore 2012**," "**[d]uring 2012**," and "**[i]n 2012**" (*id.* ¶¶ 35-36) (emphasis added);
- issues with Dr. Awaisi's health assessments in **December 2012** and that Relator recommended that Dr. Awaisi be terminated in **January 2013** (*id.* ¶¶ 54, 59) (emphasis added);
- issues with health assessments performed by Dr. Robinson, Vadim Troshkin, Dr. Hanna Rhee, and Ron Bedford in **December 2011, "Fall and Winter" 2011, "during or about 2012,"** and in **March 2013** (*id.* ¶¶ 60, 64, 73)

(emphasis added);

- spoiled blood samples **in "the latter half of 2012"** and "[t]hroughout Relator's employment with MedXM"** (*id.* ¶¶ 68, 72) (emphasis added);
- inadequacy of MedXM's compliance program continuing "at least [to] **the end of Silingo's employment**" (*id.* ¶ 81) (emphasis added);
- compliance activities undertaken by the Defendant Health Plans **in 2011 and 2012** (*id.* ¶¶ 92, 95, 96, 97) (emphasis added); and
- false certifications regarding the health assessment data generated by MedXM **up through 2013** (*id.* ¶ 81) (emphasis added).

Moreover, both the initial August 2013 complaint and the TAC repeatedly describe the alleged misconduct in the ***past tense***. *See, e.g., id.* ¶¶ 78 ("[t]he MedXM health assessments **performed** on behalf of the defendant Health Plan . . . **did not have** valid signatures"); 88 ("[n]one of the Defendant health Plans . . . **made** an attempt of any kind to satisfy the duties. . . .") (emphasis added). The TAC is entirely devoid of specific factual allegations showing ongoing misconduct on the part of MedXM or any of the Defendant Health Plans after Relator left MedXM's employment in 2013.

Relator argues that the TAC alleges that the Defendant Health Plans violated the FCA in connection with health assessments performed between 2010 and 2014. Br. 1, 3, 4. But a close reading of the TAC shows otherwise. Indeed, Relator points to only ***three paragraphs*** in the 149-paragraph TAC that even refer to any point in time before August 2011 or after June 2013. And those few paragraphs plead only general activities by MedXM or the Defendant Health Plans, not fraudulent conduct. One of those paragraphs merely alleges that WellPoint conducted an audit of MedXM in November 2014. *Id.* 4 (citing TAC ¶ 99). The other two paragraphs both generally allege that "during and between 2010 and 2014, MedXM sent its health assessment reports to the [D]efendant Health Plans." *See id.* (citing TAC ¶¶ 24, 79). Nothing in the TAC alleges that improper

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEF.'S JOINT MEM. RE TIME FRAME FOR DISCOVERY

assessments were conducted, that assessment reports were improperly signed, or that Defendant Health Plans knew anything suggesting any impropriety outside of the August 2011-June 2013 time period. *See* TAC ¶¶ 2, 24, 27-28, 79.

The remaining paragraphs Relator cites similarly lack reference to any time period at all. For example, Relator points to several allegations in the TAC about purportedly improper credentialing and supervision of nurse practitioners who performed the assessments — none of which contain any dates at all. *See* Br.3 (citing TAC ¶¶ 30-45). And the only allegations concerning improper credentialing that do contain dates specifically refer to events in 2012. *See* TAC ¶¶ 35-36. Likewise, the rest of the paragraphs cited by Relator are merely general allegations that also do not allege any conduct before August 2011 or after June 2013. *See* Br. 3-4 (citing TAC ¶¶ 77, 81-126, 128). Finally, Relator also points to two paragraphs asserting that certain activities were undertaken and certain legal requirements were violated "at all times relevant." *E.g.* TAC ¶¶ 7, 45. Relator does not specifically define that formulaic term, but in a FCA case the phrase must be read to refer to the time period of the TAC's allegations of fraud — August 2011 to June 2013.

## III. DISCOVERY OF ASSESSMENTS CONDUCTED BEFORE AUGUST 2011 OR AFTER JUNE 2013 IS NOT WARRANTED UNDER APPLICABLE CASE LAW.

Relator seeks "discovery for a far broader time period than that detailed" in the TAC. *Jacobs*, 2016 WL 4146077, at *2. Because the well-pled allegations in the TAC are limited to August 2011-June 2013, discovery should be limited to that period as well.

### A. Relator Is Entitled Only To Relevant Evidence Related To Visits Conducted Between August 2011-June 2013.

Relator's arguments for discovering evidence related to risk adjustment data and health assessments from 2010-2014 are entirely unpersuasive. As explained, Relator does not (and cannot) point to any specific allegations about risk adjustment data or health assessments before August 2011 or after June 2013 that allegedly resulted in the submission of a false claim to the government. Rather, Relator relies

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
SAN FRANCISCO

on precisely the type of vague, cursory, and general allegations that courts routinely find insufficient to warrant discovery in FCA cases. *See, e.g., Uchytil*, 2018 WL 4150889, at *1 (declining to expand discovery based on vague allegations that misconduct continued "at least until" relator left defendant company); *Spay*, 2013 WL 4525226, at *3 ("cursory allegations" that alleged fraud continued beyond time of specific allegations insufficient to expand discovery).

Implicitly acknowledging the TAC's pleading deficiencies, Relator submits a declaration to expand and bolster her allegations. Br. 9 n.3 & Silingo Decl. But the law is clear that Relator "cannot broaden the scope of [her] pleading by submission of [ ] evidence" in an attempt to justify discovery that goes beyond the well-pled allegations of her complaint. *Spay*, 2013 WL 4525226, at *3; *accord Uchytil*, 2018 WL 4150889, at *2. Relator likewise cannot circumvent the need to obtain leave of court under Rule 15(a)(2) to add new allegations. Nor can she avoid having any new allegations subjected to the heightened pleading requirements of Rule 9(b). Fed. R. Civ. P. 15(a)(2); *Jackson v. Bank of Haw.*, 9092 F.2d 1385, 1387-89 (9th Cir. 1990) (trial court may deny motion to amend "if permitting an amendment would prejudice the opposing party, produce an undue delay in the litigation, or result in futility for lack of merit"). In short, the Court should reject Relator's attempt to end run the requirements of the Federal Rules, and it should disregard her declaration.

But even if the Court were to consider Relator's improper declaration (and it should not do so), the declaration still would not justify the broad discovery Relator now seeks. The declaration relies entirely on supposition and conjecture rather than actual personal knowledge about anything happening at MedXM that could justify discovery outside of the August 2011-June 2013 period. Silingo Decl. ¶¶ 3, 4 (claiming she "became aware" of practices and "was aware that MedXM continued" practices and had no plans to change as of the end of her employment). Moreover, Relator cannot now disavow the TAC's repeated description of

1   MedXM's improper completion of home health assessments in the past tense. *See*

2   Section I. B.  That repeated factual pleading is consistent with Relator's first

3   complaint—filed in August 2013 not long after Relator's employment with

4   MedXM was terminated—which also states its allegations of misconduct

5   exclusively in the past tense. *E.g.* Compl. ¶¶ 20 ("decided," "inserted," "sent," and

6   "submitted"), 40 ("made," "turned"), ECF No. 1 (Aug. 30, 2013).  These

7   allegations alone require rejection of Relator's broad discovery request.  When a

8   relator "repeatedly refer[s] to [the defendant's] actions in the past tense, [that]

9   strongly suggest[s] that relator plaintiffs' claims are limited to the time frame ***prior***

10  ***to the date on which this action was initiated*.*" *Dalitz*, 2015 WL 8717398, at *4

11  (emphasis added); *see also Spay*, 2013 WL 4525226, at *2 (past tense phrasing

12  supports lack of continuing conduct and limiting discovery).

13       Nothing cited by Relator warrants a different conclusion.  For example,

14  Relator repeatedly cites the Ninth Circuit's opinion in this case, *U.S. ex rel. Silingo*

15  *v. WellPoint, Inc.*, 904 F.3d 667 (9th Cir. 2018), in support of her contention that

16  the TAC pleads false claims resulting from invalid health assessments performed

17  between 2010 and 2014. Br. 1, 3, 4, 7, 8. But the Ninth Circuit merely referred in

18  dicta to the allegation that "MedXM ***contracted*** with the [Defendant Health Plans]

19  to provide up-to-date diagnosis codes and medical documentation for enrollees."

20  *Silingo*, 904 F.3d at 674 (emphasis added).  The Ninth Circuit did not even consider

21  the temporal question at issue here, and it certainly did not hold that the TAC

22  sufficiently pled fraudulent conduct from 2010 through 2014.  *Id.*

23       Relator also cites three cases in support of her argument that it would be

24  improper to limit the temporal scope of discovery to the period of her employment

25  with MedXM.  Br. 9-10.  But those cases actually support Defendants' position.  In

26  each of those cases, the courts allowed expanded discovery because the complaints

27  included sufficient factual allegations of fraudulent conduct outside the relators'

28

1  employment with the defendants.[5]  And those courts also concluded that the time

2  frame for discovery should not extend past the date on which the initial complaint

3  was filed (Aug. 2013). *Walker*, 433 F.3d at 1359; *Dalitz*, 2015 WL8717398, at *4.

4      Allegations of fraudulent conduct outside Relator's period of employment

5  are precisely what is missing from the TAC.  Thus, Relator's own cases—like the

6  well-established case law on this issue—mandate that discovery should be limited

7  to MedXM assessments conducted during the August 2011-June 2013 time period.

8  *See Jacobs*, 2016 WL 4146077, at *2 (limiting discovery to time period relator was

9  employed by defendant because "the complaint does not directly implicate a larger

10  time frame"); *Uchytil*, 2018 WL 4150889, at *1; *Spay*, 2013 WL 4525226, at *3.

11  **B.**  **Relator Is Not Entitled To Any Discovery Beyond 2014.**

12      Relator also contends that she is entitled to discovery of certain limited types

13  of information beyond 2014, including even up to the present. Br. 1. Relator is

14  wrong.

15      First, Relator asserts that she is entitled to discovery of information

16  concerning revenues earned by the Defendant Health Plans from 2010 through 2015

17  in connection with MedXM home assessments. Br. 1. Relator correctly notes that

18  Defendants' revenues are set by CMS based on health assessments conducted in the

19  *prior* calendar year, Br. 3, 6, 7, but this means only that, for MedXM health

20  assessments conducted between 2011 and 2013, discovery should be limited to

21  revenues Defendants earned from 2012 through 2014.

22      Second, Relator argues that she should be able to discover information from

23  any time (up to the present) concerning Defendants' audits of MedXM and their

24  knowledge that certain MedXM health assessment reports purportedly were invalid.

[5] *See Walker*, 433 F.3d at 1359 (permitting expanded discovery based on factual allegations about conduct since relator's employment with defendant was terminated); *Dalitz*, 2015 WL 8717398, at *4 (permitting expanded discovery where allegations "demonstrate that the scope of relator plaintiffs' claims concern fraudulent practices by defendants that occurred prior to, during, and after relator plaintiffs' employment"); *U.S. ex rel. Fiederer v. Healing Hearts Home Care, Inc.*, 2014 WL 4666531, at *5-6 (D. Nev. Sept. 18, 2014) (concluding that factual allegations warranted discovery beyond period of employment).

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

Br. 1.  To prevail on her FCA claims, however, Relator must show that each Defendant acted with actual knowledge, in deliberate ignorance, or in reckless disregard of the truth or falsity of the allegedly false claims or certifications submitted to the government *at the time it submitted* the challenged claims or certifications from August 2011-June 2013, not years later.  31 U.S.C. §§ 3729(a)(1)(A)-(B),(b).  Relator fails to explain how discovery regarding Defendants' knowledge or audits during the period after Relator's employment ended—much less after she filed her Complaint or up to the present—is tied to any allegation in the TAC, or even is relevant to Relator's FCA claims.

Third, Relator claims that she should be able to discover "mitigation of damage efforts" from any time.  Relator has not indicated what exactly she seeks or how it could be relevant.  Br. 1.  But, even assuming she could do so, such discovery should be limited to evidence connected to health assessments performed between 2011 and 2013.

## IV.   RELATOR'S REQUESTED EXPANDED DISCOVERY IS NOT PROPORTIONAL.

Discovery must be "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  The time period of the TAC's well-pled allegations is only 22 months (August 2011 to June 2013), whereas Relator's requested time period of 2010 through 2014 for home assessments is 60 months—nearly triple the amount of time.  For other categories of information for which Relator seeks discovery up to the present, documents and data spanning many more years would be at issue.  The significant cost and burden that such expansive discovery would impose on Defendants renders the discovery disproportional to its minimal or non-existent benefit.

## CONCLUSION

For all the reasons set forth above, this Court should find that the relevant time period for discovery should be limited to home assessments conducted by MedXM between August 2011 and June 2013.

1

2  Dated:  April 5, 2019

3

4

5

6

7

8

9

10  Dated:  April 5, 2019

11

12

13

14

15

16  Dated:  April 5, 2019

17

18

19

20

21

22

23

24  Dated:  April 5, 2019

25

26

27

28

HOGAN LOVELLS US LLP

By:  /s/ Michael M. Maddigan
Michael M. Maddigan
Poopak Nourafchan
Attorneys for Defendants
WELLPOINT, INC., BLUE CROSS
OF CALIFORNIA D/B/A ANTHEM
BLUE CROSS, and ANTHEM BLUE
CROSS LIFE AND HEALTH
INSURANCE COMPANY

LATHAM & WATKINS LLP

By:  /s/ David J. Schindler
David J. Schindler
Anne W. Robinson
ATTORNEYS FOR DEFENDANTS
HEALTH NET, INC., HEALTH NET
OF CALIFORNIA, INC. AND
HEALTH NET LIFE INSURANCE
COMPANY

O'MELVENY & MYERS LLP

By:  David Leviss
David Leviss (Admitted *Pro Hac Vice*)
Scott Voelz
Elizabeth Bock
ATTORNEYS FOR DEFENDANTS
MOLINA HEALTHCARE, INC.,
MOLINA HEALTHCARE OF
CALIFORNIA, AND MOLINA
HEALTHCARE OF CALIFORNIA
PARTNER PLAN

EPSTEIN BECKER & GREEN, P.C.

By:  /s/ David Jacobs
David Jacobs
ATTORNEYS FOR DEFENDANT
VNS CHOICE

11

1

2   Dated:  April 5, 2019                     DSR HEALTHLAW

3

4                                             By:  /s/ Michael J. Daponde
                                              Michael J. Daponde
5                                             Anthony R. Eaton
                                              ATTORNEYS FOR DEFENDANT
6                                             ALAMEDA ALLIANCE FOR
                                              HEALTH
7

8
                          **Attestation Regarding Signatures**
9
          I, Michael M. Maddigan, attest that all other signatures listed, and on whose
10
behalf this filing is submitted, concur in the filing's content and have authorized the
11
filing.
12

13   Dated: April 5, 2019                     /s/ Michael M. Maddigan
                                              Michael M. Maddigan
14
                                              Attorney for Defendants WELLPOINT,
15                                            INC., BLUE CROSS OF CALIFORNIA
                                              D/B/A ANTHEM BLUE CROSS, and
16                                            ANTHEM BLUE CROSS LIFE AND
                                              HEALTH INSURANCE COMPANY
17

18

19

20

21

22

23

24

25

26

27

28